# NOTICE OF REMOVAL

# EXHIBIT A
## Part 1 of 5

## IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS

ALAN HELMAN; MARJORIE HELMAN;
LEPONT PALM BEACH, LLC;
MAURICE KASPY; LIBORIO PIAZZA;
TROY HAMMOND; and TIMOTHY AKER,

                     Plaintiffs,

     vs.

MARRIOTT INTERNATIONAL, INC., a Maryland
corporation; THE RITZ-CARLTON HOTEL
COMPANY, LLC, a Delaware corporation;
RC HOTELS (VIRGIN ISLANDS), INC., a U.S.
Virgin Islands corporation; THE RITZ-CARLTON
CLUB, ST. THOMAS, INC., a U.S. Virgin Islands
corporation; RC ST. THOMAS, LLC, a U.S. Virgin
Islands limited liability company; MARRIOTT
VACATIONS WORLDWIDE CORPORATION, a
Delaware corporation; MARRIOTT OWNERSHIP
RESORTS, INC., a Delaware corporation; RITZ-
CARLTON MANAGEMENT COMPANY, LLC, a
Delaware limited liability company; THE RITZ-
CARLTON DEVELOPMENT COMPANY, INC., a
Delaware corporation; COBALT TRAVEL
COMPANY, LLC, INC., a Delaware limited liability
company; THE LION & CROWN TRAVEL CO.,
LLC, a Delaware limited liability company;
the NORTH AMERICAN TRUST, a land trust
organized under Florida law; and DOES 1-50,

                   Defendants.

ST-19-CV-_36_

**COMPLEX CASE DIVISION**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



### CLASS ACTION COMPLAINT

On behalf of themselves and others similarly situated, Plaintiffs ALAN & MARJORIE HELMAN, LEPONT PALM BEACH, LLC, MAURICE KASPY & LIBORIO PIAZZA, TROY HAMMOND, and TIMOTHY AKER (collectively, "Plaintiffs") bring this class action complaint for damages and equitable relief and demand a jury trial against MARRIOTT INTERNATIONAL, INC., a Maryland corporation, THE RITZ-CARLTON HOTEL COMPANY, LLC, a Delaware corporation, RC HOTELS (VIRGIN ISLANDS), INC., a U.S. Virgin Islands corporation, MARRIOTT VACATIONS WORLDWIDE CORPORATION, a Delaware corporation,

MARRIOTT OWNERSHIP RESORTS, INC., a Delaware corporation, RITZ-CARLTON MANAGEMENT COMPANY, LLC, a Delaware limited liability company, THE RITZ-CARLTON DEVELOPMENT COMPANY, INC., a Delaware corporation, COBALT TRAVEL COMPANY, LLC, INC., a Delaware limited liability company, THE LION & CROWN TRAVEL CO., LLC, a Delaware limited liability company, THE RITZ-CARLTON CLUB, ST. THOMAS, INC., a U.S. Virgin Islands corporation, RC ST. THOMAS, LLC, a U.S. Virgin Islands limited liability company, the NORTH AMERICAN TRUST, a land trust organized under Florida law, and DOES 1-50 (collectively, "Marriott Defendants") based on information, belief, and the investigation of counsel.

## INTRODUCTION

1.      Plaintiffs bring this class action on behalf of themselves and nearly a thousand similarly situated purchasers of fractional condominium interests, commonly known as "fractionals," at a Ritz-Carlton Destination Club in St. Thomas, U.S. Virgin Islands referred to herein as the **"Ritz-Carlton Great Bay"** (or occasionally **"St. Thomas"** when contrasted with other clubs). The case arises out of the Marriott Defendants' wrongful decision to merge two different vacation ownership product lines.[1] Specifically, they merged the Ritz-Carlton Destination Club (sometimes **"RCDC"**), a network of luxury properties sold as deeded fractionals, with the Marriott Vacation Club (sometimes **"MVC"**), a much less exclusive and cheaper timeshare product line.

2.      In industry parlance, the Ritz-Carlton Great Bay and the other RCDC properties are known as "private residence clubs," a term intended to capture their exclusive and luxurious nature. Based on the storied Ritz-Carlton brand and the promise of exclusivity, Plaintiffs and the nearly thousand other members of the proposed Class paid premium prices (in the hundreds of thousands of dollars) for three weeks of exclusive access to the Ritz-Carlton Great Bay and what was supposed to be a growing network of RCDC locations around the world.

---

[1] "Vacation ownership" is a broad term that refers to timeshares, private residence clubs, and timeshares generally, all of which are described below.

Complaint
*Helman, et al. v. Marriott International, et al.*

Page 3 of 60

    3.    Marriott[2] marketed these fractionals as akin to second homes, distinct from mere timeshares in that they required a multi-week purchase and came with a separate deed recorded at the time of purchase. Marriott claimed that these fractionals would be "operated for the exclusive use, benefit and enjoyment of the Members, their families and their guests." But in or around 2011, the Marriott Defendants quietly embarked on a multi-year re-engineering campaign to give more than 400,000 members of the Marriott Vacation Club access to the Ritz-Carlton Destination Clubs, including by transferring unsold RCDC fractional inventory (approximately 20% of all RCDC fractionals) to a land trust affiliated with the Marriott Vacation Club.

    4.    The Marriott Defendants did not disclose their intention to merge the Ritz-Carlton Destination Club with the Marriott Vacation Club until July 2012. Opposition was massive and immediate across the entire RCDC network. Many owners and their association boards complained — presciently as it turned out — that the merger would dilute the exclusivity of the Ritz-Carlton Destination Club and erode resale values. This groundswell of opposition did not surprise the Marriott Defendants; internal documents obtained in related litigation confirm that they knew the "affiliation," as they termed it, would gut the value of the 3,200 luxury or so fractionals they sold at nine RCDC locations, including St. Thomas.

    5.    The Marriott Defendants also knew that this merger might lead to litigation; that was the conclusion of an internal analysis summarized in a December 2011 internal report. Indeed, the conduct described herein clearly violates their fiduciary duties.[3] But the Marriott Defendants could not resist the temptation to reap the rewards they knew would come with their re-engineering plan. Opening up the Ritz-Carlton Destination Club to members of the Marriott Vacation Club

---

[2] As used herein, **"Marriott"** refers to all Marriott-related entities generally.

[3] *See RCHFU, LLC v. Marriot Vacations Worldwide Corp.*, 2018 WL 1535509, at *5-6 (D. Colo. Mar. 29, 2018) (declining to dismiss fiduciary duty claims in related case, stating "The Court finds that the plaintiffs have sufficiently alleged that the Management Agreement entrusted RC Management with control over plaintiffs' property sufficient to create fiduciary duties"); *Reiser v. Marriott Vacations Worldwide Corp.*, 2017 WL 569677, at *4–5 (E.D. Cal. Feb. 13, 2017) (similar ruling). Together with a third case, *Petrick, et al. v. Marriott, et al.* (San Francisco Sup. Case No. CGC 15-545987), these cases are referred to as the "related cases" or "related litigation."

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 4 of 60

would allow the Marriott Defendants to use the "halo effect" of the storied Ritz-Carlton brand and the prospect of access to luxury RCDC properties to sell more MVC points at higher prices.

6.      The Marriott Defendants employed various means to overcome opposition and push the merger through. For example, they promised that the merger would not take place without an affirmative vote of a majority of the owners at each club. But it soon became apparent that they would lose these votes, and they set about to secretly breach that promise. Owners at Bachelor Gulch held their own vote, and, despite an attempt by the Marriott Defendants to interfere with the vote, opted to exit the RCDC system altogether rather than suffer an influx of MVC members and the loss in resale values that would inevitably follow the merger. A survey and a focus group commissioned by the Marriott Defendants showed that the result of votes elsewhere would be the same. So, in place of the promised votes, the Marriott Defendants quietly substituted a highly misleading survey in Aspen Highlands, San Francisco, and Tahoe, and vowed to forge ahead with the merger no matter the results of these surveys.

7.      The Marriott Defendants used other forms of deception too. The contract that ultimately led to the merger, an "Affiliation Agreement" from November 2013 ("2013 Affiliation Agreement"), gave the association at each club the power to vote on whether the merger would extend to their club. But the Marriott Defendants hid this document from each association — and courts presiding over three related cases in California and Colorado. Why? Because in a campaign of misinformation lasting many years and employed in those three related cases, the Marriott Defendants claimed that the merger could not be stopped or contested because their subsidiary (Cobalt) was contractually vested with the "sole discretion" to make such decisions and the various associations and their boards had no role in that decision, nor the power to stop it. Disclosing the 2013 Affiliation Agreement would have revealed the falsity of that claim, so the Marriott Defendants buried it.

8.      The Marriott Defendants' strategy in St. Thomas was particularly devious. An unusually high number of buyers in St. Thomas financed their purchases with loans from Marriott. After the onset of the recession in 2008, there was a correspondingly high number of owners in St.

Complaint
*Helman, et al. v. Marriott International, et al.*                    Page 5 of 60

Thomas who fell behind on their mortgages and maintenance dues. This provided the Marriott
Defendants with the opportunity to gain leverage over Plaintiffs and the proposed Class. Under
the governing documents for the Ritz-Carlton Great Bay, responsibility for foreclosing on
fractionals with delinquent maintenance dues was given to the Marriott Defendants. Upon
foreclosure — but not before — the Marriott Defendants were required to pay dues on the
foreclosed units. This meant that the Marriott Defendants could manufacture a financial crisis by
delaying foreclosure proceedings, which is exactly what they did.

9.      Over a period of years, losses caused by the unusually high number of delinquent
owners and the "slow walking" of foreclosures by the Marriott Defendants began to accrue. In
2013, the Marriott Defendants proposed their "solution": If owners, including Plaintiffs and the
proposed Class, voted to permit the RCDC-MVC merger, the Marriott Defendants would
accelerate foreclosures and begin paying maintenance dues on the foreclosed fractionals — both
things that they were required to do even without a vote.

10.     Misled by their fiduciaries and put into financial extremis, owners, including
Plaintiffs and the proposed Class, voted on January 26, 2014, to accept the Marriot Defendants'
proposal.

11.     Among other things, this "deal" was a flagrant breach of the fiduciary and other
duties the Marriott Defendants owed to Plaintiffs and the proposed Class. As fiduciaries, the
Marriott Defendants were required to act in the best interests of Plaintiffs and the proposed Class,
not manufacture a financial crises to obtain leverage over them, hide the disastrous consequences
of the merger, and then secretly profit from their wrongdoing.

12.     As a result of this merger, thousands of MVC members have flooded the Ritz-
Carlton Great Bay and other Ritz-Carlton Destination Clubs, fundamentally altering the offering.
Resale prices have plummeted and are forever diminished because nobody is willing to pay
premium prices for supposedly exclusive access to a supposed private residence club when access
can be obtained at a much lower price-point and with much greater flexibility through the Marriott
Vacation Club. Plaintiffs and other members of the proposed Class have suffered losses to their

Complaint
*Helman, et al. v. Marriott International, et al.*                               Page 6 of 60

property values, rights and expectations while the Marriott Defendants, as they predicted, reaped

hundreds of millions of dollars by selling more MVC points at higher prices.

13.     Among other wrongdoing, the Marriott Defendants breached the fiduciary duties

they owed to Plaintiffs and the proposed Class, engaged in commercial extortion and proxy fraud,

perpetrated a scheme to defraud, and engaged in an ongoing pattern of racketeering activity in

violation of the Virgin Islands Criminally Influenced and Corrupt Organizations Act, 30 V.I.C. §

600, *et seq.* ("CICO"). In addition, the Marriott Defendants acted with a reckless, wanton, and

willful disregard of their fiduciary duties and other obligations and the rights of Plaintiffs and the

proposed Class. Among other remedies, Plaintiffs seek disgorgement from Defendants of these ill-

gotten profits and treble damages under CICO.

14.     There are two groups of defendants. First, there is Marriott International, Inc. and

its subsidiaries named herein and identified below (collectively, the "MII Defendants"), which

built, marketed, and sold thousands of the RCDC fractionals, including over a thousand at the Ritz-

Carlton Great Bay. The second group consists of Marriott Vacations Worldwide Corporation and

its subsidiaries named herein and identified below (collectively, the "MVW Defendants"), which

were "spun-off" from Marriott International in 2011. After the spin-off, the MVW Defendants

took over most operational aspects of the Ritz-Carlton Destination Club and the Marriott Vacation

Club. But Marriott International has remained deeply involved in both the RCDC and the MVC.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction over common law torts committed in the Virgin Islands

as well as Plaintiffs' claims under the Criminally Influenced and Corrupt Organizations Act, 14

V.I.C. §§ 600, *et seq.*, the Consumer Protection Law of 1973, 12A V.I.C. §§ 101, *et seq.*, the

Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 301, *et seq.*, and the

common law tort claims

16.     This Court has personal jurisdiction over each of the defendants because each of

them purposefully availed itself of the privilege of engaging in business in the U.S. Virgin Islands

and/or is a U.S. Virgin Islands resident and/or is a U.S. Virgin Islands registered entity.

Complaint
*Helman, et al. v. Marriott International, et al.*                              Page 7 of 60

17.    At least three of the defendants qualify as citizens of the U.S. Virgin Islands: RC
Hotels VI; the Ritz-Carlton Club, St. Thomas, Inc.; and RC. St. Thomas, LLC.

18.    The conduct of local Defendants forms a significant basis for the claims asserted
herein, and Plaintiffs and the proposed Class seek significant relief from these Defendants.

19.    The principal injuries resulting from the conduct alleged herein, as well as from the
related conduct of each defendant, were incurred in the U.S. Virgin Islands.

20.    During the three-year period preceding the filing of this class action, no other class
action has been filed asserting the same or similar factual allegations against any of the defendants
on behalf of the named plaintiffs or other similarly-situated persons.

21.    Venue in this judicial division is proper pursuant to 4 V.I.C. § 78 in that the cause
of actions arose and a substantial part of the wrongful occurred was carried out within this judicial
division.

## NON-PARTY ENTITIES AND INDIVIDUALS

22.    The Great Bay Condominium Owners Association, Inc. ("Association"), the
fractional owners association for Ritz-Carlton Great Bay, is a condominium association organized
under the laws of the U.S. Virgin Islands. On March 3, 2000, the Marriott Defendants formed the
Association by filing the Articles of Incorporation of Great Bay Condominium Owners
Association, Inc. with the U.S. Virgin Islands Office of the Lieutenant Governor, Division of
Corporations and Trademarks. The objects and purposes for which the Association was formed
included: "To provide the owners of the Great Bay Condominium . . . with an association for
benevolent, fraternal and social purposes and to conduct the activities of an association of
condominium owners pursuant to Title 28 Virgin Islands Code Chapter 33"; and "to promote the
general welfare of the Association and its members and to enforce the provisions of the
Declaration, Bylaws and Rules and Regulations of Great Bay Condominium."

## DEFENDANTS

A.    **The Marriott International Defendants**

Complaint
*Helman, et al. v. Marriott International, et al.*

23.     Defendant Marriott International, Inc. (**"Marriott International"** or sometimes **"MII"**), is a publicly-traded Delaware corporation headquartered in Bethesda, Maryland. Marriott International sold the deeded St. Thomas fractionals at issue through its wholly-owned subsidiary RC Hotels VI. A multinational hospitality company, Marriott International now has licensing agreements with its former subsidiary Marriott Vacations Worldwide that allow the MVW Defendants to use the "Marriott" and "Ritz-Carlton" brand and trade names, trademarks, and service marks in exchange for licensing fees to Marriott International of over $50 million per year, plus a percentage of Marriott Vacations Worldwide's sales, including sales of MVC points.

24.     Defendant RC Hotels (Virgin Islands), Inc. (**"RC Hotels VI"**), is a U.S. Virgin Islands corporation and a subsidiary of Marriott International Hotels, Inc., itself a subsidiary of Marriott International. RC Hotels VI remained a Marriott International subsidiary following the spin-off of Marriott Vacations Worldwide in 2011. Among other things, RC Hotels VI was the seller of the fractionals to Plaintiffs and the proposed Class and was involved in operations and delaying foreclosures.

25.     Defendant The Ritz-Carlton Hotel Company, LLC (**"RC Hotel Co."**) is a Delaware corporation with a principal place of business in Maryland that remained a Marriott International subsidiary after the 2011 spin-off of Marriott Vacations Worldwide. Since the spin-off, most "on-site" operations at the Ritz-Carlton Great Bay and other RCDC properties, as well as responsibility for managing Association governance, have been delegated to RC Hotel Co.

26.     Marriott International, RC Hotel Co., and RC Hotels VI are collectively referred to herein as the **"MII Defendants."** On information and belief, the MII Defendants: (a) are the agents, representatives, alter egos, and/or instrumentalities of their respective principals or controlling entities, (b) have interlocking or overlapping directors and/or officers with their respective principals or controlling entities, (c) are undercapitalized and/or spurious or disregard the corporate form, (d) and are entities for which "piercing the corporate veil" is or may be necessary and appropriate to prevent injustice and inequity to Plaintiffs and the proposed Class.

Complaint
*Helman, et al. v. Marriott International, et al.*

27.     Each of the MII Defendants (directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members) (a) actively or passively participated in the conduct, acts and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more other defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to conduct, acts and omissions alleged herein, and/or (d) is directly, vicariously, jointly, and/or severally liable for the conduct, acts, and omissions alleged herein.

**B.      The Marriott Vacations Worldwide Defendants**

28.     Defendant Marriott Vacations Worldwide Corporation (**"Marriott Vacations Worldwide"** or sometimes **"MVW"**) is a Delaware corporation with its principal place of business at 6649 Westwood Boulevard, Orlando, Florida. Marriott Vacations Worldwide was a Marriott International subsidiary until a spin-off in 2011, after which Marriott Vacations Worldwide became a publicly traded corporation. Marriott Vacations Worldwide operates the Ritz-Carlton Destination Club and the Marriott Vacation Club pursuant to, and its business is dependent on, licensing agreements with Marriott International.

29.     Defendant Marriott Ownership Resorts, Inc. (**"MORI"**), is a Delaware corporation. Formerly a Marriott International subsidiary, MORI became a wholly-owned subsidiary of Marriott Vacations Worldwide following the spin-off in 2011. MORI's principal place of business is also at 6649 Westwood Boulevard, Orlando, Florida. Both before and after the 2011 spin-off, MORI was the subsidiary with primary responsibility for the Marriott Vacation Club and the Ritz-Carlton Destination Club.

30.     Defendant the Ritz-Carlton Development Company, Inc. (**"RC Development"**), another Marriott Vacations Worldwide subsidiary that was a Marriott International subsidiary before the spin-off, is a Delaware corporation with a principal place of business at 6649 Westwood Boulevard, Orlando, Florida. The Disclosure Statement given to purchasers at Ritz-Carlton Great Bay states that RC Development "through or in conjunction with (the Organizer) . . . and other

Complaint
*Helman, et al. v. Marriott International, et al.*                          Page 10 of 60

affiliated and/or third-party companies, is offering a variety of locations and related benefits and privileges sometimes collectively referred to as 'The Ritz Carlton Club.'" RC Development provided financing to certain purchasers and was involved in delaying foreclosure proceedings.

31.     Defendant the **Ritz-Carlton Club, St. Thomas, Inc.** is a U.S. Virgin Islands corporation and a wholly-owned subsidiary RC Development, and therefore of Marriott Vacations Worldwide as well. The governing documents at the Ritz-Carlton Great Bay describe RC Club St. Thomas, Inc. as the "Organizer" of the Ritz-Carlton Great Bay. RC Club St. Thomas, Inc. signed the purchase contracts on behalf of the seller, RC Hotels VI.

32.     Defendant Ritz-Carlton Management Company, LLC (**"RC Management"**) is a Delaware limited liability company with a principal place of business at 6649 Westwood Boulevard, Orlando, Florida. RC Management was a wholly-owned Marriott International subsidiary until the 2011 spin-off and is now a wholly-owned subsidiary of Marriott Vacations Worldwide. RC Management has the same principal place of business as Marriott Vacations Worldwide. Pursuant to a series of management agreements, RC Management shared responsibility with Marriott International subsidiaries RC Hotels VI and RC Hotel Co. for operating the Ritz-Carlton Great Bay and managing the functions of the Association and its board.

33.     Defendant The Cobalt Travel Company, LLC (**"Cobalt"**), a Delaware limited liability company formerly known as the Ritz-Carlton Travel Company, LLC, is another wholly-owned Marriott Vacations Worldwide subsidiary with the same principal place of business in Orlando, Florida. Defendants misled owners, including Plaintiffs and the proposed Class, the boards of each fractional association, and the courts in three related cases into believing that Cobalt had the exclusive authority to "affiliate" the RCDC with the MVC. In fact, the association at each club had the power to prevent the "affiliation" from extending to their club, and the authority to affiliate with another program, such as the MVC, was later delegated to another Marriott Vacations Worldwide subsidiary, Lion & Crown, pursuant to the 2013 Affiliation Agreement.

34.     Defendant The Lion & Crown Travel Co., LLC (**"Lion & Crown"**) is a Delaware limited liability company formed in 2008. Lion & Crown is another wholly-owned subsidiary of

Complaint
*Helman, et al. v. Marriott International, et al.*                          Page 11 of 60

Marriott Vacations Worldwide with the same principal place of business in Orlando, Florida. In an affiliation agreement from 2010, Cobalt granted to Lion & Crown the authority to affiliate with so-called "external" clubs, *i.e.*, those not branded as part of the RCDC program.

35.     Marriott Resorts, Travel Company, Inc., d.b.a. MVC Exchange Company ("**MRTC**") is a Delaware corporation and a Marriott Vacations Worldwide subsidiary that has established an exchange program commonly known as Marriott Vacation Club (or more formally, the Marriott Vacations Club Destinations Exchange Program) for the purpose providing MVC members to exchange points at the MVC for access to properties outside the MVC. The RCDC-MVC merger was permanently effectuated by the 2013 Affiliation Agreement between Lion & Crown and MRTC. This 2013 Affiliation Agreement was only recently disclosed.

36.     Defendant **RC St. Thomas, LLC** is a limited liability company organized under the laws of the U.S. Virgin Islands and a wholly-owned subsidiary of Marriott Vacations Worldwide. On information and belief, RC St. Thomas, LLC was involved in foreclosing on and taking title to fractionals whose owners could not make their mortgage payments, as well as delaying those foreclosures.

37.     The North American Trust (the "**NATO land trust**") is a land trust organized under Florida law that is, on information and belief, administered and controlled by Marriott Vacations Worldwide and/or its designees. The NATO land trust owns the resorts and fractional interests (including many with the RCDC) to which Marriott Vacation Members have a right of access.

38.     Marriott Vacations Worldwide, MORI, RC Development, RC Management, RC Club St. Thomas, Inc. Cobalt, Lion & Crown, MRTC, RC St. Thomas, and the NATO land trust are collectively referred to herein as the "**MVW Defendants**." The MVW Defendants: (a) are the agents, representatives, alter egos, and/or instrumentalities of their respective principals or controlling entities, (b) have interlocking or overlapping directors and/or officers with their respective principals or controlling entities, (c) are undercapitalized and/or spurious or disregard the corporate form, (d) and are entities for which "piercing the corporate veil" is or may be necessary and appropriate to prevent injustice and inequity to Plaintiffs and the proposed Class.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 12 of 60

39.     Each of the MVW Defendants directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members: (a) actively or passively participated in the conduct, acts and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more other defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to conduct, acts and omissions alleged herein, and/or (d) is directly, vicariously, jointly, and/or severally liable for the conduct, acts, and omissions alleged herein. For example, critical decisions that Cobalt and Lion & Crown ostensibly made regarding the RCDC-MVC merger were, in fact, made by the Chief Operating Officer of Marriott Vacations Worldwide who was serving at the same time as the controlling officer of Cobalt and Lion & Crown.

## PLAINTIFFS

40.     Alan and Marjorie Helman are a married couple residing in Maitland, Florida. On or about February 8, 2002, they purchased an undivided 1/12 interest in a condominium unit at the RCDC in St. Thomas for $106,400.

41.     Lepont Palm Beach, LLC, is organized under the laws of Florida. Its only member, Michael Gianatasio, is a resident of Armonk, New York. On or about October 28, 2009, Mr. Gianatasio and his wife, Penny Gianatasio, purchased an undivided 1/12 interest in a condominium unit at the RCDC in St. Thomas for $180,000.

42.     Pursuant to an Assignment of Claims, Michael and Penny Gianatasio transferred all of their claims and all interests in claims arising out of ownership or under the purchase agreement or otherwise and pertaining to the undivided 1/12 interest in their condominium unit at the RCDC in St. Thomas to Lepont Palm Beach, LLC.

43.     Maurice Kaspy and Liborio Piazza are residents of Montreal, Quebec. On or about March 20, 2006, they purchased an undivided 1/12 interest in a condominium unit at the RCDC in St. Thomas for $144,000.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 13 of 60

44.      Troy Hammond is a resident of Santa Barbara, California. On or about April 4, 2006, he purchased an undivided 1/12 interest in a condominium unit at the RCDC in St. Thomas for $235,000.

45.      Timothy Aker is a resident of Pennington, New Jersey. On or about March 22, 2006, he purchased an undivided 1/12 interest in a condominium unit at the RCDC in St. Thomas for $165,000.

## GENERAL ALLEGATIONS

### A.      History and Evolution of the Marriott Vacation Club

46.      In the 1980s, Marriott International established MORI to run its Marriott Vacation Club timeshare operations. In 1984, Marriott's Monarch on Hilton Head Island became the first Marriott Vacation Club resort. By 2009, more than 400,000 timeshare owners had purchased one-week timeshare intervals as part of MVC. This was the initial iteration of the Marriott Vacation Club; it would soon evolve from a timeshare to a points-based vacation ownership program.

47.      By the summer of 2010, Marriott International had decided to move away from its historic model of selling weekly timeshare intervals through the Marriott Vacation Club. The company introduced the concept of selling points that purchasers could use to stay at a range of resorts, as opposed to a particular week in a particular resort. Marriott International and then Marriott Vacations Worldwide after the 2011 spin-off viewed this introduction of vacation points as a way to maximize the cash flow of their vacation ownership business.

48.      This points-based model is more flexible than a fixed-week ownership interest in a particular property for at least two reasons. First, owners of MVC points are not locked into weekly intervals, but rather can use their points to stay in various properties for short periods of time. In contrast, purchasers of RCDC fractionals had to commit to buy three-week intervals (or four weeks in Aspen Highlands), and the exchange program that allowed RCDC owners to swap time with other RCDC properties required one-week stays. The Marriott Defendants touted these minimums as a key differentiating factor for the Ritz-Carlton Destination Club justifying the substantially increased sales prices.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 14 of 60

49.     Second, MVC points can be sold in varying quantities according to the preference of the purchaser. This means the "cost of entry" to join the Marriott Vacation Club is substantially less than the cost to join other programs. The minimum required purchase for MVC points is just 1,500 points. When first introduced in the summer of 2010, MVC points were priced at $9.20 per point, meaning the minimum purchase was only $13,800. Even at today's price, around $14.00 per point, the same purchase would cost only $21,000 — far below what Plaintiffs and other members of the proposed Class were required to spend to obtain access to the RCDC. On average, the 3,200 purchasers of Ritz-Carlton Destination Club fractions paid more than $200,000.

50.     MVC points are not backed by a direct interest in any particular underlying property, but rather entitle the purchaser to use rights specified by the Marriott Defendants and a beneficial interest in NATO land trust. This means that, to support the number of MVC points they wished to sell, Marriott International, and later Marriott Vacations Worldwide after the 2011 spin-off, had to transfer ownership of sufficient developed inventory to the NATO land trust. As more fully alleged elsewhere in this Complaint, this is why the Marriott Defendants sought to merge the Ritz-Carlton Destination Club with the Marriott Vacation Club.

**B.     History and Evolution of the Ritz-Carlton Destination Club**

51.     In 1999, MORI introduced the Ritz-Carlton Destination Club as a luxury alternative to its MVC timeshare product. The St. Thomas and Aspen Highlands properties were the RCDC's first fractional ownership properties. Until about 2012, the Marriott Defendants developed and sold approximately 3,200 deeded 1/12 luxury fractionals under The Ritz-Carlton Destination Club brand at the following nine locations: Aspen Highlands, Colorado; Bachelor Gulch, Colorado; Jupiter, Florida; North Lake Tahoe, California; San Francisco, California; Vail, Colorado; Abaco, Bahamas; Maui, Hawaii; and, as relevant here, St. Thomas, U.S. Virgin Islands.

52.     The Ritz-Carlton Destination Club was conceived and sold as a "luxury" product line that was more exclusive than and superior to a mere timeshare. The Marriott Defendants sold separately deeded 1/12 fractional ownership interests that provided purchasers with rights to three particular weeks selected at the time of purchase. In contrast, traditional timeshares (such as the

Complaint
*Helman, et al. v. Marriott International, et al.*                    Page 15 of 60

initial iteration of the MVC) are sold in one-week intervals, and points-based programs (such as

the MVC after about 2010) can be used for transient occupancy for as short a stay as one night.

The exchange program that allowed RCDC owners to swap time within the RCDC required full-

week exchanges rather than shorter periods.

     53.    Marriott touted the deeded property interest aspect of the RCDC to differentiate

these fractional offerings from mere timeshares and to sell them as a superior form of real property

ownership. Marriott marketed these fractionals as "[l]ike any form of real estate, . . . [that] can be

sold, willed or transferred by the Member at any time" and represented in sales materials that they

would be "operated for the exclusive use, benefit and enjoyment of the Members, their families

and their guests." The luxurious and private nature of these fractionals, the requirement that they

be purchased and used in longer blocks of time measured in weeks not days, and the exclusivity

of use distinguished them from the MVC product line.

     54.    Based on these distinctions and attributes, RCDC fractionals were substantially

more expensive, both in terms of purchase price and annual maintenance fees, than the points-

based MVC timeshare. The average RCDC purchaser paid more than $200,000 for a RCDC

fractional, whereas one could become a member of the Marriott Vacation Club for less than

$20,000 during the relevant period.

     **C.**    **The Ritz-Carlton Great Bay**

     55.    The Ritz-Carlton Club Great Bay is located at 6910 Great Bay, St. Thomas, VI

00802 and consists of a total of 105 Condominiums, broken down as follows: (a) 81 "Residences"

consisting of two and three bedrooms sold as 1/12 fractional interests (equaling 972 fractionals);

and (b) 24 "Suites" consisting of two-bedroom units similarly sold as 1/12 fractional interests

(equaling another 288 fractionals).

     56.    The club was formally created on May 22, 2002, when Marriott International

wholly-owned subsidiary RC Hotels VI recorded a Declaration Establishing a Plan for

Condominium for the Great Bay Condominium (the "Condominium Declaration"). A

Supplemental Declaration of Condominium for The Club at Great Bay Condominium ("Club

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 16 of 60

Declaration") recorded by RC Hotels VI that same day included certain use restrictions, including
the following contained in Article XI, section 11.1:

> [E]ach of the Residences (i.e., whole condominiums sold as fractionals)[4] relating to
> Residence Interests (i.e., the fractionals themselves) subject to this Club Declaration shall
> be occupied only for temporary occupancy. Use of the same and the Common Elements
> and Limited Common Elements of this Condominium is limited solely to the personal use
> of Members, their guests, invitees and lessees and for recreational uses by corporations and
> other entities owning Residence Interests. . . . **Use of Residences or the Common
> Elements for commercial purposes or any purposes other than the personal use
> described herein is expressly prohibited. "Commercial purpose" shall include, but
> not be limited to, a pattern of rental activity or other occupancy by a Member that
> the Members Association, in its reasonable discretion, could conclude constitutes a
> commercial enterprise or practice.**

(Emphasis added.) As more fully alleged below, this provision of the Club Declaration either
prevented the RCDC-MVC merger without a vote to amend the Club Declaration.

57.     Beginning in 2002 and through 2011, the Marriott Defendants sold all but 79 of the
1,260 available fractionals at the Ritz-Carlton Great Bay for an average price of over $150,000 per
fractional. As at the other Ritz-Carlton Residence Club locations, the Marriott Defendants
marketed these St. Thomas fractionals as being superior to mere timeshares in that they were
separately deeded property interests equivalent to a second home, located in an exclusive and
private property available only to those who purchased three weeks at premium prices.

58.     The Ritz-Carlton Great Bay is located on a beautiful parcel of land with beach
access, and was previously known as a quiet, very high-end destination.

**D.     The Marriott Defendants Controlled the Association Board,
        Communications With Plaintiffs and the Proposed Class, and Nearly All
        Aspects of Their Separately Deeded Property Interests**

59.     The Marriott Defendants fashioned the governing documents to ensure their
continued control of the Association and its board, even after it became nominally "independent."

---

[4] The Condominium and Club Declarations refers to the whole condominiums as a "Residence" and
the 1/12 fractional interests that Plaintiffs purchased as a "Residence Interest."

Complaint
*Helman, et al. v. Marriott International, et al.*

Like in the governing documents at the other Ritz-Carlton Destination Clubs,[5] the Marriott Defendants imposed management agreements on the property that delegated all board functions and duties to RC Hotels VI, which in turn subcontracted board functions and duties to RC Management. Later, RC Management further delegated certain important duties, such as elements of association board governance, to Marriott International subsidiary RC Hotel Co. The Marriott Defendants used this control to improperly influence, infiltrate, and exert control over the ostensibly independent Association board, operate the Ritz-Carlton Great Bay in a manner that benefited the Marriott Defendants, and otherwise carry out the wrongful conduct and the fraudulent scheme described herein.

60.     In the first management agreement dated May 22, 2002, the Association, which had been just formed and was controlled by the Marriott Defendants, entered into a Management Agreement with RC Hotels VI that gave that Marriott International subsidiary "all of the power and authority of the Association to the extent necessary to perform the Management Company's duties and obligations under this Agreement." This Management Agreement further provided that RC Hotels VI, "on behalf of and at the expense of, the Association, to the exclusion of all other persons including the Association and its Members, shall have all the powers and duties of the Board of Directors as set forth in the Declaration and the Bylaws of the Association . . . ."

61.     That same day, RC Hotels VI entered into a "Sub-Management Agreement" with RC Management in which RC Hotels VI engaged "RC Management Company as the exclusive managing entity of the Condominium and to manage the daily affairs of the Condominium and the Plan." The Sub-Management Agreement also provides that "RC Management Company shall have all of the power and authority of RC Hotels VI under the Management Agreement to the extent necessary to perform RC Hotels VI's duties and obligations under the Management Agreement" and further that "RC Management Company, on behalf of and at the expense of, the Association,

---

[5] Pursuant to the governing documents for each of the other four properties that remain in the RCDC program — the resorts at San Francisco, Tahoe, Vail, and Aspen Highlands — all of the duties, including fiduciary duties, of the supposedly independent fractional owners association boards are similarly delegated to RC Management.

Complaint
*Helman, et al. v. Marriott International, et al.*                                     Page 18 of 60

to the exclusion of all other persons including the Association and its Members, shall have all the
powers and duties of the Board of Directors as set forth in the Declaration and the Bylaws of the
Association . . . ."

62.     Nearly a decade later, at the time of the November 2011 spin-off, RC Management
entered into a further sub-agency agreement with Marriott International subsidiary RC Hotel Co.
at each RCDC location. This sub-agency agreement dated November 21, 2011, provides that
Marriott International, through RC Hotel Co., will manage the on-site operations of each RCDC
location, giving Marriott International control over the Ritz-Carlton Great Bay. Importantly, it also
provides that Marriott International, through RC Hotel Co., manages association governance. This
allowed Marriott International to manipulate the Association to achieve the unwanted RCDC-
MVC merger.

63.     The MII and MVW Defendants (through RC Hotel Co. and RC Management and
otherwise) also insisted that all communications with Plaintiffs and the proposed Class —
including those from the nominally independent but surreptitiously controlled Association board
— be drafted or edited by Marriott personnel. As a result, these communications were improperly
and deceptively crafted to achieve the Marriott Defendants' unlawful objectives.

**E.      The MII and MVW Defendants Owe Fiduciary Duties to Plaintiffs and the
         Proposed Class**

64.     Marriott International and its subsidiaries RC Hotels VI and RC Hotels Co. and
Marriott Vacations Worldwide and its subsidiaries RC Management, Cobalt, Lion & Crown, and
MRTC were the agents for and assumed fiduciary duties to the Association, Plaintiffs, and the
proposed Class based on principles of agency law, the terms of the management agreements
described above, their almost complete control over the Association and its board, and the
separately-deeded property interests purchased by Plaintiffs. The governing documents, for
example, provided for the following instruments of control over the physical property:

a.     Fractional owners were not provided keys to their units. Rather, they had to check
       in at the front desk on each visit to obtain access.

Complaint
*Helman, et al. v. Marriott International, et al.,*                                    Page 19 of 60

    b.    Unlike cases in which a group of friends share a property, the fractional owners in a particular unit did not decide *when* each co-owner used the unit—Defendants controlled the reservation system governing access.

    c.    Defendants even controlled whether Plaintiffs could ever access *their particular unit.* The purchase contract ensured that they had three weeks at the Ritz-Carlton Great Bay, but the Marriott reservation system in fact determined whether an owner stayed in their chosen unit or a separate one entirely.

    d.    Defendants determined the décor and when and how the various unit would be refurbished.

    65.    In these and other ways, Marriott International, through RC Hotel Co. and RC Hotels VI, and Marriott Vacations Worldwide, through RC Management and other subsidiaries, controlled nearly all aspects of Plaintiffs' and the proposed Class' separately-deeded property interests. It is this high degree of control that gives rise to the Marriott Defendants' fiduciary obligations to Plaintiffs and the proposed Class.

**F.**    **Sales of RCDC Fractionals Slow by 2010**

    66.    By 2010, sales of luxury private residence clubs had substantially slowed down from pre-recession rates. In fall 2010, Marriott International attempted to sell its RCDC business to a third party in a marketing offering led by an internationally known investment bank. On information and belief based on relatively widespread knowledge in the industry, a number of parties were interested, including Timbers Group and Discovery Land Company. During its marketing to sell RCDC to third parties, the Marriott Defendants extolled at length the value of the Ritz-Carlton brand.

    67.    It was around this time that Marriott International and its subsidiaries began converting legacy "week owners" of MVC timeshares to a "points-based product" through which purchasers bought interests in the NATO land trust set up to own the resorts and fractionals to which MVC members had access. By the end of 2011, many of MVC's 400,000-plus owners at over 50 MVC resorts worldwide were utilizing points purchased from MORI to trade for use of MVC resorts.

Complaint
*Helman, et al. v. Marriott International, et al.*                               Page 20 of 60

**G.    The Spinoff of Marriott Vacations Worldwide from Marriott International
and the "Re-Engineering" of the RCDC**

68.    In February 2011, Marriott International officially announced its plan to spin-off
Marriott Vacations Worldwide as a publicly traded company. Ostensibly, Marriott Vacations
Worldwide became the exclusive developer and manager of vacation ownership and related
products under the Marriott brand and the exclusive developer of vacation ownership and related
products under the Ritz-Carlton brand, but Marriott International retained significant control of
Marriott Vacations Worldwide's operations because of licensing agreements further described
below.

69.    At the same time, the Marriott Defendants abandoned efforts to sell the Ritz-Carlton
Destination Club, opting instead to include it in the newly spun-out company. However, the
Marriott Defendants did not plan to invest further in the RCDC luxury product line. To the
contrary, a SEC filing on June 28, 2011, states:

> Given the continued weakness in the economy, particularly in the luxury real estate market,
> we have significantly scaled back our development of Luxury segment vacation ownership
> products. We do not have any Luxury segment projects under construction nor do we have
> any current plans for new luxury development. While we will continue to sell existing
> Luxury segment vacation ownership products, we also expect to evaluate opportunities for
> bulk sales of finished inventory and disposition of undeveloped land.

70.    Around mid-2011, a group of senior Marriott International executives that made up
something called the Growth and Governance Council began plotting their specific plans for the
re-engineering of the Ritz-Carlton Destination Club. After seriously considering at least one other
option, this group decided to transfer unsold RCDC fractional inventory to the NATO land trust
and thereby make it available to members of the Marriott Vacation Club, and then merge the Ritz-
Carlton Destination Club with the Marriott Vacation Club. They knew that doing so would allow
the Marriott Defendants to sell more MVC points at higher prices because giving MVC members
access to luxury Ritz-Carlton Destination Clubs would enhance Marriott Vacation Club's
attractiveness.

Complaint
*Helman, et al. v. Marriott International, et al.*

71.   On November 19, 2011, Marriott International formally spun off the Marriott Vacations Worldwide entities as a separately traded public company (NYSE: VAC). Marriott International gave this new company licensing agreements allowing it and its subsidiaries to use the "Marriott" and "Ritz-Carlton" brand and trade names, trademarks, and service marks subject to strict restrictions. Because Marriott International owns these tradenames, all or most aspects of Marriott Vacations Worldwide's business are controlled by Marriott International. Marriott International's approval was either required, or as a practical matter necessary, for most major decisions by Marriott Vacation Worldwide, including the merger of the RCDC with the MVC that is the subject of this Complaint. Marriott Vacations Worldwide regularly reported to Marriott International on the status of the RCDC-MVC merger, and worked together to increase sales of MVC points through cross marketing and referrals from Marriott International's "Marriott Rewards" loyalty program. In addition, Marriott International subsidiaries played major roles in the operation of Ritz-Carlton Destination Clubs, including the Ritz-Carlton Great Bay.

72.   Pursuant to the License Agreement between Marriott International and Marriott Vacations Worldwide Corporation executed as part of the spin-off, Marriott Vacations Worldwide was to pay Marriott International $50 million annually, plus 2% of annual sales (including of MVC points), for the right to use the Marriott and Ritz-Carlton tradenames and marks.

73.   In the months following the spin-off, under the direction of Marriott Vacations Worldwide Chief Operating Officer and Executive Vice President Lee Cunningham and Chief Executive Officer Stephen Weisz, the MVW Defendants began the work needed to carry out Marriott Internationals' plan to radically re-engineer the RCDC — with the support, assistance, and oversight of Marriott International. The goal was to increase the revenue and profits of both the MVW and the MII Defendants. In a nutshell, the plan was to merge the RCDC and MVC product lines and use the "halo effect" of the storied Ritz-Carlton brand and the prospect of access to the luxury Ritz-Carlton Destination Club properties to sell more MVC points at higher prices.

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 22 of 60

74.     Cunningham wore many hats for the Marriott Vacations Worldwide entities,
essentially alter egos, including leading Lion & Crown, RC Development, and Cobalt, often
signing in a general role for RCDC.

75.     Stephanie Sobeck, an RCDC executive critical to the scheme alleged here, similarly
wore other hats, such as leading the Ritz-Carlton Management Company.

76.     In or about late 2011, a group of senior Marriott Vacations Worldwide executives
on a committee called the Corporate Growth Committee was presented with a specific strategic
plan to accomplish the merge. The Corporate Growth Committee instructed MVC's Law
Department to analyze the legal risks involved in merging the two clubs. With advice from a large
and very sophisticated legal division, the Marriott Defendants knew the RCDC-MVC merger
might bring litigation but decided to proceed with the merger anyway. These conclusions are
summarized in a December 2011 report.

77.     In its first Annual Report filed following the spin-off, dated March 21, 2012,
Marriott Vacations Worldwide revealed:

> [W]e have significantly scaled back our development of Luxury segment vacation
> ownership products. We do not have any Luxury segment projects under construction nor
> do we have any current plans for new luxury development. While we will continue to sell
> existing Luxury segment vacation ownership products, we also expect to evaluate
> opportunities for bulk sales of finished inventory and disposition of undeveloped land.

78.     In its annual report the next year, Marriott Vacations Worldwide repeated similar
language and then noted:

> During 2012 we placed inventory from one of our Luxury properties into the [Marriott
> Vacation Club] program, and we intend to place most of our remaining Luxury inventory
> into the [Marriott Vacation Club] program. We have repositioned our Luxury sales centers
> to sell the [Marriott Vacation Club] points product.

79.     In May 2012, recognizing the legal risks but proceeding anyway, Marriott
Vacations Worldwide's Corporate Growth Committee approved the proposed RCDC-MVC
merger. This plan included (a) closing all RCDC sales centers, with some to become MVC
timeshare sales offices; (b) transferring unsold RCDC fractionals to the NATO land trust so that

Complaint
*Helman, et al. v. Marriott International, et al.*                    Page 23 of 60

MVC points members could access the unsold inventory at the various RCDC properties; and (c)
pursuing formal affiliations with each RCDC owners association to permanently merge the two
clubs, allowing further trading of MVC points for non-MVC-owned RCDC fractional units. The
plan acknowledged that the level of MVC points needed to exchange into an RCDC must be set
low enough that the average MVC points user could gain access. Marriott International ratified
these decisions and reaped huge rewards to the detriment of Plaintiffs and the proposed Class.

80.     Under this new business model, Marriott Vacations Worldwide and Marriott
International leveraged the allure of access to luxury RCDC properties with the storied Ritz-
Carlton brand to sell more and higher-priced MVC points. Indeed, beginning in July 2011 and
continuing to the present, MVC sales presentations and promotional material have prominently
featured access to Ritz-Carlton Destination Club properties. That Marriott Vacations Worldwide
abandoned plans to expand the network of RCDC properties did not pose a problem for this new
business model. Nor did it matter that only some RCDC inventory is actually available to MVC
members. The mere possibility of access is enough to sell more MVC points at higher prices.
Experts in the industry refer to this as the "halo effect." This phenomenon drove profits for the
Marriott Defendants.

**H.     The Marriott Defendants Encounter Massive Opposition After Announcing
        the Merger**

81.     The first public announcement of the Marriott Defendants' intention to merge the
Marriott Vacation Club with the Ritz-Carlton Destination Club came on July 17, 2012, when
Eveleen Babich, posing as a "General Manager" of Cobalt, disclosed one aspect of the RCDC-
MVC merger to all RCDC fractional owners. In fact, Babich did not write or even see the letter; it
came from MVW's executives on the Corporate Growth Committee. They described the ability of
RCDC owners to one or more of the RCDC weeks for MVC points that they could use to access
MVC properties:

*Based on the Ritz-Carlton Destination Club member feedback,* additional benefits and
experiences will be available through a new affiliation with Marriott Vacation Club
Destinations . . . Affiliation will extend to you the opportunity to deposit your Reserved

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 24 of 60

Allocation on an annual basis. Once you deposit, the following will be available for you: . . . Secure any of the 51 worldwide Marriott Vacation Club Resorts . . . .

(Emphasis added.) In fact, discovery in the related cases clearly shows that this merger was not initiated in response to "member feedback." Rather, the Marriott Defendants' express purpose was to profit at the expense of Plaintiffs, members of the proposed Class, and other RCDC owners.

82.     This letter was misleading in several other respects. The Babich letter was on Ritz-Carlton Destination Club letterhead, as if that were an entity independent of Marriott and bore her signature as general manager of Defendant Cobalt, the supposedly independent company vested with discretion under the governing documents over the exchange program through which RCDC owners could access other RCDC properties. In fact, Babich was not a "general manager" and Cobalt had no existence independent of Marriott Vacations Worldwide; all of Cobalt's officers were Marriott Vacations Worldwide executives, and it had no employees or offices of its own. In short, Cobalt is and was the alter ego and tool of Marriott Vacations Worldwide. The same is true on information and belief of the other Marriott Vacations Worldwide subsidiaries except MORI.

83.     Moreover, the letter did not disclose that the 400,000-plus Marriott Vacation Club members would be able to access to the exclusive RCDC private residence clubs. Babich assured owners nothing about their private residence club would change even though she and other senior Marriott executives knew that would not be the case. Further, the letter did not disclose that the Marriott Defendants would transfer unsold and foreclosed RCDC inventory to the NATO land trust for use by MVC members.

84.     Babich's July 17, 2012, letter is typical of the many related communications that followed. For example, just a month later in another mass mailing intended to slow down a groundswell of opposition, Marriott Vacations Worldwide COO Cunningham repeated the false assurance that "nothing has changed or will change as a result of the announcement." Discovery in the related cases proves the Marriott Defendants knew that statement was false. Indeed, the Ritz-Carlton Destination Club has been fundamentally transformed as a result of the merger. Among other things, it is no longer an exclusive private residence club akin to a second home. An influx

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 25 of 60

of MVC members enjoy a right of transient occupancy. Resale values for RCDC fractionals have

collapsed as a result of the merger and the Marriott Defendants' related misconduct.

85.     The July 17, 2012 letter also informed the RCDC owners that they were losing two

clubs — the Ritz-Carlton Abaco and the Ritz-Carlton Kapalua — but concealed from the owners

that the loss resulted from the RCDC re-engineering plans approved by the Marriott Defendants

in May 2012. The loss of options within the RCDC network had a two-fold benefit for the Marriott

Defendants. First, the Marriott Defendants saved costs by shedding expenses associated with

maintaining luxury properties to the standard required by the Marriott International licensing

agreement. Second, as options to trade weeks within the RCDC system dwindled (soon other

RCDC properties would be lost too), there was a greater chance that RCDC owners, when faced

with dwindling options, would trade RCDC weeks for MVC points and thereby increase RCDC

inventory for the Marriott Vacation Club.

86.     Within the next month or so, the boards of the associations in Aspen Highlands,

Bachelor Gulch, and St. Thomas sent letters expressing their concern about this merger. A letter

dated August 3, 2012, from the Association in St. Thomas stated the following to Plaintiffs and

the proposed Class:

> Let us take this opportunity to assure you that your Boards of Directors are not
> taking this "evolution" notice lightly from the RCDC Parties. We are currently evaluating
> the systemic changes they have communicated in their letter to see how it will affect our
> club and, together with all of the other remaining RCDC Club Associations, assessing the
> impact on the entire RCDC system.
> We have been in frequent communications with each other and the Presidents of
> the other RCDC Clubs since this announcement. Our general but preliminary consensus
> regarding the "evolution" of the RCDC brand as described in Eveleen Babich's letter of
> July 17th is that we are concerned that this may not be an enhancement to our Membership
> Interests. We all, as members, invested in the Ritz-Carlton brand!
> Please rest assured that your Board will hold the RCDC Parties accountable to
> preserve, maintain and continually enhance the Ritz-Carlton Destination Club product they
> developed and sold to all of us.

87.     In August 2012, an internal email to Marriott Vacations Worldwide executives

described the negative follow-up to a Marriott webinar about the proposed affiliation. Jacqueline

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 26 of 60

Ader-Grob, Senior Manager of Public Relations for RCDC, was monitoring social media and quoted "several Facebook conversations from the Members' private groups." In this email, which was forwarded to Cunningham, she wrote: "The two most vocal group[s] continue to be St. Thomas and Aspen, which is where the feeds below come from after the call yesterday." The email excerpts, for example, a St. Thomas owner stating that they "know (and owning both MVCI[6] and RCC) that you are not comparing apples to apples with these two types of 'weeks.'" Another wrote: "Such incredib[]le spin! Really, such BS (pardon my French)," and another, "It also looks like we are going to have a much harder time using week for week exchanges due to partial week point users. Our units are also going to have a lot more wear & tear."

88.    On August 28, 2012, CEO and President of Marriott Vacations Worldwide Steve Weisz and Lee Cunningham (identified in his Ritz-Carlton Club role) held a conference call for Ritz-Carlton Members. Weisz touted his ongoing commitment to the Ritz-Carlton luxury brand post-spin off from Marriott International. Cunningham admitted that Babich had been wrong to say nothing had changed but says that other than the removal of two clubs from the system, nothing else about the original membership benefits had in fact changed. He also misleadingly answered the question of how the merger would address the value of the RCDC fractional interests by calculating the number of MVC points that would be required to reserve several weeks at Aspen and St. Thomas—glossing over the fact that most MVC points users would not be staying for such long periods, requiring lower costs of entry. On August 30, 2012, the same entities issued a set of frequently asked questions addressing the proposed affiliation that essentially cribs from Cunningham's August 28, 2012, remarks.

89.    On December 3, 2012, an attorney retained by the Association, James M. Derr, Esq., delivered to the MVW Defendants a "cease and desist" letter, stating, among other points:

> It has come to the [Association]'s attention that Marriott Vacations Worldwide Corporation ("MVW"), through its Marriott Vacations Worldwide program [i.e., MVC], has begun, or is in the process of beginning to promote the use of the Residence Interests at the Ritz-Carlton Club, St. Thomas to Marriott Vacation Club members who are non-

---

[6] MVCI is an acronym for Marriott Vacation Club International, which is one of the many names by which MORI does business.

Complaint
*Helman, et al. v. Marriott International, et al.*                                   Page 27 of 60

deeded members of Marriott Vacation Club's timeshare/points/exchange system and are not also members of the Ritz-Carlton Destination Club. It has also come to the [Association]'s attention that The Ritz-Carlton Management Company, LLC, an affiliate of MVW and the manager of the COA (the "COA Manager"), RC Hotels (Virgin Islands), Inc., RC St. Thomas, LLC and The Ritz-Carlton Development Company, which presently own unsold and returned Residence Interests at the [Association], are active and willing participants in and beneficiaries of such promotion and resulting use. Further, we believe that part of the plan of each of these entities involves the conveyance of these Residence Interests to an entity we believe is known as The Marriott Trust ("Trust"), which will ultimately hold title to the Residence Interests and will exert ultimate control and direction over their use in the Marriott Vacation Club program. . . .

The [Association] demands that MVW, the HOA Manager, the Program manager and their respective affiliates and each of the entities you represent immediately cease and desist from promoting the use of the Residence Interests at the [Association] to the MVC Members and permanently refrain from implementing any such program at the Ritz-Carlton Club, St. Thomas.

In addition to violating the Declaration, any practice of allowing the use of the Residence Interests by MVC Members may constitute, among other things, one or more breaches of the fiduciary duties of the COA Manager to the Association under the COA Management Agreement as a result of self-dealing among the COA Manager, and the various Ritz-Carlton and Marriott entities and their respective affiliates to the detriment of the [Association] and its members.

90.     The Cease and Desist letter cited the Club Declaration, Article XI, section 11.1 (quoted *supra*) prohibiting commercial use of the fractionals, including "a pattern of rental activity or other occupancy by a Member that the Members Association, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice," as well as Article V, section 5.5, which provided that: "In no event . . . shall a member convey or encumber less than a Residence Interest . . . , attempt to subdivide a Residence Interest into lesser interests, or merge together more than one Residence Interest." Derr ended the letter by stating:

I look forward to receiving your collective written confirmation by December 5, 2012 that each of MVW, the COA Manager, the Project Manager, the Marriott licensor entity and their respective affiliates will immediately cease and desist from promoting the use of the Residence Interests to MVC Members and permanently refrain from implementing any such program at the Ritz-Carlton Destination Club, St. Thomas. In the absence of such written confirmation by such date, the COA will have no choice but to pursue claims regarding the circumstances described in this letter.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 28 of 60

91.     The Marriott Defendants averted the threatened new lawsuit by, in early 2013, promising to put the issue of the RCDC-MVC merger to a vote of owners at each RCDC property. Lee Cunningham memorialized this promise in a mass email to all RCDC owners on May 14, 2013.

## I.     The Marriott Defendants Resort to Trickery to Overcome the Member Opposition and Explicit Prohibitions in the Governing Documents

92.     On December 11, 2012, owners at Bachelor Gulch and Aspen Highland properties filed a lawsuit in federal court in Minnesota (Case No. 12-CV-03093-DSD-JJK) against Marriott Vacations Worldwide, MORI, RC Hotel Co., RC Management, RC Development and others, based in part on Marriott's "intention to 'affiliate' the formerly exclusive RCDCs with the Marriott Vacation Clubs. . . ." As a result of that lawsuit and cease and desist letters sent by counsel for the St. Thomas, Aspen Highlands, and Bachelor Gulch associations, the Marriott Defendants were fully aware of the vehement opposition to their plans to leverage the Ritz-Carlton "halo effect" to sell MVC points and that this opposition threatened their merger plans.

93.     Top executives of the Marriott Defendants, including Cunningham and Weisz, decided at a Strategic Council meeting in January 2013 that they needed an aggressive, club-by-club strategy to win the votes needed for their merger. They agreed that Marriott Vacations Worldwide would undertake an aggressive campaign, using an outside communication firm, aimed at each RCDC property to give them the best chance. Marriott Vacations Worldwide hired marketing and other public relations and survey experts to help them "sell" the merger.

94.     For example, the company commissioned APCO, a national firm based in Washington, D.C., to conduct a professionally designed and executed system-wide survey in the summer of 2013 (the "APCO Survey"). But this backfired. Almost 800 RCDC owners responded, and the results were not equivocal: Owners nearly unanimously opposed the MVC merger and vehemently so.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 29 of 60

95.     Plaintiffs and the proposed Class were no exception. Out of the 797 survey respondents, 323 were St. Thomas owners. They were expressly vocal about opposing any such affiliation, with their frustration building on each of the Marriott Defendant's prior bad acts.

96.     Meanwhile, Bachelor Gulch exited the RCDC system (and lost the Ritz-Carlton "flag") after its owners voted to reject the RCDC-MVC merger and not renew its management contracts. Opposition to the merger there was so vehement that owners preferred the costly loss of the Ritz-Carlton name rather than suffer the consequences of the merger. Internal Marriott correspondence obtained in the related litigation reveals that senior Marriott Defendants executives became concerned they would lose other votes as well. Faced with this harsh reality, the Marriott Defendants surreptitiously breached the promise made by Cunningham that each RCDC club would be allowed to vote on the proposed merger.

97.     In Aspen Highlands, San Francisco, and Tahoe, the Marriott Defendants quietly delayed and substituted a highly misleading survey for the promised vote, then hoodwinked the association boards at those clubs and, on information and belief, at St. Thomas into consenting to the merger, as more fully alleged below. Indeed, the St. Thomas board signed a joinder to and acknowledgment of the affiliation immediately after the vote.

**J.     The Marriott Defendants Hide a Key Agreement from the Various Boards**

98.     When Plaintiffs, members of the proposed Class, and others purchased their RCDC fractionals, they were given a confusing raft of disclosure documents and agreements. But the contractual picture was even more confusing than that, for there were additional agreements that the Marriott Defendants hid.

99.     As alleged above, there were various management agreements that delegated powers to RC Hotels VI, RC Hotel Co. and RC Management. One of these agreements, the "Sub-Management Agreement" between RC Hotels VI and RC Management, gave RC Management the power to engage a "program manager" to manage and administer the exchange program whereby owners at one RCDC location can access other RCDC locations. An "Affiliation Agreement" designated Defendant Cobalt as the program manager. Confusing provisions in this agreement

Complaint
*Helman, et al. v. Marriott International, et al.*                          Page 30 of 60

allowed the Marriott Defendants to falsely claim to the various boards (and repeatedly assert in the related litigation) that the governing documents gave Cobalt "sole discretion" to merge the RCDC with the MVC.

100.    Indeed, the Marriott Defendants rebuffed opposition to the merger by association boards by claiming that this grant of "sole discretion" to Cobalt meant the merger would go through with or without their approval. To the courts presiding over the related cases, the Marriott Defendants argued this grant of "sole discretion" to Cobalt defeated damages claims based on the merger. As it turned out, these were patent and deliberate falsehoods contrived to mislead anyone perceived to have power over the merger.

101.    In fact, there were two other affiliation agreements that the Marriott Defendants did not disclose to purchasers. In a 2010 affiliation agreement, Cobalt delegated its authority to Lion & Crown, another Marriott Vacations Worldwide subsidiary. Then, Lion & Crown signed the 2013 Affiliation Agreement with MRTC, yet another Marriott Vacations Worldwide subsidiary. This latter affiliation agreement was the one that provided for a the RCDC-MVC merger, *but with a critical qualification that the Marriott Defendants concealed for years. Before the merger could extend to a particular RCDC property, the association board at that club had to sign an "Acknowledgment and Joinder" to the 2013 Affiliation Agreement.*

102.    In other words, the board of each RCDC association could thwart the merger at their club with a simple majority vote to refuse to sign the Acknowledgment and Joinder. This gave each board veto power over the merger at their club; they could refuse to sign the Acknowledgment and Joinder with a simple majority vote of the directors.

103.    Intent on pushing the merger through at all costs and knowing that a complete disclosure of the power each association board had would doom the merger, the Marriott Defendants withheld the 2013 Affiliation Agreement from all of the association boards when asking them to sign the Acknowledgment and Joinder.

104.    The Marriott Defendants were able to perpetrate this fraud because they had pervasive control over each RCDC association board, and also because they had crafted the