# NOTICE OF REMOVAL

# EXHIBIT A
## Part 4 of 5

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 21 of 60

71.    On November 19, 2011, Marriott International formally spun off the Marriott Vacations Worldwide entities as a separately traded public company (NYSE: VAC). Marriott International gave this new company licensing agreements allowing it and its subsidiaries to use the "Marriott" and "Ritz-Carlton" brand and trade names, trademarks, and service marks subject to strict restrictions. Because Marriott International owns these tradenames, all or most aspects of Marriott Vacations Worldwide's business are controlled by Marriott International. Marriott International's approval was either required, or as a practical matter necessary, for most major decisions by Marriott Vacation Worldwide, including the merger of the RCDC with the MVC that is the subject of this Complaint. Marriott Vacations Worldwide regularly reported to Marriott International on the status of the RCDC-MVC merger, and worked together to increase sales of MVC points through cross marketing and referrals from Marriott International's "Marriott Rewards" loyalty program. In addition, Marriott International subsidiaries played major roles in the operation of Ritz-Carlton Destination Clubs, including the Ritz-Carlton Great Bay.

72.    Pursuant to the License Agreement between Marriott International and Marriott Vacations Worldwide Corporation executed as part of the spin-off, Marriott Vacations Worldwide was to pay Marriott International $50 million annually, plus 2% of annual sales (including of MVC points), for the right to use the Marriott and Ritz-Carlton tradenames and marks.

73.    In the months following the spin-off, under the direction of Marriott Vacations Worldwide Chief Operating Officer and Executive Vice President Lee Cunningham and Chief Executive Officer Stephen Weisz, the MVW Defendants began the work needed to carry out Marriott Internationals' plan to radically re-engineer the RCDC — with the support, assistance, and oversight of Marriott International. The goal was to increase the revenue and profits of both the MVW and the MII Defendants. In a nutshell, the plan was to merge the RCDC and MVC product lines and use the "halo effect" of the storied Ritz-Carlton brand and the prospect of access to the luxury Ritz-Carlton Destination Club properties to sell more MVC points at higher prices.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 22 of 60

74.     Cunningham wore many hats for the Marriott Vacations Worldwide entities, essentially alter egos, including leading Lion & Crown, RC Development, and Cobalt, often signing in a general role for RCDC.

75.     Stephanie Sobeck, an RCDC executive critical to the scheme alleged here, similarly wore other hats, such as leading the Ritz-Carlton Management Company.

76.     In or about late 2011, a group of senior Marriott Vacations Worldwide executives on a committee called the Corporate Growth Committee was presented with a specific strategic plan to accomplish the merge. The Corporate Growth Committee instructed MVC's Law Department to analyze the legal risks involved in merging the two clubs. With advice from a large and very sophisticated legal division, the Marriott Defendants knew the RCDC-MVC merger might bring litigation but decided to proceed with the merger anyway. These conclusions are summarized in a December 2011 report.

77.     In its first Annual Report filed following the spin-off, dated March 21, 2012, Marriott Vacations Worldwide revealed:

> [W]e have significantly scaled back our development of Luxury segment vacation ownership products. We do not have any Luxury segment projects under construction nor do we have any current plans for new luxury development. While we will continue to sell existing Luxury segment vacation ownership products, we also expect to evaluate opportunities for bulk sales of finished inventory and disposition of undeveloped land.

78.     In its annual report the next year, Marriott Vacations Worldwide repeated similar language and then noted:

> During 2012 we placed inventory from one of our Luxury properties into the [Marriott Vacation Club] program, and we intend to place most of our remaining Luxury inventory into the [Marriott Vacation Club] program. We have repositioned our Luxury sales centers to sell the [Marriott Vacation Club] points product.

79.     In May 2012, recognizing the legal risks but proceeding anyway, Marriott Vacations Worldwide's Corporate Growth Committee approved the proposed RCDC-MVC merger. This plan included (a) closing all RCDC sales centers, with some to become MVC timeshare sales offices; (b) transferring unsold RCDC fractionals to the NATO land trust so that

Complaint
*Helman, et al. v. Marriott International, et al.*                                   Page 23 of 60

MVC points members could access the unsold inventory at the various RCDC properties; and (c)

pursuing formal affiliations with each RCDC owners association to permanently merge the two

clubs, allowing further trading of MVC points for non-MVC-owned RCDC fractional units. The

plan acknowledged that the level of MVC points needed to exchange into an RCDC must be set

low enough that the average MVC points user could gain access. Marriott International ratified

these decisions and reaped huge rewards to the detriment of Plaintiffs and the proposed Class.

80.     Under this new business model, Marriott Vacations Worldwide and Marriott

International leveraged the allure of access to luxury RCDC properties with the storied Ritz-

Carlton brand to sell more and higher-priced MVC points. Indeed, beginning in July 2011 and

continuing to the present, MVC sales presentations and promotional material have prominently

featured access to Ritz-Carlton Destination Club properties. That Marriott Vacations Worldwide

abandoned plans to expand the network of RCDC properties did not pose a problem for this new

business model. Nor did it matter that only some RCDC inventory is actually available to MVC

members. The mere possibility of access is enough to sell more MVC points at higher prices.

Experts in the industry refer to this as the "halo effect." This phenomenon drove profits for the

Marriott Defendants.

## H.     The Marriott Defendants Encounter Massive Opposition After Announcing the Merger

81.     The first public announcement of the Marriott Defendants' intention to merge the

Marriott Vacation Club with the Ritz-Carlton Destination Club came on July 17, 2012, when

Eveleen Babich, posing as a "General Manager" of Cobalt, disclosed one aspect of the RCDC-

MVC merger to all RCDC fractional owners. In fact, Babich did not write or even see the letter; it

came from MVW's executives on the Corporate Growth Committee. They described the ability of

RCDC owners to one or more of the RCDC weeks for MVC points that they could use to access

MVC properties:

> *Based on the Ritz-Carlton Destination Club member feedback*, additional benefits and
> experiences will be available through a new affiliation with Marriott Vacation Club
> Destinations . . . Affiliation will extend to you the opportunity to deposit your Reserved

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 24 of 60

Allocation on an annual basis. Once you deposit, the following will be available for you: . . . Secure any of the 51 worldwide Marriott Vacation Club Resorts . . . .

(Emphasis added.) In fact, discovery in the related cases clearly shows that this merger was not initiated in response to "member feedback." Rather, the Marriott Defendants' express purpose was to profit at the expense of Plaintiffs, members of the proposed Class, and other RCDC owners.

82.    This letter was misleading in several other respects. The Babich letter was on Ritz-Carlton Destination Club letterhead, as if that were an entity independent of Marriott and bore her signature as general manager of Defendant Cobalt, the supposedly independent company vested with discretion under the governing documents over the exchange program through which RCDC owners could access other RCDC properties. In fact, Babich was not a "general manager" and Cobalt had no existence independent of Marriott Vacations Worldwide; all of Cobalt's officers were Marriott Vacations Worldwide executives, and it had no employees or offices of its own. In short, Cobalt is and was the alter ego and tool of Marriott Vacations Worldwide. The same is true on information and belief of the other Marriott Vacations Worldwide subsidiaries except MORI.

83.    Moreover, the letter did not disclose that the 400,000-plus Marriott Vacation Club members would be able to access to the exclusive RCDC private residence clubs. Babich assured owners nothing about their private residence club would change even though she and other senior Marriott executives knew that would not be the case. Further, the letter did not disclose that the Marriott Defendants would transfer unsold and foreclosed RCDC inventory to the NATO land trust for use by MVC members.

84.    Babich's July 17, 2012, letter is typical of the many related communications that followed. For example, just a month later in another mass mailing intended to slow down a groundswell of opposition, Marriott Vacations Worldwide COO Cunningham repeated the false assurance that "nothing has changed or will change as a result of the announcement." Discovery in the related cases proves the Marriott Defendants knew that statement was false. Indeed, the Ritz-Carlton Destination Club has been fundamentally transformed as a result of the merger. Among other things, it is no longer an exclusive private residence club akin to a second home. An influx

Complaint
*Helman, et al. v. Marriott International, et al.*                                             Page 25 of 60

of MVC members enjoy a right of transient occupancy. Resale values for RCDC fractionals have

collapsed as a result of the merger and the Marriott Defendants' related misconduct.

85.     The July 17, 2012 letter also informed the RCDC owners that they were losing two

clubs — the Ritz-Carlton Abaco and the Ritz-Carlton Kapalua — but concealed from the owners

that the loss resulted from the RCDC re-engineering plans approved by the Marriott Defendants

in May 2012. The loss of options within the RCDC network had a two-fold benefit for the Marriott

Defendants. First, the Marriott Defendants saved costs by shedding expenses associated with

maintaining luxury properties to the standard required by the Marriott International licensing

agreement. Second, as options to trade weeks within the RCDC system dwindled (soon other

RCDC properties would be lost too), there was a greater chance that RCDC owners, when faced

with dwindling options, would trade RCDC weeks for MVC points and thereby increase RCDC

inventory for the Marriott Vacation Club.

86.     Within the next month or so, the boards of the associations in Aspen Highlands,

Bachelor Gulch, and St. Thomas sent letters expressing their concern about this merger. A letter

dated August 3, 2012, from the Association in St. Thomas stated the following to Plaintiffs and

the proposed Class:

> Let us take this opportunity to assure you that your Boards of Directors are not
> taking this "evolution" notice lightly from the RCDC Parties. We are currently evaluating
> the systemic changes they have communicated in their letter to see how it will affect our
> club and, together with all of the other remaining RCDC Club Associations, assessing the
> impact on the entire RCDC system.
> We have been in frequent communications with each other and the Presidents of
> the other RCDC Clubs since this announcement. Our general but preliminary consensus
> regarding the "evolution" of the RCDC brand as described in Eveleen Babich's letter of
> July 17th is that we are concerned that this may not be an enhancement to our Membership
> Interests. We all, as members, invested in the Ritz-Carlton brand!
> Please rest assured that your Board will hold the RCDC Parties accountable to
> preserve, maintain and continually enhance the Ritz-Carlton Destination Club product they
> developed and sold to all of us.

87.     In August 2012, an internal email to Marriott Vacations Worldwide executives

described the negative follow-up to a Marriott webinar about the proposed affiliation. Jacqueline

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 26 of 60

Ader-Grob, Senior Manager of Public Relations for RCDC, was monitoring social media and
quoted "several Facebook conversations from the Members' private groups." In this email, which
was forwarded to Cunningham, she wrote: "The two most vocal group[s] continue to be St.
Thomas and Aspen, which is where the feeds below come from after the call yesterday." The email
excerpts, for example, a St. Thomas owner stating that they "know (and owning both MVCI[6] and
RCC) that you are not comparing apples to apples with these two types of 'weeks.'" Another wrote:
"Such incredib[]le spin! Really, such BS (pardon my French)," and another, "It also looks like we
are going to have a much harder time using week for week exchanges due to partial week point
users. Our units are also going to have a lot more wear & tear."

88.     On August 28, 2012, CEO and President of Marriott Vacations Worldwide Steve
Weisz and Lee Cunningham (identified in his Ritz-Carlton Club role) held a conference call for
Ritz-Carlton Members. Weisz touted his ongoing commitment to the Ritz-Carlton luxury brand
post-spin off from Marriott International. Cunningham admitted that Babich had been wrong to
say nothing had changed but says that other than the removal of two clubs from the system, nothing
else about the original membership benefits had in fact changed. He also misleadingly answered
the question of how the merger would address the value of the RCDC fractional interests by
calculating the number of MVC points that would be required to reserve several weeks at Aspen
and St. Thomas—glossing over the fact that most MVC points users would not be staying for such
long periods, requiring lower costs of entry. On August 30, 2012, the same entities issued a set of
frequently asked questions addressing the proposed affiliation that essentially cribs from
Cunningham's August 28, 2012, remarks.

89.     On December 3, 2012, an attorney retained by the Association, James M. Derr,
Esq., delivered to the MVW Defendants a "cease and desist" letter, stating, among other points:

> It has come to the [Association]'s attention that Marriott Vacations Worldwide
> Corporation ("MVW"), through its Marriott Vacations Worldwide program [i.e., MVC],
> has begun, or is in the process of beginning to promote the use of the Residence Interests
> at the Ritz-Carlton Club, St. Thomas to Marriott Vacation Club members who are non-

---

[6] MVCI is an acronym for Marriott Vacation Club International, which is one of the many names by
which MORI does business.

deeded members of Marriott Vacation Club's timeshare/points/exchange system and are not also members of the Ritz-Carlton Destination Club. It has also come to the [Association]'s attention that The Ritz-Carlton Management Company, LLC, an affiliate of MVW and the manager of the COA (the "COA Manager"), RC Hotels (Virgin Islands), Inc., RC St. Thomas, LLC and The Ritz-Carlton Development Company, which presently own unsold and returned Residence Interests at the [Association], are active and willing participants in and beneficiaries of such promotion and resulting use. Further, we believe that part of the plan of each of these entities involves the conveyance of these Residence Interests to an entity we believe is known as The Marriott Trust ("Trust"), which will ultimately hold title to the Residence Interests and will exert ultimate control and direction over their use in the Marriott Vacation Club program. . . .

> The [Association] demands that MVW, the HOA Manager, the Program manager and their respective affiliates and each of the entities you represent immediately cease and desist from promoting the use of the Residence Interests at the [Association] to the MVC Members and permanently refrain from implementing any such program at the Ritz-Carlton Club, St. Thomas.

> In addition to violating the Declaration, any practice of allowing the use of the Residence Interests by MVC Members may constitute, among other things, one or more breaches of the fiduciary duties of the COA Manager to the Association under the COA Management Agreement as a result of self-dealing among the COA Manager, and the various Ritz-Carlton and Marriott entities and their respective affiliates to the detriment of the [Association] and its members.

90.     The Cease and Desist letter cited the Club Declaration, Article XI, section 11.1 (quoted *supra*) prohibiting commercial use of the fractionals, including "a pattern of rental activity or other occupancy by a Member that the Members Association, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice," as well as Article V, section 5.5, which provided that: "In no event . . . shall a member convey or encumber less than a Residence Interest . . . , attempt to subdivide a Residence Interest into lesser interests, or merge together more than one Residence Interest." Derr ended the letter by stating:

> I look forward to receiving your collective written confirmation by December 5, 2012 that each of MVW, the COA Manager, the Project Manager, the Marriott licensor entity and their respective affiliates will immediately cease and desist from promoting the use of the Residence Interests to MVC Members and permanently refrain from implementing any such program at the Ritz-Carlton Destination Club, St. Thomas. In the absence of such written confirmation by such date, the COA will have no choice but to pursue claims regarding the circumstances described in this letter.

Complaint
*Helman, et al. v. Marriott International, et al.*                                          Page 28 of 60

91.     The Marriott Defendants averted the threatened new lawsuit by, in early 2013, promising to put the issue of the RCDC-MVC merger to a vote of owners at each RCDC property. Lee Cunningham memorialized this promise in a mass email to all RCDC owners on May 14, 2013.

I.      **The Marriott Defendants Resort to Trickery to Overcome the Member Opposition and Explicit Prohibitions in the Governing Documents**

92.     On December 11, 2012, owners at Bachelor Gulch and Aspen Highland properties filed a lawsuit in federal court in Minnesota (Case No. 12-CV-03093-DSD-JJK) against Marriott Vacations Worldwide, MORI, RC Hotel Co., RC Management, RC Development and others, based in part on Marriott's "intention to 'affiliate' the formerly exclusive RCDCs with the Marriott Vacation Clubs. . . ." As a result of that lawsuit and cease and desist letters sent by counsel for the St. Thomas, Aspen Highlands, and Bachelor Gulch associations, the Marriott Defendants were fully aware of the vehement opposition to their plans to leverage the Ritz-Carlton "halo effect" to sell MVC points and that this opposition threatened their merger plans.

93.     Top executives of the Marriott Defendants, including Cunningham and Weisz, decided at a Strategic Council meeting in January 2013 that they needed an aggressive, club-by-club strategy to win the votes needed for their merger. They agreed that Marriott Vacations Worldwide would undertake an aggressive campaign, using an outside communication firm, aimed at each RCDC property to give them the best chance. Marriott Vacations Worldwide hired marketing and other public relations and survey experts to help them "sell" the merger.

94.     For example, the company commissioned APCO, a national firm based in Washington, D.C., to conduct a professionally designed and executed system-wide survey in the summer of 2013 (the "APCO Survey"). But this backfired. Almost 800 RCDC owners responded, and the results were not equivocal: Owners nearly unanimously opposed the MVC merger and vehemently so.

95.     Plaintiffs and the proposed Class were no exception. Out of the 797 survey respondents, 323 were St. Thomas owners. They were expressly vocal about opposing any such affiliation, with their frustration building on each of the Marriott Defendant's prior bad acts.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 29 of 60

96.     Meanwhile, Bachelor Gulch exited the RCDC system (and lost the Ritz-Carlton "flag") after its owners voted to reject the RCDC-MVC merger and not renew its management contracts. Opposition to the merger there was so vehement that owners preferred the costly loss of the Ritz-Carlton name rather than suffer the consequences of the merger. Internal Marriott correspondence obtained in the related litigation reveals that senior Marriott Defendants executives became concerned they would lose other votes as well. Faced with this harsh reality, the Marriott Defendants surreptitiously breached the promise made by Cunningham that each RCDC club would be allowed to vote on the proposed merger.

97.     In Aspen Highlands, San Francisco, and Tahoe, the Marriott Defendants quietly delayed and substituted a highly misleading survey for the promised vote, then hoodwinked the association boards at those clubs and, on information and belief, at St. Thomas into consenting to the merger, as more fully alleged below. Indeed, the St. Thomas board signed a joinder to and acknowledgment of the affiliation immediately after the vote.

**J.      The Marriott Defendants Hide a Key Agreement from the Various Boards**

98.     When Plaintiffs, members of the proposed Class, and others purchased their RCDC fractionals, they were given a confusing raft of disclosure documents and agreements. But the contractual picture was even more confusing than that, for there were additional agreements that the Marriott Defendants hid.

99.     As alleged above, there were various management agreements that delegated powers to RC Hotels VI, RC Hotel Co, and RC Management. One of these agreements, the "Sub-Management Agreement" between RC Hotels VI and RC Management, gave RC Management the power to engage a "program manager" to manage and administer the exchange program whereby owners at one RCDC location can access other RCDC locations. An "Affiliation Agreement" designated Defendant Cobalt as the program manager. Confusing provisions in this agreement allowed the Marriott Defendants to falsely claim to the various boards (and repeatedly assert in the related litigation) that the governing documents gave Cobalt "sole discretion" to merge the RCDC with the MVC.

Complaint
*Helman, et al. v. Marriott International, et al.*                              Page 30 of 60

100.    Indeed, the Marriott Defendants rebuffed opposition to the merger by association boards by claiming that this grant of "sole discretion" to Cobalt meant the merger would go through with or without their approval. To the courts presiding over the related cases, the Marriott Defendants argued this grant of "sole discretion" to Cobalt defeated damages claims based on the merger. As it turned out, these were patent and deliberate falsehoods contrived to mislead anyone perceived to have power over the merger.

101.    In fact, there were two other affiliation agreements that the Marriott Defendants did not disclose to purchasers. In a 2010 affiliation agreement, Cobalt delegated its authority to Lion & Crown, another Marriott Vacations Worldwide subsidiary. Then, Lion & Crown signed the 2013 Affiliation Agreement with MRTC, yet another Marriott Vacations Worldwide subsidiary. This latter affiliation agreement was the one that provided for a the RCDC-MVC merger, *but with a critical qualification that the Marriott Defendants concealed for years. Before the merger could extend to a particular RCDC property, the association board at that club had to sign an "Acknowledgment and Joinder" to the 2013 Affiliation Agreement.*

102.    In other words, the board of each RCDC association could thwart the merger at their club with a simple majority vote to refuse to sign the Acknowledgment and Joinder. This gave each board veto power over the merger at their club; they could refuse to sign the Acknowledgment and Joinder with a simple majority vote of the directors.

103.    Intent on pushing the merger through at all costs and knowing that a complete disclosure of the power each association board had would doom the merger, the Marriott Defendants withheld the 2013 Affiliation Agreement from all of the association boards when asking them to sign the Acknowledgment and Joinder.

104.    The Marriott Defendants were able to perpetrate this fraud because they had pervasive control over each RCDC association board, and also because they had crafted the Acknowledgment and Joinder in a highly misleading way that obscured what would happen if a board refused to sign it.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 31 of 60

105.    On information and belief, not knowing it had this power to stop the merger, the
Association at St. Thomas signed the Acknowledgment and Joinder, and the "affiliation" was
given an effective date of December 5, 2014.

106.    Not coincidentally, they failed to produce the 2013 Affiliation Agreement in the
related litigation until Plaintiffs discovered its existence in March 2018, years after those cases
were first filed and after discovery was well underway, with document production and depositions
essentially completed. This resulted in the federal court presiding over the litigation in Aspen
Highlands to sanction the Marriott Defendants. *See RCHFU, LLC v. Marriott Vacations
Worldwide Corp.*, 2018 WL 6839800 (D. Colo. Dec. 31, 2018). But concealing the 2013
Affiliation Agreement was worth that cost. Indeed, concealment of the 2013 Affiliation Agreement
was an integral part of the fraudulent scheme that the Marriott Defendants perpetrated between
2012 and 2018 across the entire RCDC network and in three related cases.

107.    Further, providing the 2013 Affiliation Agreement to each of the association boards
and their respective members would have revealed its numerous one-sided and unfair terms that
transferred significant control from the associations to the Marriott Defendants. For instance,
Section X created a ten-year term for the RCDC-MVC merger and that term automatically renews
for additional five-year terms. Critically, once an association signed the Acknowledgment and
Joinder, it had no further power to withdraw from the merger as termination rights rest solely with
the MVW Defendants.

108.    Further, the 2013 Affiliation Agreement gave the Marriott Defendants significant
use rights in the RCDC properties, above and beyond the use rights given to owners themselves
under the Club Declaration. The Marriott Defendants secured the right during certain periods to
use the Ritz-Carlton Great Bay for "marketing and sales of Interests, vacation ownership interests
at other resort condominiums or club resorts, or such other vacation ownership or multisite
vacation ownership or membership plans developed or marketed by [MVC] or its affiliates."

109.    The Marriott Defendants further secured the right to use exchange time at Ritz-
Carlton Great Bay "*for any purpose,* including, without limitation, in [MVC]'s sole and absolute

Complaint
*Helman, et al. v. Marriott International, et al.*                                   Page 32 of 60

discretion, any purpose related to marketing, selling, or promoting the [MVC] Program or other

timeshare or fractional projects developed, marketed or offered by [MVC]'s affiliates." (Emphasis

added).

110.    Furthermore, it is customary for such exchange agreements to specify a formula for

allocating exchange time between various programs. But section 7.8 of the 2013 Affiliation

Agreement gave MVC the sole and absolute discretion to calculate the value of exchange time,

meaning that the Marriott Defendants could and likely would use 100% of the exchange time

committed by Ritz-Carlton Great Bay owners. Likewise, while it is customary for exchange

agreements to fairly allocate costs between affiliating exchanges, the 2013 Affiliation Agreement

has no such provision. Indeed, the cost allocation was grossly one-sided and likely to lead to

increased costs for Ritz-Carlton Great Bay owners. Section 7.1 of the Agreement reserved for the

Marriott Defendants the right to charge Ritz-Carlton Destination Club owners for use of the

exchange program, but explicitly prohibited Lion & Crown — which had the power to affiliate the

RCDCs with external programs — from charging Marriott Vacation Club members fees for

exchanging into the Ritz-Carlton Destination Club.

K.      **The Marriott Defendants Manufacture a Financial Crisis to Overcome
        Opposition to the RCDC Merger**

111.    On October 27, 2008, the Association wrote to all owners at the Ritz-Carlton Great

Bay informing them of a Special Assessment due to a problem with delinquent maintenance dues.

The Association emphasized the impact of the mortgage crisis, calling the delinquencies,

foreclosures and units for sale as "at an all-time high," causing values to decline. The letter cited

almost $1 million in unpaid dues, about half of which was delinquent 2008 owner dues, with the

remainder from prior years.

112.    The October 27, 2008 letter failed to inform Plaintiffs and the proposed Class that

the overwhelming percentage of delinquent owners had also defaulted on their mortgages —

mortgages in which RC Development or another Marriott Defendant subsidiary was the

mortgagee. Moreover, the letter did not reveal that RC Hotels VI and RC Development were

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 33 of 60

delaying foreclosure proceedings. This slow-walking of foreclosures was a substantial cause of the $1,000,000 (and growing) delinquency in maintenance dues owed to the Association.

113.    RC Development's delay in foreclosing violated its own policies regarding judicial foreclosures which, on information and belief, requires a judicial foreclosure action to be filed within 80 days of default. But the Marriott Defendants had reasons to delay them. First, by delaying foreclosures, the Marriott Defendants avoided having to pay the maintenance dues owed on foreclosed units. Second, the delays created a financial crisis that the Marriott Defendants used as leverage, including to obtain approval for their merger from Plaintiffs and the proposed Class.

114.    On information and belief, by the end of the year 2010, the Association had accrued over $3,000,000 in unpaid maintenance fees. The Marriott Defendants' decision not to foreclose on delinquent owners caused the great majority of this bad debt expense. On November 14, 2011, at the behest of the Association, Plaintiffs and the proposed Class voted to amend the Club Declaration to allow the Association to rent the fractionals owned by delinquent owners with the proceeds to be used by the Association to cover delinquent maintenance dues. This helped but did not entirely solve the problem. A perception remained that delinquent dues threatened serious harm to the Ritz-Carlton Great Bay.

**L.    *RC Hotels (Virgin Islands), Inc v. B&T Cook Family Partners, Ltd and Great Bay Condominium Owners Association***

115.    It was not lost on the Association that the Marriott Defendants were slow-walking foreclosures. On or about July 25, 2011, the Association had attorney James M. Derr, Esq. file a counterclaim in a foreclosure suit filed on behalf of the RC Hotels VI. The Association alleged that the Marriott Defendants had violated their fiduciary duties by delaying the filing of that particular foreclosure action for seven months from default, resulting in injury to the Association in the form of accruing unpaid maintenance fees.

116.    On July 20, 2012, the court rejected a motion to dismiss filed by the Marriott Defendants. By that time, delinquent maintenance dues were in excess of $4,000,000, of which the great majority resulted from the Marriott Defendants' failure to timely foreclose. In a published opinion, the court agreed that pursuant to the management agreement prepared by the Marriott

Defendants, RC Hotels VI assumed all of the duties of the Board of Directors, and that as a

consequence, RC Hotels VI assumed a fiduciary relationship with the Association. The court

stated:

> that a reasonable person can infer that RC Hotels did not exercise the proper standard of
> care required as Great Bay's managing agent, *since the sooner a foreclosure action is filed,*
> *the sooner the parties can obtain the monies owed on the Note and for assessment of fees.*
> *The longer it takes for the commencement of the foreclosure action, the more assessments*
> *accrue, Thus, . . . the Court finds that Great Bay's claim for breach of fiduciary duty is*
> *plausible on its face.*"

*RC Hotels (Virgin Islands), Inc v. B&T Cook Family Partners, Ltd and Great Bay Condominium*

*Owners Association*, 57 V.I. 3, * 11 (V.I. Super. July 20, 2012) (emphasis added).

117.    Neither the Association nor the Marriott Defendants ever disclosed this significant

win to Plaintiffs and the proposed Class. Had they known the Marriott Defendants owed a fiduciary

duty to promptly foreclose, they may not have voted in the manner described below. The obvious

alternative was to sue the Marriott Defendants for breach of fiduciary duty and recover a judgment

for unpaid maintenance dues. As far as Plaintiffs and the proposed Class knew, there was still a

brewing financial crises resulting from delinquent maintenance dues.

118.    By the end of 2013, approximately 138 owners at Ritz-Carlton Great Bay were

delinquent on their Marriott-held mortgages and had also defaulted on maintenance dues owed to

the Association, with nearly 100 of them delinquent for multiple years. The total amount of

uncollected maintenance dues approached $7 million, even though, as noted, the Association had

begun mitigating losses through rentals.

M.    **The Marriott Defendants Game a Vote at the Ritz-Carlton Great Bay**

119.    In January 2013, the Marriott Defendants approached the St. Thomas Association

board with a proposal to solve the perceived financial crisis for which the Marriott Defendants

were liable under the *B&T Cook Family Partners* ruling. The Marriott Defendants proposed that,

in exchange for an owner vote in favor of the merger, they would begin foreclosure proceedings

on each fractional interest in which the member had defaulted on a Marriott Vacations Worldwide-

affiliated mortgage and begin paying the delinquent maintenance dues. Among other things, the

vote would allow the Marriott Defendants to transfer the foreclosed and unsold inventory to the NATO land trust for use by MVC members.

120.   On February 22, 2013, Association President John Doyle and Treasurer Thomas Doyle travelled to Marriott Vacations Worldwide's headquarters in Orlando, Florida to discuss this proposal. The Marriott Defendants conceded that the Club Declaration potentially blocked them from including the Ritz-Carlton Great Bay in the RCDC-MVC merger, even if they ignored Derr's warning that they were breaching their fiduciary duties and attempting unjust enrichment. The Marriott Defendants therefore sought the vote of owners described herein.

121.   On December 13, 2013, the Association board sent a letter to Plaintiffs and members of the proposed Class recommending that they vote in favor of amending the Club Declaration as requested by the Marriott Defendants. The letter, which was drafted and/or edited by the Marriott Defendants, failed to disclose that the consideration Marriott Vacations Worldwide was proposing for the favorable vote was illusory. Not only did the MVW Defendants have a fiduciary duty to promptly foreclose and concomitantly start paying maintenance fees, but also the Association and its members had a viable claim against the MVW Defendants for the approximately $7 million in unpaid maintenance dues that had accrued by then.

122.   In addition, on December 18 and 19, 2013, the Marriott Vacations Worldwide held a webinar for the owners at the Ritz-Carlton Great Bay in which they attempted to convince Plaintiffs and the proposed Class to vote for the RCDC-MVC merger.

123.   Further, on or about said dates, the Marriott Defendants provided owners with a set of Frequently Asked Questions. Question 6 asked: "If this program is approved, is there an end period to The Ritz-Carlton Destination Club taking over delinquent members or, once approved, is this program ongoing?" And Marriott answered: "The Ritz-Carlton Destination Club will seek liens and foreclosures on new delinquent Members and pay the annual assessments on new delinquent interests once the foreclosure is achieved or a deed in lieu of foreclosure (DIL) is obtained. . . ." Similarly, Question 9 asked: "How many total fractions are currently involved with this transaction (i.e., how many total delinquencies and foreclosures are there)?" Marriott

answered: "There are approximately 130 delinquent fractions included in the Agreement. If the proposal is approved, over the next two years, The Ritz-Carlton Destination Club would cover Club dues for all of the approximately 130 delinquent fractional interests for which The Ritz-Carlton Destination Club receives title. This would relieve the Association of approximately one million dollars of ongoing annual bad debt expense beginning with the 2015 Club budget."

124.    Both the webinars and FAQs were materially misleading, and omitted material information that the MVW Defendants were under a fiduciary obligation to provide, including the fact that the consideration Marriott Vacations Worldwide was proposing for the favorable vote was illusory. The Marriott Defendants also failed to disclosure the numerous one-sided and unfair terms contained in the undisclosed 2013 Affiliation Agreement that transferred permanent and significant control from the Association to the Marriott Defendants.

125.    Further, although the Marriott Defendants owed Plaintiffs and the proposed Class fiduciary duties, the Marriott Defendants concealed from Plaintiffs and the proposed Class that a national appraisal firm hired by the Marriott Defendants had concluded that the merger would negatively impact the owners' fractional interest values.

126.    The vote took place on January 26, 2014.  Faced with misrepresentations and incomplete information, Plaintiffs and the proposed Class voted to approve the merger.

127.    The Marriott Defendants emailed Plaintiffs and the proposed Class two days later, stating in part:

> We are pleased to advise that the proposal extended by your Board and The Ritz-Carlton Destination Club has been accepted and as a result of the vote, the Association will receive funds in relation to the current delinquent Member inventory that will greatly assist in the Association's financial position and in return The Ritz-Carlton Destination Club will have the ability to convey fractional interests in the Club to the MVC Trust. St. Thomas Members will also have the opportunity later this year to exchange with the Marriott Vacation Club Destinations Exchange Program if they choose to do so.

128.    The effective date of the RCDC-MVC affiliation at St. Thomas was in December 2014, with access provided soon thereafter.

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 37 of 60

129.    In summary, the Marriott Defendants obtained approval for the merger at the Ritz-Carlton Great Bay by means of a fraudulently obtained vote of owners. More specifically, the Marriott Defendants engaged in proxy-fraud by including false and misleading statements in communications with the owners while omitting other material facts. Among other things, this violated the Marriott Defendants' fiduciary duty of utmost good faith and candor to Plaintiffs and the proposed Class.

### N.    Marriott International and MVC Profit Greatly at the Expense of RCDC Owners

130.    The results of the above-described conduct, culminating in the 2014 merger, were disastrous for Plaintiffs and the proposed Class. Among other harms, their fractional interest values declined such that they can barely give them away.[7]

131.    The coerced, fraudulently obtained merger of the Ritz-Carlton Great Bay with the MVC, along with the other misconduct alleged herein, including the slow-walking of foreclosures by the Marriott Defendants and the resulting increase in maintenance dues to Plaintiffs and the proposed Class, caused the values of Plaintiffs' and Class members' fractionals to be far lower than the otherwise would be. These values already were fragile given the Marriott Defendants' decision to abandon the luxury RCDC product line in service of building up the MVC points program. In contrast, the association of the highly regarded luxury Ritz-Carlton Great Bay with the lower-ranked Marriott Vacation Club program had a halo effect for that program, increasing its prestige and allowing it to sell more MVC points at higher prices and earn hundreds of millions in ill-gotten revenues, which this lawsuit seeks to disgorge.

132.    The loss in value post-affiliation was also caused in part by potential fractional purchasers' understanding that an influx of MVC members who had no long-term investment at

---

[7] As an MVC member posting on the popular timeshare blog tuggbbs.com noted in November 2015, "The timeshare sales team still pitch [St. Thomas] as the Ritz Carlton Destination Club, but admit that it is really just MVC. . . . It is great for us that this property is now in the Trust, as the points chart is now fixed, and we benefit from the contractual access to the hotel. It is unfortunate for the original Ritz owners as they fund the MFs [maintenance fees] on the property that is now accessible to us." https://tugbbs.com/forums/index.php?threads/ritz-carlton-st-thomas.235224/

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 38 of 60

the St. Thomas resort would lead to increased wear and tear from increased turnover and a diminishment in the resort's renowned peace and calm.

133.    Since this vote, the value of Great Bay fractionals has continued to decline, while the Marriott Defendants have reaped huge profits by using the allure of the RCDC to sell MVC points to the masses at a much lower price point. Marriott Vacations Worldwide's share price rose since the beginning of the re-engineering to above $150.

## CLASS ALLEGATIONS

134.    Plaintiffs bring this action on behalf of themselves and, under Virgin Islands Rules of Civil Procedure 23(b), as representatives of the following Class:

> *All entities and individuals (including their assignees) who, at any time from May 22, 2002 to January 26, 2014, purchased a 1/12 fractional interest at the Ritz-Carlton Great Bay, except that the following individuals and entities are excluded from the class: (a) those who financed their purchases through any Defendant and whose fractional interest was foreclosed upon, (b) any defendants named in this Complaint and any affiliate, parent, or subsidiary of any defendant; any successor or assignee of any defendant; any entity in which any defendant has a controlling interest; and any officer, director, or employee of any defendant.*

135.    Plaintiffs reserve the right to amend this "Class Definition" if discovery and further investigation reveal that the proposed Class should be expanded or otherwise modified.

136.    The Class is sufficiently numerous in that it numbers at least in the hundreds, rendering joinder of all members of the Class impracticable.

137.    Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the proposed Class have been subjected to the same wrongful conduct and have been damaged in the same manner.

138.    Plaintiffs will fairly and adequately protect the interests of the proposed Class. Plaintiffs are represented by competent counsel experienced in the prosecution of complex class actions. Plaintiffs' interests coincide with, and are not antagonistic to, those of the proposed Class.

Complaint
*Helman, et al. v. Marriott International, et al.*                                            Page 39 of 60

139.   Questions of law and fact common to all class members predominate over any
questions affecting only individual class members. Predominating common questions include,
without limitation:

a.   Whether any of the Marriott Defendants violated any provision of the Criminally
Influenced and Corrupt Organizations Act, 14 V.I.C. § 600, *et. seq.*

b.   Whether any of the Marriott Defendants owed fiduciary duties to Class members
and breached those duties.

c.   Whether any of the Marriott Defendants committed constructive fraud or fraudulent
concealment.

d.   Whether any of the Marriott Defendants aided and abetted or conspired with other
defendant to commit the wrongful conduct alleged herein.

e.   Whether any of the Marriott Defendants are liable for breach of the implied
covenant of good faith and fair dealing and/or breached any implied provisions of
the purchase contract.

f.   Whether any of the Marriott Defendants violated any provision of the Consumer
Protection Law of 1973 and the Consumer Fraud and Deceptive Business Practices
Act.

g.   Whether Plaintiffs and members of the proposed Class suffered a diminution in
value of their fractional interests, and if so, by how much.

h.   Whether any of the Marriott Defendants were unjustly enriched by the conduct
described herein, and if so, by how much.

i.   Whether Class members are entitled to disgorgement of the Marriott Defendants'
ill-gotten profits, and if so, the amount of disgorgement.

j.   Whether Class members are entitled to other forms of equitable relief, including
imposition of a constructive trust.

k.   Whether Class members are entitled to punitive damages, reasonable attorneys'
fees, pre-judgment interest, post-judgment interest, and/or costs of suit.

140.   A class action is superior to any other available method for the fair and efficient
adjudication of this controversy. Class treatment will permit a large number of similarly situated
persons to prosecute their common claims in a single forum simultaneously and efficiently. There
are no difficulties likely to be encountered in the management of this lawsuit that would preclude
its maintenance as a class action, and no superior alternative exists for the fair and efficient
adjudication of the controversy.

## COUNT I

### *Violations of 14 V.I.C. § 605(a) of CICO Against All Defendants*

141.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

142.    The MII and MVW Defendants formed an associated-in-fact enterprise to infiltrate and control the Association and perpetrate a scheme to defraud that began just before the spin-off of the MVW Defendants from Marriott International in November 2011 and that continued through the January 26, 2014 vote and thereafter as well.  As more fully alleged elsewhere in this Complaint, the MII and MVW Defendants accomplished this unlawful scheme to defraud by using their control over the Association, its board, and its communications with Plaintiffs and the proposed Class to manipulate them into voting for the RCDC-MVC merger based on a real or perceived financial crisis that the Marriott Defendants manufactured by slow-walking foreclosures in violation of their fiduciary duties. In addition, the MVW Defendants, acting at the behest and direction of the MII Defendants, drafted and sent other highly misleading communications to Plaintiffs and the proposed Class that concealed material facts.

143.    The MII and MVW Defendants, and each of them, are and at all relevant times were "persons" within the meaning of 14 V.I.C. § 604(l) that conducted and/or participated in, directly or indirectly, the affairs of the CICO enterprises (i.e., the associated-in-fact enterprise and the wrongfully infiltrated and controlled Association) alleged herein through a pattern of racketeering activity.

144.    At all relevant times, the Association was an "enterprise" within the meaning of 14 V.I.C. § 604(h) that the other Defendants infiltrated, operated, and controlled to perpetrate the scheme to defraud and other wrongful conduct alleged herein. In addition, and alternatively, the MII and MVW Defendants, and each of them, associated together for the common purpose of engaging in the ongoing course of racketeering/criminal activity alleged in this Complaint. They formed and operated an associated-in-fact enterprise to perpetrate the scheme to defraud and other wrongful conduct alleged in this Complaint (the "associated-in-fact enterprise"). Each member of

Complaint
*Helman, et al. v. Marriott International, et al.*                                   Page 41 of 60

the associated-in-fact enterprise participated in the conduct of this enterprise in furtherance of a

common purpose that they all agreed upon (i.e., the scheme to defraud alleged in this Complaint).

145.    Defendants agreed to function and did function as a unit and according to specified

roles, and each played specific roles to achieve that agreed upon purpose. Among other things,

beginning in 2011 and continuing to the present:

      a.    Using the governing documents that Marriott International and its subsidiaries
fashioned to ensure continuing control over nominally independent fractional
owners associations, such as the Association in St. Thomas, the MII Defendants
(through RC Hotels VI, RC Hotel Co., and otherwise) and the MVW Defendants
(using MORI personnel acting in the name of RC Management and other MVW
subsidiaries that had no actual employees of their own) manipulated the fractional
owners associations in St. Thomas, San Francisco, Tahoe, and Aspen into
supporting, approving, consenting to, and/or acquiescing to the RCDC-MVC
affiliation.

      b.    The MII Defendants (through RC Hotels VI, RC Hotel Co., and otherwise) and the
MVW Defendants (using MORI personnel acting in the name of RC Management
and other MVW subsidiaries that had no actual employees of their own) controlled
the flow of information to the owners associations, including the Association in St.
Thomas, the agendas for board meetings, and most other aspects of association
governance.

      c.    The MII Defendants (through RC Hotels VI, RC Hotel Co., and otherwise) and the
MVW Defendants (using MORI personnel acting in the name of RC Management
and other MVW subsidiaries that had no actual employees of their own) edited
communications from the boards of the various owners associations to RCDC
owners, including communications from the Association board in St. Thomas to
Plaintiffs and the proposed Class.

      d.    In consultation with and at the direction of Marriott International, the MVW
Defendants sent communications to RCDC owners, including Plaintiffs and the
proposed Class, that misstated material facts and concealed others.

      e.    Marriott International directed RC Hotels VI (and other MII subsidiaries) to slow-
walk foreclosures of the many fractional owners in St. Thomas that financed their
purchase through Marriott and fell behind on their mortgages and their maintenance
dues. The MII Defendants were joined in this effort by Marriott Vacations
Worldwide, which directed RC Development (and other MVW subsidiaries) to
slow-walk these foreclosures. This was actually done by MORI personnel because
RC Development and other MVW subsidiaries had no actual employees of its own.

      f.    Marriott Vacation Worldwide and MORI, acting in the name of Cobalt, Lion &
Crown, and MRTC, three MVW subsidiaries with no employees or existence of

Complaint
*Helman, et al. v. Marriott International, et al.*                                          Page 42 of 60

their own, executed a confusing web of affiliation agreements, including the 2013
Affiliation Agreement and the Acknowledgment and Joinder, to effect the merger.

g.      Once Plaintiffs and the proposed Class were deceived into voting for the RCDC
merger, Marriott International had RC Hotels VI (and other MII subsidiaries), and
Marriott Vacations Worldwide had RC Development (and other MVW
subsidiaries) transfer foreclosed and unsold inventory to the NATO land trust for
use by Marriott Vacation Club members.

146.    The MII and MVW Defendants acted in concert and conspired to deprive Plaintiffs
and the proposed Class of the value of their fractional interests at the Ritz-Carlton Great Bay. In
addition, the Marriott Defendants deprived Plaintiffs and the proposed Class of maintenance dues
that the Marriott Defendants would have had to pay to the Association had they timely foreclosed
on delinquent owners, as their fiduciary duties required them to do. Plaintiffs and the proposed
Class were required to pay increased maintenance dues to make up for the shortfall in Association
funds created by the Marriott Defendants' breach of their obligations, and Plaintiffs and the
proposed Class lost the benefit of maintenance dues that the Marriott Defendants would have had
to pay had they timely foreclosed.

147.    In furtherance of this scheme to defraud and other wrongful conduct, the MII
Defendants and the MVW Defendants participated in, directly or indirectly, the affairs of the CICO
enterprises alleged herein (i.e., the Association and the associated-in-fact enterprise) through a
pattern of criminal activity within the meaning of 14 V.I.C. § 604(j). This pattern consisted of
predicate acts of mail and wire fraud. 18 U.S.C. §§ 1341 and 1343. In addition, the Marriott
Defendants engaged in predicate violations of the Travel Act, 18 U.S.C. § 1952, with interstate
and foreign travel to and from the U.S. Virgin Islands, Bethesda, Maryland, and Orlando, Florida,
among other places, all in furtherance of this scheme to defraud. Specific predicate acts include
but are not limited to the following:

a.      During the weeks surrounding May 24, 2012, Lee Cunningham and agents of
MORI, RC Hotel Co., and other members of the CGC committee met in person,
emailed, and communicated by phone about various re-engineering steps, such as
transferring the remaining unsold developer inventory to the NATO Trust and
obtaining Marriott International's approval for selling points. They predicted that
the process could take a year to a year and a half to complete, extending beyond the

Complaint
*Helman, et al. v. Marriott International, et al.*                                                    Page 43 of 60

subsequent vote at St. Thomas to affiliate with MVC in exchange for the Marriott
Defendants taking action on the foreclosures. They also noted the concern about
whether the transfer could violate St. Thomas's governing documents' anti-
commercialization provisions, and discussed other communications.

b.      On September 12, 2012, David Mann participated in the annual Marriott
International/Marriott Vacations Worldwide senior executives meeting in
Bethesda, Maryland, which other members joined by phone, and discussed next
steps in the re-engineering, including the delinquencies at the St. Thomas and how
they harmed the other owners. Additional Marriott International agents
participating on information and belief included Tim Grisius, Kevin Kimball, Ken
Rehman, and Carl Berquist.

c.      Marriott International received the attorney's letter alleging breach of contract and
breach of fiduciary duty, among other violations, at the Aspen Highlands resort,
and on November 28, 2012, discussed it via conference call and an in-person
meeting in Orlando, Florida, with Marriott Vacations Worldwide executives, along
with other RCDC re-engineering updates.

d.      Marriott International's David Mann and Kevin Kimball participated the October
2, 2013, Marriott International/Marriott Vacations Worldwide Senior Executive
Quarterly Meeting in Bethesda, Maryland, which some participants joined by
phone, discussing, among other topics, the Re-engineering Plan update, furthering
the scheme.

e.      Marriott International participated in the June 25, 2014, Marriott
International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting
in Bethesda, Maryland, at which Cunningham once again gave an RCDC
Reengineering Plan update. They discussed that the unsold developer inventory at
St. Thomas was in the process of going into the Trust, effectuating the scheme.
Members joined by phone.

f.      RC Hotel Co. exercised Marriott International's authority over the Associations'
governance by emailing, on October 17, 2013, the Aspen board various documents
for a pre-read before its vote on the affiliation with the MVC—without sending the
2013 Affiliation agreement. As a distinct predicate act, on August 8, 2013, John
Hearns, the vice president of the RC Hotel Co, emailed the letter and survey
responses for the APCO member survey to all the RCC General Managers, noting
that Sobeck would discuss the results on an upcoming brand conference call.
APCO's detailed reports about its member study and focus groups show that the
possibility of the MVC affiliation was a serious concern among Ritz-Aspen
members. Despite learning about these grave member concerns, Marriott decided
to advance its own interests at the expense of Plaintiffs' interests by imposing the
MVC affiliation. The Marriott Defendants never gave the reports to any RCDC
Association boards, including the St. Thomas board, who were being asked for
input on whether their clubs should affiliate. Recognizing that the owners likely

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 44 of 60

would reject affiliation if they knew they had the power to do so, the Marriott Defendants concocted the foreclosure-related settlement plan at St. Thomas.

g.   On information and belief, shortly after the January 26, 2014 vote, RC Hotels VI transferred or participated in the transfer of RCDC fractional inventory to the NATO land trust, which transfers were accomplished using the mails and/or interstate wires.

h.   On January 3, 2012, Cunningham emailed the Action Item/Status Summary circulated at a recent Strategic Council meeting to other Marriott executives. This summary was linked to the Defendants' movement of RCDC inventory into the NATO trust.

i.   At the Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly meeting on May 30, 2012, attended in person in Orlando, Florida, and by phone, the Defendants, including Cunningham, confirmed the plan to stop selling Ritz-Carlton products, along with confirming other steps in the re-engineering process.

j.   On or about August 17, 2012, Cunningham sent the follow-up email to owners about Babich's July 2012 letter announcing the merger.

k.   On August 28 and 30, 2012, Steve Weisz and Cunningham held the conference call for Ritz-Carlton Members and then issued the FAQs.

l.   Marriott International received the attorney's letter alleging breach of contract and breach of fiduciary duty, among other violations, at the Aspen Highlands resort, and on November 28, 2012, discussed it via conference call and an in-person meeting in Orlando, Florida, with Marriott Vacations Worldwide executives, along with other RCDC re-engineering updates.

m.   Cunningham emailed all RCDC owners on May 14, 2013, promising a vote on the affiliation question.

n.   Lion & Crown, in concert with other Defendants, helped make the MVW-RCDC affiliation permanent by adding unexpected language in the Lion & Crown enrollment agreement in May 2013 after at least one board had reviewed the original provisions. For example, Cunningham engaged in both email and phone conversations with the board of the Association at the Aspen Highlands on June 4, 2013, in furtherance of the scheme, as did Sobeck.

o.   On July 23, 2013, Cunningham emailed RCDC owners reminding them to complete the APCO survey.

p.   Although the Marriott Defendants owed Plaintiffs and the proposed Class fiduciary duties, the Marriott Defendants concealed from Plaintiffs and the proposed Class that they had learned on November 20, 2013, from a national appraisal firm they had hired that the merger would negatively impact the owners' fractional interest values. RCDC/RC Management's Kim Frates-Mazzilli and MVW's Ben Pierce circulated this report by email on that date.

q.   On December 11, 2013, Sobeck responded to an email from St. Thomas's John Doyle that expressed concerns about the Defendants' actions at the other resorts by

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 45 of 60

            stating, as turned out to be false, that inventory would not be moved into the MVC trust unless the Aspen owners voted on the decision. A vote never took place, just a misleading survey. Sobeck had also emailed the Aspen board members in April 16, April 29, and May 11, 2013 about a "vote" at the Aspen resort.

r.      Pursuant to the scheme perpetrated by the MII and MVW Defendants, the Association used the mails and interstate wires to file an amendment to a declaration on January 28, 2014, stating that the Club Declaration did not prohibit fractional interests from being moved into the NATO land trust for MVC's use.

s.      On information and belief, shortly after the January 26, 2014 vote, RC Development transferred or participated in the transfer of RCDC fractional inventory to the NATO land trust, which transfers were accomplished using the mails and/or interstate wires.

t.      On July 17, 2012, Babich sent the letter on behalf of Cobalt announcing the intention to merge the MVC and RCDC.

u.      Lion & Crown: On November 26, 2014, Babich on behalf of Lion & Crown, wrote MRTC setting the effective date of the St. Thomas Association's at December 5, 2014.

v.      On information and belief, the NATO land trust participated in the transfer of RCDC fractional inventory to that trust, which transfers were accomplished using the mails and/or interstate wires.

w.     Additionally, on January 14, 2015, the NATO trust, convened a conference call to discuss voting as owners on the Association. This communication constituted two predicate acts, involving both email and phone calls. Participants included Julie Kennedy-Rick, Julie; Jeff Comfort; Keith Kocarek; Laura Cobb; Lori Colaiuta; and Steven Novack.

x.      At the Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly meeting on May 30, 2012, attended in person in Orlando, Florida, and by phone, Marriott Defendants executives and personnel, including David Mann, confirmed the plan to stop selling Ritz-Carlton products, along with confirming other steps in the re-engineering process.

y.      On September 12, 2012, Lee Cunningham traveled to the annual Marriott International/Marriott Vacations Worldwide senior executives meeting in Bethesda, Maryland, and discussed next steps in the re-engineering, including the delinquencies at the St. Thomas and how they harmed the other owners. Additional representatives of Marriott Vacations Worldwide included on information and belief John Geller, Jim Hunter, Lani Kane-Hanan, and Steve Weisz.

z.      Cunningham traveled to the October 2, 2013, Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting in Bethesda, Maryland, and gave a Re-engineering Plan update, furthering the scheme. MVW's John Geller, Jim Hunter, and Lani Kane-Hana also participated.

aa.    Cunningham traveled to the June 25, 2014, Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting in Bethesda, Maryland,

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 46 of 60

            and once again gave an RCDC Reengineering Plan update. They discussed that the unsold developer inventory at St. Thomas was in the process of going into the Trust, effectuating the scheme.

bb.    On January 28, 2014, Randy Mercer sent Ritz-Carlton Great Bay owners an email summarizing the results of the vote.

cc.    Sobeck travelled to the Virgin Islands on multiple occasions to addend meetings of the Association board, including on January 26, 2014. Other MII and MVW personnel travelled to the Virgin Islands to attend other board meetings as well, including one on April 29, 2013.

dd.    In the runup to the January 26, 2014 vote, the Marriott Defendants sent a series of communications to members, as discussed in the January 17, 2014 Business Review Report.

ee.    On December 18 and 19, 2013, the MVW Defendants held a webinar for the owners at the Ritz-Carlton Great Bay in which they attempted to convince Plaintiffs and the proposed Class to vote for the RCDC-MVC merger. A few days later, they sent a mass communication to Ritz-Carlton Great Bay owners regarding these webinars.

ff.    The MVW Defendants held a meeting with John Doyle and Tom Doyle, including on or about February 23, 2013 and May 20, 2013, to discuss the vote, requiring interstate travel for all or some of the participants.

148.    Because Cunningham not only served MVW but also led and acted in the name of and on behalf of alter egos Lion & Crown, Cobalt, RC Development, RC Management, MRTC, and perhaps other MVW Defendants as well, each predicate act alleged here against Cunningham is also incorporated against those other MVW Defendants. Similarly, because Sobeck acted in the name and on behalf of Marriott Vacations Worldwide, MORI, RC Management, RC Development, Cobalt, and perhaps other MVW Defendants as well, each predicate act alleged against Sobeck is incorporated against these other MVW Defendants too. Similarly, Kim Frates-Mazzilli served both in an RC Development role and as an agent of RC Management, so allegations involving her apply to both of those defendants. More generally, all or most of the predicate acts alleged herein were committed by the MII and MVW Defendants by implication and chain of authority.

149.    The Marriott Defendants, and each of them, agreed to commit these predicate acts, agreed to aid and abet their commission by other members of the associated-in-fact enterprise, and/or agreed that some members of that enterprise would commit the predicate acts for the benefit of all members of the associated-in-fact enterprise.

Complaint
*Helman, et al. v. Marriott International, et al.*                                     Page 47 of 60

150.    Plaintiffs and members of the proposed Class suffered harm and/or injury to their business or property as a direct and proximate result of the Marriott Defendants' wrongful conduct. Specifically, the Marriott Defendants' unlawful conduct has destroyed the value of Plaintiffs' separately-deeded property interests, and the private residence club that formed the heart of those property interests. In addition, Plaintiffs and members of the proposed Class have been forced to pay increased maintenance dues as a direct and proximate result of the Marriott Defendants' wrongful conduct.

151.    Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011).

## COUNT II

### *Violations of 14 V.I.C. § 605(b) of CICO Against All Defendants*

152.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

153.    In violation of 14 V.I.C. § 605(b), the MII and MVW Defendants acquired and maintained control over the Association and the separately-deeded property interests owned by Plaintiffs and other members of the proposed Class through the conduct alleged elsewhere in this Complaint.

154.    Also in violation of 14 V.I.C. § 605(b), the NATO land trust (and through it the MVW Defendants) wrongfully acquired the RCDC fractional inventory that the other Marriott Defendants (including RC Hotels VI and RC Development) transferred to it following the January 26, 2014 vote, each of which transfers were also predicate acts of mail and wire fraud, as they were, on information and belief, accomplished using the mails and/or interstate wires.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 48 of 60

155.   Plaintiffs and the proposed Class suffered the harm and/or injury to their business or property alleged above as a direct and proximate result of the Marriott Defendants' wrongful conduct. Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

## COUNT III

### *Violations of 14 V.I.C. § 605(c) of CICO Against All Defendants*

156.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

157.   Fractional inventory obtained through foreclosure was one of the proceeds that the MII and MVW Defendants derived, directly or indirectly, from their pattern of criminal activity alleged herein. The MII and MVW Defendants invested these RCDC fractionals in their operation of the Marriott Vacation Club, which qualifies as an enterprise within the meaning of 14 V.I.C. § 607(a)(1) by transferring them into the NATO land trust in violation of 14 V.I.C. §§ 605(c).

158.   Plaintiffs and the proposed Class suffered the harm and/or injury to their business or property alleged above as a direct and proximate result of the Marriott Defendants' wrongful conduct. Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

Complaint
*Helman, et al. v. Marriott International, et al.*                                     Page 49 of 60

159.   Further, to prevent the Marriott Defendants from continuing to benefit from their wrongdoing, the Court should order pursuant to 14 V.I.C. § 607(a)(1) that all fractionals transferred to the NATO land trust be transferred out of that trust so they are no longer available for use by Marriott Vacation Club members.

<u>COUNT IV</u>

*Conspiracy to Violate CICO, 14 V.I.C. § 605(d), Against All Defendants*

160.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

161.   The Marriott Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to participate in, directly or indirectly, the scheme to defraud, predicate acts, and violations of 14 V.I.C. §§ 605(a)-(c) alleged above and thereby conspired with one another in violation of 14 V.I.C. § 605(d).

162.   Each of the Marriott Defendants agreed to perform these wrongful acts and each acted the material ways alleged herein to accomplish their wrongful purpose, including concerted action. The predicate acts and other conduct alleged elsewhere herein constitute overt acts in furtherance of this conspiracy.

163.   Plaintiffs and the proposed Class suffered the harm and/or injury to their business or property alleged above as a direct and proximate result of the Marriott Defendants' wrongful conduct. Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

## COUNT V

### *Breach of Fiduciary Duty Against All Defendants*

164.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

165.    The Marriott Defendants, and each of them, assumed fiduciary duties to Plaintiffs and the proposed Class based on their control of the Association and its board, and on the high degree of control they otherwise exercised over Plaintiffs' and the proposed Class' separately-deeded fractional property interests, as more fully alleged above.[8]

166.    As fiduciaries, the Marriott Defendants were required to act with utmost good faith and in the best interests of Plaintiffs and the proposed Class and refrain from any actions that would cause harm to Plaintiffs and the proposed Class, or that allow the Marriott Defendants to profit at their expense.

167.    The Marriott Defendants, and each of them, breached their fiduciary duties by advancing their own interests at Plaintiffs' and the proposed Class' expense, as more fully alleged elsewhere herein.

168.    As a direct and proximate result of their breaches of their fiduciary duties, the Marriott Defendants, and each of them, proximately caused damage to Plaintiffs and the proposed Class, including by destroying the value in their fractionals, in an amount to be proven at trial. In addition, a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their breaches of their fiduciary duties and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

---

[8] *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 1535509, at *6 (D. Colo. Mar. 29, 2018) ("The Court finds that the plaintiffs have sufficiently alleged that the Management Agreement entrusted RC Management with control over plaintiffs' property sufficient to create fiduciary duties"); *Reiser v. Marriott Vacations Worldwide Corp.*, 2017 WL 569677, at *4–5 (E.D. Cal. Feb. 13, 2017) (similar ruling).

Complaint
*Helman, et al. v. Marriott International, et al.*                                                     Page 51 of 60

169.    For purposes of this cause of action, each of the Marriott Defendants either qualifies
as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust
Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so
qualify.

**COUNT VI**

*Constructive Fraud Against All Defendants*

170.    Plaintiffs incorporate by reference the allegations contained in the preceding and
subsequent paragraphs of this Complaint as if fully set forth herein.

171.    The Marriott Defendants, and each of them, had a duty as fiduciaries to act honestly,
with full disclosure and loyalty to the Plaintiffs as their principals.

172.    The Marriott Defendants, and each of them, knew that their uniform
communications to Plaintiffs and the proposed Class regarding the RCDC-MVC merger and the
vote thereon failed to disclose material facts that they had a duty to disclose as fiduciaries and
otherwise, including but not limited to:

  a. The fact that the Marriott Defendants knew they would reap massive profits while
     severely damaging plaintiffs once the merger went through;
  b. The fact they had slow-walked foreclosures to manufacture a financial crisis for the
     Association;
  c. The fact that their fiduciary duties required them to promptly foreclose even
     without the deal that owners, including Plaintiffs and the proposed Class, voted on
     in January 2014; and
  d. The fact that the affiliation would be governed by an undisclosed 2013 Affiliation
     Agreement that provided the Marriott Defendants with a series of one-sided
     provisions that were highly damaging to Plaintiffs and the proposed Class and the
     Ritz-Carlton Great Bay, including a permanent affiliation between RCDC and
     MVC. These onerous provisions were designed to give unfair advantages to the
     Marriott Defendants and MVC members over RCDC members.

173.    Based on the materiality of the concealed facts, there is a presumption of reliance
on the part of Plaintiffs and the proposed Class, negating the need for individualized testimony
from members of the proposed Class.

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 52 of 60

174.   By virtue of their non-disclosure of material facts described above and herein, the Marriott Defendants were able to take undue advantage of Plaintiffs and the proposed Class. The Marriott Defendants' misrepresentations and non-disclosure of the material facts described above and elsewhere herein were material in that they were likely to have a substantial effect on how Plaintiffs and members of the Class voted on January 26, 2014.

175.   As a direct and proximate result of their constructive fraud, the Marriott Defendants, and each of them, proximately caused damage to Plaintiffs and the proposed Class, including by destroying the value in their fractionals, in an amount to be proven at trial. In addition, a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their breaches of their fiduciary duties and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

176.   For purposes of this cause of action, each of the Marriott Defendants either qualifies as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so qualify.

**COUNT VII**

*Fraud by Concealment Against All Defendants*

177.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

178.   Because they were fiduciaries and also because they made uniform, class-wide statements that were misleading without disclosure of the concealed material facts, the Marriott Defendants, and each of them, had a duty to disclose all material facts relating to the RCDC-MVC merger and the January 26, 2014 vote.

179.   The Marriott Defendants, and each of them, knew that their class-wide communications with Plaintiffs and the proposed Class would be likely to mislead if the concealed material facts were not included in those uniform communications, but the Marriott Defendants

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 53 of 60

intentionally concealed these material facts because they intended to mislead Plaintiffs and the proposed Class into agreeing to the RCDC-MVC merger.

180.     Based on the materiality of the concealed facts, there is a presumption of reliance on the part of Plaintiffs and the proposed Class, negating the need for individualized testimony from members of the proposed Class.

181.     As a direct and proximate result of their fraud by concealment, the Marriott Defendants, and each of them, proximately caused damage to Plaintiffs and the proposed Class, including by destroying the value in their fractionals, in an amount to be proven at trial.

182.     In addition, a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their breaches of their fiduciary duties and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

183.     For purposes of this cause of action, each of the Marriott Defendants either qualifies as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so qualify.

## COUNT VIII

### *Aiding and Abetting Breach Tort Against All Defendants*

184.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

185.     The Marriott Defendants, and each of them, knowingly aided and abetted in the breaches of fiduciary duty, constructive fraud, and fraud by concealments committed by the other defendants by providing assistance to, counseling, commanding, inducing, or providing the means to achieve the wrongful conduct alleged elsewhere in this Complaint, and or otherwise caused those wrongful acts to be done.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 54 of 60

186.    As a direct and proximate result of their aiding and abetting in the other defendants'
breach of fiduciary duty, constructive fraud, and fraud by concealment, the Marriott Defendants,
and each of them, damaged Plaintiffs in an amount to be proven at trial.

187.    In addition, a constructive trust should be imposed on the Marriott Defendants' ill-
gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things
of value they obtained as a result of their breaches of their fiduciary duties and the scheme to
defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust
Enrichment § 43.

188.    For purposes of this cause of action, each of the Marriott Defendants either qualifies
as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust
Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so
qualify.

## COUNT IX

### Breach of Contract/Implied Covenant Against
### RC Hotels VI and RC Club St. Thomas, Inc.

189.    Plaintiffs incorporate by reference the allegations contained in the preceding and
subsequent paragraphs of this Complaint as if fully set forth herein.

190.    The standardized purchase agreement and related documents such as the Offering
Plan (collectively the "purchase agreement") constitute an enforceable contract between Plaintiffs
and the proposed Class and the seller, RC Hotels VI, and the organizer RC Club St. Thomas, which
provided financing to certain purchasers.

191.    Plaintiffs and members of the proposed Class performed all, or substantially all, of
the significant things that the purchase agreement required them to do, and/or they were excused
from doing those things.

192.    The purchase agreement includes an implied promise that RC Hotels VI and RC
Club St. Thomas would not take any action that would radically alter the nature of the RCDC, the
Ritz-Carlton Great Bay, or the separately-deeded property interests purchased at premium prices

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 55 of 60

by Plaintiffs and the proposed Class, nor any action that would violate the reasonable expectations

of Plaintiffs and the proposed Class under the purchase agreement. Plaintiffs reasonably expected

that these defendants might make certain changes, but would maintain the fundamental character

of the RCDC, the Ritz-Carlton Great Bay, and the fractionals at that club.

193.    The wrongful conduct of RC Hotels VI and RC Club St. Thomas alleged elsewhere

in this Complaint — in particular their merger of the RCDC with the MVC — constitutes a material

breach of implied promises in the purchase agreement, and a violation of the implied covenant of

good faith and fair dealing that the law incorporates into that contract.

194.    RC Hotels VI and RC Club St. Thomas have frustrated Plaintiffs' and the proposed

Class's reasonable expectations under the purchase agreement, deprived them of the value of their

fractionals and the fruits of the purchase agreement, and/or defeated the purpose of that contract.

195.    As a result of this breach of the purchase agreement, Plaintiffs and the proposed

Class are entitled to damages in an amount to be proved at trial.

## COUNT X

### *Violation of the Consumer Protection Law of 1973, 12A V.I.C. §§ 101, et seq.*

196.    Plaintiffs incorporate by reference the allegations contained in the preceding and

subsequent paragraphs of this Complaint as if fully set forth herein.

197.    The Virgin Islands Consumer Protection Law protects the consuming public and

legitimate business enterprises from those who engage in misleading, deceptive, or unfair acts or

practices in the course of trade or commerce.

198.    The Marriott Defendants, and each of them, and any co-conspirators engaged, and

continue to engage, in a misleading, deceptive, and unfair trade or commerce practice regarding

the management of the fractionals at the Ritz-Carlton Great Bay.

199.    The Marriott Defendants and any co-conspirators' trade and commerce practices

misrepresented to, deceived, or unfairly influenced objective and reasonable consumers owning

property in the Virgin Islands as more fully alleged elsewhere herein, include by slow-walking

foreclosures, manufacturing a real or perceived financial crisis for the Association, and then

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 56 of 60

proposing that Plaintiffs and the proposed Class members vote for the RCDC-MVC merger — a
merger that Defendants knew would devalue Plaintiffs' and proposed class members' property
interests — in exchange for a "solution" to that crisis, i.e., an agreement by the Marriott Defendants
to foreclose on delinquent properties and then start paying maintenance fees as they were already
required to do.

200.     The consumer protection laws of the Virgin Islands are to be liberally construed to
protect the people and businesses of the Virgin Islands.

201.     Individual reliance is not an element of proof under the consumer protection
statutes of the Virgin Islands because the laws are intended to be enforced by class action. Rather,
the standard is that of an objective and reasonable consumer in the Virgin Islands.

202.     The Marriott Defendants' and any co-conspirators' wrongful actions additionally
constitute a misleading, deceptive and unfair trade or commerce practice in that they unfairly took
advance of the consumers' lack of knowledge, ability, experience, or capacity when marketing,
selling, developing, and managing fractional and timeshare products in the Virgin Islands.

## COUNT XI

### *Violation of the Consumer Fraud and Deceptive Business Practices Act,*
### *12A V.I.C. §§ 301, et seq.*

203.     Plaintiffs incorporate by reference the allegations contained in the preceding and
subsequent paragraphs of this Complaint as if fully set forth herein.

204.     The purpose of the Consumer Fraud and Deceptive Business Practices Act is to
protect the consuming public from those who engage in fraudulent and deceptive acts in the course
of trade or commerce.

205.     The Marriott Defendants engaged in, and continue to engage in, fraudulent and
deceptive trade practice in the marketing, sale, developing, and managing of fractional and
timeshare programs.

206.     The Marriott Defendants' trade practices misrepresented, deceived, or unfairly
influenced objective and reasonable consumers in the Virgin Islands by marketing, selling,

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 57 of 60

developing, and managing fractional and timeshare products in the Virgin Islands in a manner that
harmed Plaintiffs and the proposed Class.

207.   The consumer protection laws of the Virgin Islands are to be liberally construed to
protect the people and businesses of the Virgin Islands.

208.   Individual reliance is not an element of proof under the consumer protection
statutes of the Virgin Islands because the laws are intended to be enforced by class action. Rather,
the standard is that of an objective and reasonable consumer in the Virgin Islands.

209.   The Marriott Defendants' and any co-conspirators' wrongful actions additionally
constitute a misleading, deceptive and unfair trade or commerce practice in that they unfairly took
advance of the consumers' lack of knowledge, ability, experience, or capacity of consumers when
marketing, selling, developing, and managing fractional and timeshare products in the Virgin
Islands.

## COUNT X

### *Violation of the Consumer Protection Law of 1973, 12A V.I.C. §§ 101, et seq.*

210.   Plaintiffs incorporate by reference the allegations contained in the preceding and
subsequent paragraphs of this Complaint as if fully set forth herein.

211.   As a result of their own wrongful conduct or the wrongful conduct of other
defendants, the Marriott Defendants, and each of them, received, innocently or knowingly, things
of value that are traceable to Plaintiffs and the proposed Class and that rightfully belong to
Plaintiffs and the proposed Class.

212.   Plaintiffs and the proposed Class thus conferred benefits on the Marriott
Defendants, and each of them, that should be restored to Plaintiffs and the proposed Class.
It would be inequitable and unjust for the Marriott Defendants to be permitted to retain these things
of value.

213.   The Marriott Defendants should be compelled to disgorge to Plaintiffs and the
proposed Class all improperly obtained things of value obtained by them as a result of the wrongful

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 58 of 60

conduct alleged herein.  A constructive trust should be imposed upon all such things of value in order to prevent the unjust enrichment of the Marriott Defendants, and each of them.

## FRAUDULENT CONCEALMENT

214.   Throughout the Class Period, the Marriott Defendants and their co-conspirators intended to and did affirmatively and fraudulently conceal their wrongful conduct and the existence of their unlawful actions from Plaintiffs and the proposed Class, and intended that their communications with each other and their resulting actions be kept secret from Plaintiffs and the proposed Class.

215.   Plaintiffs and the proposed Class had no knowledge of the wrongful conduct alleged herein or of any of the facts that might have led to discovery thereof, until in or about 2018, when the Plaintiffs contacted lawyers and learned of the 2013 Affiliation Agreement and the *B&T Cook Family Partners* decision described above.

216.   Plaintiffs and the proposed Class could not have discovered the wrongful conduct alleged herein at any earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the Marriott Defendants to avoid detection and affirmatively conceal their actions.

217.   Based on the foregoing, Plaintiffs and the proposed Class were unaware that the Marriott Defendants had a duty to foreclose on the delinquent properties and also that they had an independent right to reject the RCDC-MVC merger and were injured by such concealment.

## DAMAGES TO PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS

218.   Plaintiffs cannot state at this time the precise amount of damages sustained by them and other members of the proposed Class. A precise determination of damages will require discovery from the Marriott Defendants and any co-conspirators. Further damages will include damages by statute, and punitive damages for intentional wrongful conduct. Plaintiffs allege that the damages are substantial.

### NOTICE OF PUNITIVE DAMAGES

219.    The Marriott Defendants' breaches of fiduciary duties, constructive fraud, fraudulent concealment, conspiracies, and unfair and deceptive trade practices, among other alleged wrongful misconduct alleged herein, were outrageous, done with wrongful motive, and recklessly indifferent to the rights of Plaintiffs and the proposed Class.

220.    These bad acts create a profound and pervasive negative effect on all consumers by higher prices.

221.    Further, the Defendants' business practices rob profits from businesses that operate lawfully in the Territory, making the opening and growth of new business, operating lawfully, much more difficult and burdensome.

222.    Such wrongful conduct undermines consumer confidence in the Virgin Islands, impairs the free market, discourages lawfully operating businesses and entrepreneurs, and reduces future sustainable investment in the Virgin Islands.

223.    Punitive damages are appropriate to deter and punish this willful and intentional misconduct, which affects all residents and businesses in the Territory negatively. The deterrence of punitive damages will discourage future wrongful business practices by others.

### JURY TRIAL DEMAND

224.    On behalf themselves and all others similarly situated, Plaintiffs demand a trial by jury, pursuant to 5 V.I.C. § 358 and Rule 38(b) of the Virgin Islands Rules Civil Procedure, of all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and behalf of all others similarly situated, pray for judgment against the Marriott Defendants, and each of them, and request as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(b)(2) and (b)(3) of the U.S. Virgin Islands Rules of Civil Procedure; that the Court determine that Plaintiffs are adequate and appropriate representatives of the proposed Class; that the Court designate Plaintiffs' attorneys as lead counsel for the proposed Class; and that the Court direct that the best notice practicable under the circumstances be given to members of the proposed Class pursuant to Rule 23(c)(2).

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 60 of 60

B.  That the Court adjudge and decree that the Marriott Defendants violated CICO, owed and breached fiduciary duties, committed constructive fraud and fraud by concealment, aided and abetted the other defendants' wrongdoing, and violated the Consumer Protection Law of 1973 and the Consumer Fraud and Deceptive Business Practices Act.

C.  That the Court enter judgment for Plaintiffs and members of the proposed Class against the Marriott Defendants and any co-conspirators, and each of them, jointly and severally, for damages according to proof and trebling of those damages as allowed by law, along with statutory damages, costs, and reasonable attorneys' fees.

D.  That the Marriott Defendants and any co-conspirators, their respective affiliates, successors, transferees, assignees, as well as the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be restrained from, in any manner, continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and adopting or following any practice, plan, program, or device having a similar purpose or effect.

E.  That the Marriott Defendants and any co-conspirators be subject to an award of punitive damages.

F.  That an accounting be performed to account for the Marriott Defendants' ill-gotten gains and that all such ill-gotten gains be disgorged to Plaintiffs and the proposed Class.

G.  That a constructive trust be imposed on the assets, property, contracts, revenues, income and profits of the Marriott Defendants and disgorgement of all benefits received by Defendants.

H.  Pre-judgment and post-judgment interest to the extent allowed by law.

I.  That the Court grant such additional equitable or legal relief as may be deemed just and proper.

Dated: April 2, 2019                              Respectfully submitted,

                                                  /s/ Russell B. Pate, Esq. (V.I. Bar No. 1124)
                                                  THE PATE LAW FIRM
                                                  P.O. Box 890, St. Thomas, USVI 00804
                                                  Tel: (340) 777-7283
                                                  Em: Pate@SunLawVI.com
                                                  Em: SunLawVI@gmail.com
                                                  Fax: (888) 889-1132