## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| ALAN HELMAN; MARJORIE HELMAN; LEPONT PALM BEACH, LLC; MAURICE KASPY; LIBORIO PIAZZA; and TIMOTHY AKER,<br><br>                     Plaintiffs,<br><br>  vs.<br><br>MARRIOTT INTERNATIONAL, INC., a Delaware corporation; MARRIOTT VACATIONS WORLDWIDE CORPORATION, a Delaware corporation; MARRIOTT OWNERSHIP RESORTS, INC., a Delaware corporation; RC HOTELS (VIRGIN ISLANDS), INC., U.S. Virgin Islands corporation; RC ST. THOMAS, LLC, a U.S. Virgin Islands limited liability company; THE RITZ-CARLTON HOTEL COMPANY, L.L.C., a Delaware limited liability company; THE RITZ-CARLTON CLUB, ST. THOMAS, INC., a U.S. Virgin Islands corporation; THE RITZ-CARLTON MANAGEMENT COMPANY, L.L.C., a Delaware limited liability company; THE RITZ-CARLTON DEVELOPMENT COMPANY, INC., a Delaware corporation; THE COBALT TRAVEL COMPANY, LLC, a Delaware limited liability company; THE LION & CROWN TRAVEL CO., LLC, a Delaware limited liability company; MARRIOTT RESORTS, TRAVEL COMPANY, INC., a Delaware corporation, d.b.a. MVC Exchange Company; and FIRST AMERICAN TRUST, FSB, a federal savings bank, solely as Trustee of Land Trust No. 1082-0300-00 (a.k.a. MVC Trust),<br><br>                     Defendants. | Removed from:<br>SUPERIOR COURT OF THE VIRGIN ISLANDS<br>**ST-19-CV-36**<br><br>CASE NO. 3:19-cv-00036-CVG-RM<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED CLASS ACTION COMPLAINT

On behalf of themselves and others similarly situated, Plaintiffs ALAN & MARJORIE HELMAN, LEPONT PALM BEACH, LLC, MAURICE KASPY & LIBORIO PIAZZA, and TIMOTHY AKER (collectively, "Plaintiffs") bring this class action complaint for damages and equitable relief and demand a jury trial against MARRIOTT INTERNATIONAL, INC., a Delaware corporation, THE RITZ-CARLTON HOTEL COMPANY, L.L.C., a Delaware limited

Complaint
*Helman, et al. v. Marriott International, et al.*                    Page 2 of 62

liability company, RC HOTELS (VIRGIN ISLANDS), INC., a U.S. Virgin Islands corporation, MARRIOTT VACATIONS WORLDWIDE CORPORATION, a Delaware corporation, MARRIOTT OWNERSHIP RESORTS, INC., a Delaware corporation, THE RITZ-CARLTON MANAGEMENT COMPANY, L.L.C., a Delaware limited liability company, THE RITZ-CARLTON DEVELOPMENT COMPANY, INC., a Delaware corporation, THE COBALT TRAVEL COMPANY, LLC, a Delaware limited liability company, THE LION & CROWN TRAVEL CO., LLC, a Delaware limited liability company, THE RITZ-CARLTON CLUB, ST. THOMAS, INC., a U.S. Virgin Islands corporation, RC ST. THOMAS, LLC, a U.S. Virgin Islands limited liability company, MARRIOTT RESORTS, TRAVEL COMPANY, INC., a Delaware corporation, d.b.a. MVC Exchange Company, FIRST AMERICAN TRUST, FSB, a federal savings bank, solely as Trustee of Land Trust No. 1082-0300-00 (a.k.a. MVC Trust), a land trust organized under Florida law, and DOES 1-50 (collectively, "Marriott Defendants") based on information, belief, and the investigation of counsel.

## INTRODUCTION

1.        Plaintiffs bring this class action on behalf of themselves and nearly a thousand similarly situated purchasers of fractional condominium interests, commonly known as "fractionals," at a Ritz-Carlton Destination Club in St. Thomas, U.S. Virgin Islands referred to herein as the **"Ritz-Carlton Great Bay"** (or occasionally **"St. Thomas"** when contrasted with other clubs). The case arises out of the Marriott Defendants' wrongful decision to merge two different vacation ownership product lines.[1] Specifically, they merged the Ritz-Carlton Destination Club (sometimes **"RCDC"**), a network of luxury properties sold as deeded fractionals, with the Marriott Vacation Club (sometimes **"MVC"**), a much less exclusive and cheaper timeshare product line.

2.        In industry parlance, the Ritz-Carlton Great Bay and the other RCDC properties are known as "private residence clubs," a term intended to capture their exclusive and luxurious nature.

---

[1] "Vacation ownership" is a broad term that refers to timeshares, private residence clubs, and timeshares generally, all of which are described below.

Complaint

*Helman, et al. v. Marriott International, et al.*                              Page 3 of 62

Based on the storied Ritz-Carlton brand and the promise of exclusivity, Plaintiffs and the nearly thousand other members of the proposed Class paid premium prices (in the hundreds of thousands of dollars) for three weeks of exclusive access to the Ritz-Carlton Great Bay and what was supposed to be a growing network of RCDC locations around the world.

3.      Marriott[2] marketed these fractionals as akin to second homes, distinct from mere timeshares in that they required a multi-week purchase and came with a separate deed recorded at the time of purchase. Marriott claimed that these fractionals would be "operated for the exclusive use, benefit and enjoyment of the Members, their families and their guests." But in or around 2011, the Marriott Defendants quietly embarked on a multi-year re-engineering campaign to give more than 400,000 members of the Marriott Vacation Club access to the Ritz-Carlton Destination Clubs, including by transferring unsold RCDC fractional inventory (approximately 20% of all RCDC fractionals) to a land trust affiliated with the Marriott Vacation Club.

4.      The Marriott Defendants did not disclose their intention to merge the Ritz-Carlton Destination Club with the Marriott Vacation Club until July 2012. Opposition was massive and immediate across the entire RCDC network. Many owners and their association boards complained — presciently as it turned out — that the merger would dilute the exclusivity of the Ritz-Carlton Destination Club and erode resale values. This groundswell of opposition did not surprise the Marriott Defendants; internal documents obtained in related litigation confirm that they knew the "affiliation," as they termed it, would gut the value of the 3,200 luxury or so fractionals they sold at nine RCDC locations, including St. Thomas.

5.      The Marriott Defendants also knew that this merger might lead to litigation; that was the conclusion of an internal analysis summarized in a December 2011 internal report. Indeed, the conduct described herein clearly violates their fiduciary duties.[3] But the Marriott Defendants

---

[2] As used herein, **"Marriott"** refers to all Marriott-related entities generally.

[3] *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 1535509, at *5-6 (D. Colo. Mar. 29, 2018) (declining to dismiss fiduciary duty claims in related case, stating "The Court finds that the plaintiffs have sufficiently alleged that the Management Agreement entrusted RC Management with control over plaintiffs' property sufficient to create fiduciary duties"); *Reiser v. Marriott Vacations Worldwide Corp.*, 2017 WL 569677, at *4–5 (E.D. Cal. Feb. 13, 2017) (similar ruling).

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 4 of 62

could not resist the temptation to reap the rewards they knew would come with their re-engineering plan. Opening up the Ritz-Carlton Destination Club to members of the Marriott Vacation Club would allow the Marriott Defendants to use the "halo effect" of the storied Ritz-Carlton brand and the prospect of access to luxury RCDC properties to sell more MVC points at higher prices.

6.     The Marriott Defendants employed various means to overcome opposition and push the merger through. For example, they promised that the merger would not take place without an affirmative vote of a majority of the owners at each club. But it soon became apparent that they would lose these votes, and they set about to secretly breach that promise. Owners at Bachelor Gulch held their own vote, and, despite an attempt by the Marriott Defendants to interfere with the vote, opted to exit the RCDC system altogether rather than suffer an influx of MVC members and the loss in resale values that would inevitably follow the merger. A survey and a focus group commissioned by the Marriott Defendants showed that the result of votes elsewhere would be the same. So, in place of the promised votes, the Marriott Defendants quietly substituted a highly misleading survey in Aspen Highlands, San Francisco, and Tahoe, and vowed to forge ahead with the merger no matter the results of these surveys.

7.     The Marriott Defendants used other forms of deception too. The contract that ultimately led to the merger, an "Affiliation Agreement" from November 2013 ("2013 Affiliation Agreement"), gave the association at each club the power to vote on whether the merger would extend to their club.  But the Marriott Defendants hid this document from each association — and courts presiding over three related cases in California and Colorado. Why? Because in a campaign of misinformation lasting many years and employed in those three related cases, the Marriott Defendants claimed that the merger could not be stopped or contested because their subsidiary (The Cobalt Travel Company, LLC) was contractually vested with the "sole discretion" to make such decisions and the various associations and their boards had no role in that decision, nor the

Together with a third case, *Petrick, et al. v. Marriott, et al.* (San Francisco Sup. Case No. CGC 15-545987), these cases are referred to as the "related cases" or "related litigation."

Complaint

*Helman, et al. v. Marriott International, et al.*                                    Page 5 of 62

power to stop it. Disclosing the 2013 Affiliation Agreement would have revealed the falsity of that claim, so the Marriott Defendants buried it.

8.      The Marriott Defendants' strategy in St. Thomas was particularly devious. An unusually high number of buyers in St. Thomas financed their purchases with loans from Marriott. After the onset of the recession in 2008, there was a correspondingly high number of owners in St. Thomas who fell behind on their mortgages and maintenance dues. This provided the Marriott Defendants with the opportunity to gain leverage over Plaintiffs and the proposed Class. Under the governing documents for the Ritz-Carlton Great Bay, responsibility for foreclosing on fractionals with delinquent maintenance dues was given to the Marriott Defendants. Upon foreclosure — but not before — the Marriott Defendants were required to pay dues on the foreclosed units. This meant that the Marriott Defendants could manufacture a financial crisis by delaying foreclosure proceedings, which is exactly what they did.

9.      The Marriott Defendants knew this would put the Ritz-Carlton Great Bay in peril; their own SEC filings acknowledge the risk posed by defaults and unpaid maintenance fees. A 2019 Marriott Vacations Worldwide 10-K states, for example:

> The maintenance fees that are levied on owners . . . are used to maintain and refurbish the vacation ownership properties. . . . Once a property owners' association begins to experience a high default rate, if it is unable to foreclose and resell units to paying owners, the situation worsens as the maintenance fees assessed to remaining owners continually increase to cover expenses. . . . In these circumstances, . . . the vacation ownership properties could fall into disrepair. . . . For branded resorts, the maintenance fees are used to keep the properties in compliance with applicable brand standards. If a resort fails to comply with applicable brand standards, the applicable licensor could terminate our rights under the applicable license agreement to use its trademarks at the non-compliant resort. Increased maintenance fees . . . could also cause an increase in defaults . . . .

*See* Marriott Vacations Worldwide 10-K, filed 3/1/2019, at pp. 34-35.

10.     Over a period of years, losses caused by the unusually high number of delinquent owners and the "slow walking" of foreclosures by the Marriott Defendants began to accrue. In 2013, the Marriott Defendants proposed their "solution": If owners, including Plaintiffs and the proposed Class, voted to permit the RCDC-MVC merger, the Marriott Defendants would

Complaint

*Helman, et al. v. Marriott International, et al.*                                    Page 6 of 62

accelerate foreclosures and begin paying maintenance dues on the foreclosed fractionals — both things that they were required to do even without a vote.

11.     Misled by their fiduciaries and put into financial extremis, owners, including Plaintiffs and the proposed Class, voted on January 26, 2014, to accept the Marriot Defendants' proposal.

12.     Among other things, this "deal" was a flagrant breach of the fiduciary and other duties the Marriott Defendants owed to Plaintiffs and the proposed Class. As fiduciaries, the Marriott Defendants were required to act in the best interests of Plaintiffs and the proposed Class, not manufacture a financial crises to obtain leverage over them, hide the disastrous consequences of the merger, and then secretly profit from their wrongdoing.

13.     As a result of this merger, thousands of MVC members have flooded the Ritz-Carlton Great Bay and other Ritz-Carlton Destination Clubs, fundamentally altering the offering. Resale prices have plummeted and are forever diminished because nobody is willing to pay premium prices for supposedly exclusive access to a supposed private residence club when access can be obtained at a much lower price-point and with much greater flexibility through the Marriott Vacation Club. Plaintiffs and other members of the proposed Class have suffered losses to their property values, rights and expectations while the Marriott Defendants, as they predicted, reaped hundreds of millions of dollars by selling more MVC points at higher prices.

14.     Among other wrongdoing, the Marriott Defendants breached the fiduciary duties they owed to Plaintiffs and the proposed Class, engaged in commercial extortion and proxy fraud, perpetrated a scheme to defraud, and engaged in an ongoing pattern of racketeering activity in violation of the Virgin Islands Criminally Influenced and Corrupt Organizations Act, 30 V.I.C. § 600, *et seq.* ("CICO"). In addition, the Marriott Defendants acted with a reckless, wanton, and willful disregard of their fiduciary duties and other obligations and the rights of Plaintiffs and the proposed Class. Among other remedies, Plaintiffs seek disgorgement from Defendants of these ill-gotten profits and treble damages under CICO.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 7 of 62

15.     There are two groups of defendants. First, there is Marriott International, Inc. and its subsidiaries named herein and identified below (collectively, the "MII Defendants"), which built, marketed, and sold thousands of the RCDC fractionals, including over a thousand at the Ritz-Carlton Great Bay. The second group consists of Marriott Vacations Worldwide Corporation and its subsidiaries named herein and identified below (collectively, the "MVW Defendants"), which were "spun-off" from Marriott International in 2011. After the spin-off, the MVW Defendants took over most operational aspects of the Ritz-Carlton Destination Club and the Marriott Vacation Club. But Marriott International has remained deeply involved in both the RCDC and the MVC.

## JURISDICTION AND VENUE

16.      This Court has jurisdiction over common law torts committed in the Virgin Islands as well as Plaintiffs' claims under the Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§ 600, *et seq.*, the Consumer Protection Law of 1973, 12A V.I.C. §§ 101, *et seq.*, the Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 301, *et seq.*, and the common law tort claims

17.     This Court has personal jurisdiction over each of the defendants because each of them purposefully availed itself of the privilege of engaging in business in the U.S. Virgin Islands and/or is a U.S. Virgin Islands resident and/or is a U.S. Virgin Islands registered entity.

18.     At least three of the defendants qualify as citizens of the U.S. Virgin Islands: RC Hotels (Virgin Islands), Inc.; The Ritz-Carlton Club, St. Thomas, Inc.; and RC. St. Thomas, LLC.

19.     The conduct of local Defendants forms a significant basis for the claims asserted herein, and Plaintiffs and the proposed Class seek significant relief from these Defendants.

20.     The principal injuries resulting from the conduct alleged herein, as well as from the related conduct of each defendant, were incurred in the U.S. Virgin Islands.

21.     During the three-year period preceding the filing of this class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the named plaintiffs or other similarly-situated persons.

Complaint
*Helman, et al. v. Marriott International, et al.*                                                    Page 8 of 62

22.     Venue in this judicial division is proper pursuant to 4 V.I.C. § 78 in that the cause of actions arose and a substantial part of the wrongful occurred was carried out within this judicial division.

**NON-PARTY ENTITIES AND INDIVIDUALS**

23.     The Great Bay Condominium Owners Association, Inc. ("Association"), the fractional owners association for Ritz-Carlton Great Bay, is a condominium association organized under the laws of the U.S. Virgin Islands. On March 3, 2000, the Marriott Defendants formed the Association by filing the Articles of Incorporation of Great Bay Condominium Owners Association, Inc. with the U.S. Virgin Islands Office of the Lieutenant Governor, Division of Corporations and Trademarks. The objects and purposes for which the Association was formed included: "To provide the owners of the Great Bay Condominium . . . with an association for benevolent, fraternal and social purposes and to conduct the activities of an association of condominium owners pursuant to Title 28 Virgin Islands Code Chapter 33"; and "to promote the general welfare of the Association and its members and to enforce the provisions of the Declaration, Bylaws and Rules and Regulations of Great Bay Condominium."

**DEFENDANTS**

**A.      The Marriott International Defendants**

24.     Defendant Marriott International, Inc. **("Marriott International"** or sometimes **"MII"),** is a publicly-traded Delaware corporation headquartered in Bethesda, Maryland. Marriott International sold the deeded St. Thomas fractionals at issue through its wholly-owned subsidiary RC Hotels VI. A multinational hospitality company, Marriott International now has licensing agreements with its former subsidiary Marriott Vacations Worldwide that allow the MVW Defendants to use the "Marriott" and "Ritz-Carlton" brand and trade names, trademarks, and service marks in exchange for licensing fees to Marriott International of over $50 million per year, plus a percentage of Marriott Vacations Worldwide's sales, including sales of MVC points.

25.     Defendant RC Hotels (Virgin Islands), Inc. **("RC Hotels VI"),** is a U.S. Virgin Islands corporation and a subsidiary of Marriott International Hotels, Inc., itself a subsidiary of

Marriott International. RC Hotels VI remained a Marriott International subsidiary following the spin-off of Marriott Vacations Worldwide in 2011. Among other things, RC Hotels VI was the seller of the fractionals to Plaintiffs and the proposed Class and was involved in operations and delaying foreclosures.

26.     Defendant The Ritz-Carlton Hotel Company, L.L.C. (**"RC Hotel Co."**) is a Delaware limited liability company with a principal place of business in Maryland that remained a Marriott International subsidiary after the 2011 spin-off of Marriott Vacations Worldwide. Since the spin-off, most "on-site" operations at the Ritz-Carlton Great Bay and other RCDC properties, as well as responsibility for managing Association governance, have been delegated to RC Hotel Co.

27.     Marriott International, RC Hotel Co., and RC Hotels VI are collectively referred to herein as the **"MII Defendants."** On information and belief, the MII Defendants: (a) are the agents, representatives, alter egos, and/or instrumentalities of their respective principals or controlling entities, (b) have interlocking or overlapping directors and/or officers with their respective principals or controlling entities, (c) are undercapitalized and/or spurious or disregard the corporate form, (d) and are entities for which "piercing the corporate veil" is or may be necessary and appropriate to prevent injustice and inequity to Plaintiffs and the proposed Class.

28.     Each of the MII Defendants (directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members) (a) actively or passively participated in the conduct, acts and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more other defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to conduct, acts and omissions alleged herein, and/or (d) is directly, vicariously, jointly, and/or severally liable for the conduct, acts, and omissions alleged herein.

Complaint
*Helman, et al. v. Marriott International, et al.*                              Page 10 of 62

        **B.**      **The Marriott Vacations Worldwide Defendants**

    29.    Defendant Marriott Vacations Worldwide Corporation (**"Marriott Vacations Worldwide"** or sometimes **"MVW"**) is a Delaware corporation with its principal place of business at 6649 Westwood Boulevard, Orlando, Florida. Marriott Vacations Worldwide was a Marriott International subsidiary until a spin-off in 2011, after which Marriott Vacations Worldwide became a publicly traded corporation. Marriott Vacations Worldwide operates the Ritz-Carlton Destination Club and the Marriott Vacation Club pursuant to, and its business is dependent on, licensing agreements with Marriott International.

    30.    Defendant Marriott Ownership Resorts, Inc. (**"MORI"**), is a Delaware corporation. Formerly a Marriott International subsidiary, MORI became a wholly-owned subsidiary of Marriott Vacations Worldwide following the spin-off in 2011. MORI's principal place of business is also at 6649 Westwood Boulevard, Orlando, Florida. Both before and after the 2011 spin-off, MORI was the subsidiary with primary responsibility for the Marriott Vacation Club and the Ritz-Carlton Destination Club.

    31.    Defendant The Ritz-Carlton Development Company, Inc. (**"RC Development"**), another Marriott Vacations Worldwide subsidiary that was a Marriott International subsidiary before the spin-off, is a Delaware corporation with a principal place of business at 6649 Westwood Boulevard, Orlando, Florida. The Disclosure Statement given to purchasers at Ritz-Carlton Great Bay states that RC Development "through or in conjunction with (the Organizer) . . . and other affiliated and/or third-party companies, is offering a variety of locations and related benefits and privileges sometimes collectively referred to as 'The Ritz Carlton Club.'" RC Development provided financing to certain purchasers and was involved in delaying foreclosure proceedings.

    32.    Defendant The Ritz-Carlton Club, St. Thomas, Inc. ("**RC Club St. Thomas**") is a U.S. Virgin Islands corporation and a wholly-owned subsidiary RC Development, and therefore of Marriott Vacations Worldwide as well. The governing documents at the Ritz-Carlton Great Bay describe RC Club St. Thomas, Inc. as the "Organizer" of the Ritz-Carlton Great Bay. RC Club St. Thomas signed the purchase contracts on behalf of the seller, RC Hotels VI.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 11 of 62

33.     Defendant The Ritz-Carlton Management Company, L.L.C. ("**RC Management**")
is a Delaware limited liability company with a principal place of business at 6649 Westwood
Boulevard, Orlando, Florida. RC Management was a wholly-owned Marriott International
subsidiary until the 2011 spin-off and is now a wholly-owned subsidiary of Marriott Vacations
Worldwide. RC Management has the same principal place of business as Marriott Vacations
Worldwide. Pursuant to a series of management agreements, RC Management shared
responsibility with Marriott International subsidiaries RC Hotels VI and RC Hotel Co. for
operating the Ritz-Carlton Great Bay and managing the functions of the Association and its board.

34.     Defendant The Cobalt Travel Company, LLC ("**Cobalt**"), a Delaware limited
liability company formerly known as the Ritz-Carlton Travel Company, LLC, is another wholly-
owned Marriott Vacations Worldwide subsidiary with the same principal place of business in
Orlando, Florida. Defendants misled owners, including Plaintiffs and the proposed Class, the
boards of each fractional association, and the courts in three related cases into believing that Cobalt
had the exclusive authority to "affiliate" the RCDC with the MVC. In fact, the association at each
club had the power to prevent the "affiliation" from extending to their club, and the authority to
affiliate with another program, such as the MVC, was later delegated to another Marriott Vacations
Worldwide subsidiary, Lion & Crown, pursuant to the 2013 Affiliation Agreement.

35.     Defendant The Lion & Crown Travel Co., LLC ("**Lion & Crown**") is a Delaware
limited liability company formed in 2008. Lion & Crown is another wholly-owned subsidiary of
Marriott Vacations Worldwide with the same principal place of business in Orlando, Florida. In
an affiliation agreement from 2010, Cobalt granted to Lion & Crown the authority to affiliate with
so-called "external" clubs, *i.e.*, those not branded as part of the RCDC program.

36.     Defendant Marriott Resorts, Travel Company, Inc., d.b.a. MVC Exchange
Company ("**MRTC**") is a Delaware corporation and a Marriott Vacations Worldwide subsidiary
that has established an exchange program commonly known as Marriott Vacation Club (or more
formally, the Marriott Vacations Club Destinations Exchange Program) for the purpose providing
MVC members to exchange points at the MVC for access to properties outside the MVC. The

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 12 of 62

RCDC-MVC merger was permanently effectuated by the 2013 Affiliation Agreement between Lion & Crown and MRTC. This 2013 Affiliation Agreement was only recently disclosed.

37.     Defendant **RC St. Thomas, LLC** is a limited liability company organized under the laws of the U.S. Virgin Islands and a wholly-owned subsidiary of Marriott Vacations Worldwide. On information and belief, RC St. Thomas, LLC was involved in foreclosing on and taking title to fractionals whose owners could not make their mortgage payments, as well as delaying those foreclosures.

38.     First American Trust, FSB, a federal savings bank, solely as Trustee of Land Trust No. 1082-0300-00 (a.k.a. MVC Trust)[4] is a land trust organized under Florida law that is, on information and belief, administered and controlled by Marriott Vacations Worldwide and/or its designees. The MVC Trust owns the resorts and fractional interests (including many with the RCDC) to which Marriott Vacation Members have a right of access.

39.     Marriott Vacations Worldwide, MORI, RC Development, RC Management, RC Club St. Thomas, Cobalt, Lion & Crown, MRTC, RC St. Thomas, and the MVC Trust are collectively referred to herein as the **"MVW Defendants."** The MVW Defendants: (a) are the agents, representatives, alter egos, and/or instrumentalities of their respective principals or controlling entities, (b) have interlocking or overlapping directors and/or officers with their respective principals or controlling entities, (c) are undercapitalized and/or spurious or disregard the corporate form, (d) and are entities for which "piercing the corporate veil" is or may be necessary and appropriate to prevent injustice and inequity to Plaintiffs and the proposed Class.

40.     Each of the MVW Defendants directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members: (a) actively or passively participated in the conduct, acts and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more other defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to conduct, acts and omissions alleged herein, and/or (d)

---

[4] In some documents, the MVC Trust has been referred to as the Marriott Vacation Club Trust.

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 13 of 62

is directly, vicariously, jointly, and/or severally liable for the conduct, acts, and omissions alleged

herein. For example, critical decisions that Cobalt and Lion & Crown ostensibly made regarding

the RCDC-MVC merger were, in fact, made by the Chief Operating Officer of Marriott Vacations

Worldwide who was serving at the same time as the controlling officer of Cobalt and Lion &

Crown.

## PLAINTIFFS

41.     Alan and Marjorie Helman are a married couple residing in Maitland, Florida. On

or about February 8, 2002, they purchased an undivided 1/12 interest in a condominium unit at the

RCDC in St. Thomas for $106,400.

42.     Lepont Palm Beach, LLC, is organized under the laws of Florida. Its only member,

Michael Gianatasio, is a resident of Armonk, New York. On or about October 28, 2009, Mr.

Gianatasio and his wife, Penny Gianatasio, purchased an undivided 1/12 interest in a condominium

unit at the RCDC in St. Thomas for $180,000.

43.     Pursuant to an Assignment of Claims, Michael and Penny Gianatasio transferred

all of their claims and all interests in claims arising out of ownership or under the purchase

agreement or otherwise and pertaining to the undivided 1/12 interest in their condominium unit at

the RCDC in St. Thomas to Lepont Palm Beach, LLC.

44.     Maurice Kaspy and Liborio Piazza are residents of Montreal, Quebec. On or about

March 20, 2006, they purchased an undivided 1/12 interest in a condominium unit at the RCDC in

St. Thomas for $144,000.

45.     Timothy Aker is a resident of Pennington, New Jersey. On or about March 22,

2006, he purchased an undivided 1/12 interest in a condominium unit at the RCDC in St. Thomas

for $165,000.

## GENERAL ALLEGATIONS

### A.     History and Evolution of the Marriott Vacation Club

46.     In the 1980s, Marriott International established MORI to run its Marriott Vacation

Club timeshare operations. In 1984, Marriott's Monarch on Hilton Head Island became the first

Complaint

*Helman, et al. v. Marriott International, et al.*                    Page 14 of 62

Marriott Vacation Club resort. By 2009, more than 400,000 timeshare owners had purchased one-week timeshare intervals as part of MVC. This was the initial iteration of the Marriott Vacation Club; it would soon evolve from a timeshare to a points-based vacation ownership program.

47.     By the summer of 2010, Marriott International had decided to move away from its historic model of selling weekly timeshare intervals through the Marriott Vacation Club. The company introduced the concept of selling points that purchasers could use to stay at a range of resorts, as opposed to a particular week in a particular resort.  Marriott International and then Marriott Vacations Worldwide after the 2011 spin-off viewed this introduction of vacation points as a way to maximize the cash flow of their vacation ownership business.

48.     This points-based model is more flexible than a fixed-week ownership interest in a particular property for at least two reasons. First, owners of MVC points are not locked into weekly intervals, but rather can use their points to stay in various properties for short periods of time. In contrast, purchasers of RCDC fractionals had to commit to buy three-week intervals (or four weeks in Aspen Highlands), and the exchange program that allowed RCDC owners to swap time with other RCDC properties required one-week stays. The Marriott Defendants touted these minimums as a key differentiating factor for the Ritz-Carlton Destination Club justifying the substantially increased sales prices.

49.     Second, MVC points can be sold in varying quantities according to the preference of the purchaser. This means the "cost of entry" to join the Marriott Vacation Club is substantially less than the cost to join other programs. The minimum required purchase for MVC points is just 1,500 points. When first introduced in the summer of 2010, MVC points were priced at $9.20 per point, meaning the minimum purchase was only $13,800. Even at today's price, around $14.00 per point, the same purchase would cost only $21,000 — far below what Plaintiffs and other members of the proposed Class were required to spend to obtain access to the RCDC.  On average, the 3,200 purchasers of Ritz-Carlton Destination Club fractions paid more than $200,000.

50.     MVC points are not backed by a direct interest in any particular underlying property, but rather entitle the purchaser to use rights specified by the Marriott Defendants and a

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 15 of 62

beneficial interest in the MVC Trust. This means that, to support the number of MVC points they
wished to sell, Marriott International, and later Marriott Vacations Worldwide after the 2011 spin-
off, had to transfer ownership of sufficient developed inventory to the MVC Trust. As more fully
alleged elsewhere in this Complaint, this is why the Marriott Defendants sought to merge the Ritz-
Carlton Destination Club with the Marriott Vacation Club.

### B.       History and Evolution of the Ritz-Carlton Destination Club

51.     In 1999, MORI introduced the Ritz-Carlton Destination Club as a luxury alternative
to its MVC timeshare product. The St. Thomas and Aspen Highlands properties were the RCDC's
first fractional ownership properties. Until about 2012, the Marriott Defendants developed and
sold approximately 3,200 deeded 1/12 luxury fractionals under The Ritz-Carlton Destination Club
brand at the following nine locations: Aspen Highlands, Colorado; Bachelor Gulch, Colorado;
Jupiter, Florida; North Lake Tahoe, California; San Francisco, California; Vail, Colorado; Abaco,
Bahamas; Maui, Hawaii; and, as relevant here, St. Thomas, U.S. Virgin Islands.

52.     The Ritz-Carlton Destination Club was conceived and sold as a "luxury" product
line that was more exclusive than and superior to a mere timeshare. The Marriott Defendants sold
separately deeded 1/12 fractional ownership interests that provided purchasers with rights to three
particular weeks selected at the time of purchase. In contrast, traditional timeshares (such as the
initial iteration of the MVC) are sold in one-week intervals, and points-based programs (such as
the MVC after about 2010) can be used for transient occupancy for as short a stay as one night.
The exchange program that allowed RCDC owners to swap time within the RCDC required full-
week exchanges rather than shorter periods.

53.     Marriott touted the deeded property interest aspect of the RCDC to differentiate
these fractional offerings from mere timeshares and to sell them as a superior form of real property
ownership. Marriott marketed these fractionals as "[l]ike any form of real estate, . . . [that] can be
sold, willed or transferred by the Member at any time" and represented in sales materials that they
would be "operated for the exclusive use, benefit and enjoyment of the Members, their families
and their guests." The luxurious and private nature of these fractionals, the requirement that they

Complaint

*Helman, et al. v. Marriott International, et al.*                                            Page 16 of 62

be purchased and used in longer blocks of time measured in weeks not days, and the exclusivity of use distinguished them from the MVC product line.

54.     Based on these distinctions and attributes, RCDC fractionals were substantially more expensive, both in terms of purchase price and annual maintenance fees, than the points-based MVC timeshare.  The average RCDC purchaser paid more than $200,000 for a RCDC fractional, whereas one could become a member of the Marriott Vacation Club for less than $20,000 during the relevant period.

**C.     The Ritz-Carlton Great Bay**

55.     The Ritz-Carlton Club Great Bay is located at 6910 Great Bay, St. Thomas, VI 00802 and consists of a total of 105 Condominiums, broken down as follows: (a) 81 "Residences" consisting of two and three bedrooms sold as 1/12 fractional interests (equaling 972 fractionals); and (b) 24 "Suites" consisting of two-bedroom units similarly sold as 1/12 fractional interests (equaling another 288 fractionals).

56.     The club was formally created on May 22, 2002, when Marriott International wholly-owned subsidiary RC Hotels VI recorded a Declaration Establishing a Plan for Condominium for the Great Bay Condominium (the "Condominium Declaration"). A Supplemental Declaration of Condominium for The Club at Great Bay Condominium ("Club Declaration") recorded by RC Hotels VI that same day included certain use restrictions, including the following contained in Article XI, section 11.1:

> [E]ach of the Residences (i.e., whole condominiums sold as fractionals)[5] relating to Residence Interests (i.e., the fractionals themselves) subject to this Club Declaration shall be occupied only for temporary occupancy. Use of the same and the Common Elements and Limited Common Elements of this Condominium is limited solely to the personal use of Members, their guests, invitees and lessees and for recreational uses by corporations and other entities owning Residence Interests. . . . **Use of Residences or the Common Elements for commercial purposes or any purposes other than the personal use described herein is expressly prohibited. "Commercial purpose" shall include, but not be limited to, a pattern of rental activity or other occupancy by a Member that**

---

[5] The Condominium and Club Declarations refers to the whole condominiums as a "Residence" and the 1/12 fractional interests that Plaintiffs purchased as a "Residence Interest."

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 17 of 62

**the Members Association, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice**.

(Emphasis added.) As more fully alleged below, this provision of the Club Declaration either prevented the RCDC-MVC merger without a vote to amend the Club Declaration.

57.     Beginning in 2002 and through 2011, the Marriott Defendants sold all but 79 of the 1,260 available fractionals at the Ritz-Carlton Great Bay for an average price of over $150,000 per fractional. As at the other Ritz-Carlton Residence Club locations, the Marriott Defendants marketed these St. Thomas fractionals as being superior to mere timeshares in that they were separately deeded property interests equivalent to a second home, located in an exclusive and private property available only to those who purchased three weeks at premium prices.

58.     The Ritz-Carlton Great Bay is located on a beautiful parcel of land with beach access, and was previously known as a quiet, very high-end destination.

**D.     The Marriott Defendants Controlled the Association Board, Communications With Plaintiffs and the Proposed Class, and Nearly All Aspects of Their Separately Deeded Property Interests**

59.     The Marriott Defendants fashioned the governing documents to ensure their continued control of the Association and its board, even after it became nominally "independent." Like in the governing documents at the other Ritz-Carlton Destination Clubs,[6] the Marriott Defendants imposed management agreements on the property that delegated all board functions and duties to RC Hotels VI, which in turn subcontracted board functions and duties to RC Management. Later, RC Management further delegated certain important duties, such as elements of association board governance, to Marriott International subsidiary RC Hotel Co. The Marriott Defendants used this control to improperly influence, infiltrate, and exert control over the ostensibly independent Association board, operate the Ritz-Carlton Great Bay in a manner that

---

[6] Pursuant to the governing documents for each of the other four properties that remain in the RCDC program — the resorts at San Francisco, Tahoe, Vail, and Aspen Highlands — all of the duties, including fiduciary duties, of the supposedly independent fractional owners association boards are similarly delegated to RC Management.

Complaint

*Helman, et al. v. Marriott International, et al.*                                    Page 18 of 62

benefited the Marriott Defendants, and otherwise carry out the wrongful conduct and the fraudulent scheme described herein.

60.     In the first management agreement dated May 22, 2002, the Association, which had been just formed and was controlled by the Marriott Defendants, entered into a Management Agreement with RC Hotels VI that gave that Marriott International subsidiary "all of the power and authority of the Association to the extent necessary to perform the Management Company's duties and obligations under this Agreement." This Management Agreement further provided that RC Hotels VI, "on behalf of and at the expense of, the Association, to the exclusion of all other persons including the Association and its Members, shall have all the powers and duties of the Board of Directors as set forth in the Declaration and the Bylaws of the Association . . . ."

61.     That same day, RC Hotels VI entered into a "Sub-Management Agreement" with RC Management in which RC Hotels VI engaged "RC Management Company as the exclusive managing entity of the Condominium and to manage the daily affairs of the Condominium and the Plan." The Sub-Management Agreement also provides that "RC Management Company shall have all of the power and authority of RC Hotels VI under the Management Agreement to the extent necessary to perform RC Hotels VI's duties and obligations under the Management Agreement" and further that "RC Management Company, on behalf of and at the expense of, the Association, to the exclusion of all other persons including the Association and its Members, shall have all the powers and duties of the Board of Directors as set forth in the Declaration and the Bylaws of the Association . . . ."

62.     Nearly a decade later, at the time of the November 2011 spin-off, RC Management entered into a further sub-agency agreement with Marriott International subsidiary RC Hotel Co. at each RCDC location. This sub-agency agreement dated November 21, 2011, provides that Marriott International, through RC Hotel Co., will manage the on-site operations of each RCDC location, giving Marriott International control over the Ritz-Carlton Great Bay. Importantly, it also provides that Marriott International, through RC Hotel Co., manages association governance. This

Complaint

*Helman, et al. v. Marriott International, et al.*                    Page 19 of 62

allowed Marriott International to manipulate the Association to achieve the unwanted RCDC-MVC merger.

63.    The MII and MVW Defendants (through RC Hotel Co. and RC Management and otherwise) also insisted that all communications with Plaintiffs and the proposed Class — including those from the nominally independent but surreptitiously controlled Association board — be drafted or edited by Marriott personnel. As a result, these communications were improperly and deceptively crafted to achieve the Marriott Defendants' unlawful objectives.

**E.     The MII and MVW Defendants Owe Fiduciary Duties to Plaintiffs and the Proposed Class**

64.    Marriott International and its subsidiaries RC Hotels VI and RC Hotels Co. and Marriott Vacations Worldwide and its subsidiaries RC Management, Cobalt, Lion & Crown, and MRTC were the agents for and assumed fiduciary duties to the Association, Plaintiffs, and the proposed Class based on principles of agency law, the terms of the management agreements described above, their almost complete control over the Association and its board, and the separately-deeded property interests purchased by Plaintiffs. The governing documents, for example, provided for the following instruments of control over the physical property:

a.    Fractional owners were not provided keys to their units. Rather, they had to check in at the front desk on each visit to obtain access.

b.    Unlike cases in which a group of friends share a property, the fractional owners in a particular unit did not decide *when* each co-owner used the unit—Defendants controlled the reservation system governing access.

c.    Defendants even controlled whether Plaintiffs could ever access *their particular unit.* The purchase contract ensured that they had three weeks at the Ritz-Carlton Great Bay, but the Marriott reservation system in fact determined whether an owner stayed in their chosen unit or a separate one entirely.

d.    Defendants determined the décor and when and how the various unit would be refurbished.

65.    In these and other ways, Marriott International, through RC Hotel Co. and RC Hotels VI, and Marriott Vacations Worldwide, through RC Management and other subsidiaries, controlled nearly all aspects of Plaintiffs' and the proposed Class' separately-deeded property

Complaint
*Helman, et al. v. Marriott International, et al.*                                Page 20 of 62

interests.  It is this high degree of control that gives rise to the Marriott Defendants' fiduciary obligations to Plaintiffs and the proposed Class.

**F.      Sales of RCDC Fractionals Slow by 2010**

66.      By 2010, sales of luxury private residence clubs had substantially slowed down from pre-recession rates. In fall 2010, Marriott International attempted to sell its RCDC business to a third party in a marketing offering led by an internationally known investment bank. On information and belief based on relatively widespread knowledge in the industry, a number of parties were interested, including Timbers Group and Discovery Land Company. During its marketing to sell RCDC to third parties, the Marriott Defendants extolled at length the value of the Ritz-Carlton brand.

67.      It was around this time that Marriott International and its subsidiaries began converting legacy "week owners" of MVC timeshares to a "points-based product" through which purchasers bought interests in the MVC Trust set up to own the resorts and fractionals to which MVC members had access. By the end of 2011, many of MVC's 400,000-plus owners at over 50 MVC resorts worldwide were utilizing points purchased from MORI to trade for use of MVC resorts.

**G.      The Spinoff of Marriott Vacations Worldwide from Marriott International and the "Re-Engineering" of the RCDC**

68.      In February 2011, Marriott International officially announced its plan to spin-off Marriott Vacations Worldwide as a publicly traded company. Ostensibly, Marriott Vacations Worldwide became the exclusive developer and manager of vacation ownership and related products under the Marriott brand and the exclusive developer of vacation ownership and related products under the Ritz-Carlton brand, but Marriott International retained significant control of Marriott Vacations Worldwide's operations because of licensing agreements further described below.

69.      At the same time, the Marriott Defendants abandoned efforts to sell the Ritz-Carlton Destination Club, opting instead to include it in the newly spun-out company. However, the

Complaint
*Helman, et al. v. Marriott International, et al.*                                Page 21 of 62

Marriott Defendants did not plan to invest further in the RCDC luxury product line. To the

contrary, a SEC filing on June 28, 2011, states:

> Given the continued weakness in the economy, particularly in the luxury real estate market,
> we have significantly scaled back our development of Luxury segment vacation ownership
> products. We do not have any Luxury segment projects under construction nor do we have
> any current plans for new luxury development. While we will continue to sell existing
> Luxury segment vacation ownership products, we also expect to evaluate opportunities for
> bulk sales of finished inventory and disposition of undeveloped land.

70.     Around mid-2011, a group of senior Marriott International executives that made up

something called the Growth and Governance Council began plotting their specific plans for the

re-engineering of the Ritz-Carlton Destination Club. After seriously considering at least one other

option, this group decided to transfer unsold RCDC fractional inventory to the MVC Trust and

thereby make it available to members of the Marriott Vacation Club, and then merge the Ritz-

Carlton Destination Club with the Marriott Vacation Club. They knew that doing so would allow

the Marriott Defendants to sell more MVC points at higher prices because giving MVC members

access to luxury Ritz-Carlton Destination Clubs would enhance Marriott Vacation Club's

attractiveness.

71.     On November 19, 2011, Marriott International formally spun off the Marriott

Vacations Worldwide entities as a separately traded public company (NYSE: VAC). Marriott

International gave this new company licensing agreements allowing it and its subsidiaries to use

the "Marriott" and "Ritz-Carlton" brand and trade names, trademarks, and service marks subject

to strict restrictions. Because Marriott International owns these tradenames, all or most aspects of

Marriott Vacations Worldwide's business are controlled by Marriott International. Marriott

International's approval was either required, or as a practical matter necessary, for most major

decisions by Marriott Vacation Worldwide, including the merger of the RCDC with the MVC that

is the subject of this Complaint. Marriott Vacations Worldwide regularly reported to Marriott

International on the status of the RCDC-MVC merger, and worked together to increase sales of

MVC points through cross marketing and referrals from Marriott International's "Marriott

Complaint

*Helman, et al. v. Marriott International, et al.*                                          Page 22 of 62

Rewards" loyalty program.  In addition, Marriott International subsidiaries played major roles in the operation of Ritz-Carlton Destination Clubs, including the Ritz-Carlton Great Bay.

72.    Pursuant to the License Agreement between Marriott International and Marriott Vacations Worldwide Corporation executed as part of the spin-off, Marriott Vacations Worldwide was to pay Marriott International $50 million annually, plus 2% of annual sales (including of MVC points), for the right to use the Marriott and Ritz-Carlton tradenames and marks.

73.    In the months following the spin-off, under the direction of Marriott Vacations Worldwide Chief Operating Officer and Executive Vice President Lee Cunningham and Chief Executive Officer Stephen Weisz, the MVW Defendants began the work needed to carry out Marriott Internationals' plan to radically re-engineer the RCDC — with the support, assistance, and oversight of Marriott International. The goal was to increase the revenue and profits of both the MVW and the MII Defendants. In a nutshell, the plan was to merge the RCDC and MVC product lines and use the "halo effect" of the storied Ritz-Carlton brand and the prospect of access to the luxury Ritz-Carlton Destination Club properties to sell more MVC points at higher prices.

74.    Cunningham wore many hats for the Marriott Vacations Worldwide entities, essentially alter egos, including leading Lion & Crown, RC Development, and Cobalt, often signing in a general role for RCDC.

75.    Stephanie Sobeck, an RCDC executive critical to the scheme alleged here, similarly wore other hats, such as leading RC Management.

76.    In or about late 2011, a group of senior Marriott Vacations Worldwide executives on a committee called the Corporate Growth Committee was presented with a specific strategic plan to accomplish the merge. The Corporate Growth Committee instructed MVC's Law Department to analyze the legal risks involved in merging the two clubs. With advice from a large and very sophisticated legal division, the Marriott Defendants knew the RCDC-MVC merger might bring litigation but decided to proceed with the merger anyway. These conclusions are summarized in a December 2011 report.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 23 of 62

77.    In its first Annual Report filed following the spin-off, dated March 21, 2012, Marriott Vacations Worldwide revealed:

> [W]e have significantly scaled back our development of Luxury segment vacation ownership products. We do not have any Luxury segment projects under construction nor do we have any current plans for new luxury development. While we will continue to sell existing Luxury segment vacation ownership products, we also expect to evaluate opportunities for bulk sales of finished inventory and disposition of undeveloped land.

78.    In its annual report the next year, Marriott Vacations Worldwide repeated similar language and then noted:

> During 2012 we placed inventory from one of our Luxury properties into the [Marriott Vacation Club] program, and we intend to place most of our remaining Luxury inventory into the [Marriott Vacation Club] program. We have repositioned our Luxury sales centers to sell the [Marriott Vacation Club] points product.

79.    In May 2012, recognizing the legal risks but proceeding anyway, Marriott Vacations Worldwide's Corporate Growth Committee approved the proposed RCDC-MVC merger. This plan included (a) closing all RCDC sales centers, with some to become MVC timeshare sales offices; (b) transferring unsold RCDC fractionals to the MVC Trust so that MVC points members could access the unsold inventory at the various RCDC properties; and (c) pursuing formal affiliations with each RCDC owners association to permanently merge the two clubs, allowing further trading of MVC points for non-MVC-owned RCDC fractional units. The plan acknowledged that the level of MVC points needed to exchange into an RCDC must be set low enough that the average MVC points user could gain access. Marriott International ratified these decisions and reaped huge rewards to the detriment of Plaintiffs and the proposed Class.

80.    Under this new business model, Marriott Vacations Worldwide and Marriott International leveraged the allure of access to luxury RCDC properties with the storied Ritz-Carlton brand to sell more and higher-priced MVC points. Indeed, beginning in July 2011 and continuing to the present, MVC sales presentations and promotional material have prominently featured access to Ritz-Carlton Destination Club properties. That Marriott Vacations Worldwide abandoned plans to expand the network of RCDC properties did not pose a problem for this new

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 24 of 62

business model. Nor did it matter that only some RCDC inventory is actually available to MVC members. The mere possibility of access is enough to sell more MVC points at higher prices. Experts in the industry refer to this as the "halo effect." This phenomenon drove profits for the Marriott Defendants.

### H.     The Marriott Defendants Encounter Massive Opposition After Announcing the Merger

81.     The first public announcement of the Marriott Defendants' intention to merge the Marriott Vacation Club with the Ritz-Carlton Destination Club came on July 17, 2012, when Eveleen Babich, posing as a "General Manager" of Cobalt, disclosed one aspect of the RCDC-MVC merger to all RCDC fractional owners. In fact, Babich did not write or even see the letter; it came from MVW's executives on the Corporate Growth Committee. They described the ability of RCDC owners to one or more of the RCDC weeks for MVC points that they could use to access MVC properties:

> *Based on the Ritz-Carlton Destination Club member feedback*, additional benefits and experiences will be available through a new affiliation with Marriott Vacation Club Destinations . . . Affiliation will extend to you the opportunity to deposit your Reserved Allocation on an annual basis. Once you deposit, the following will be available for you: . . . Secure any of the 51 worldwide Marriott Vacation Club Resorts . . . .

(Emphasis added.) In fact, discovery in the related cases clearly shows that this merger was not initiated in response to "member feedback." Rather, the Marriott Defendants' express purpose was to profit at the expense of Plaintiffs, members of the proposed Class, and other RCDC owners.

82.     This letter was misleading in several other respects. The Babich letter was on Ritz-Carlton Destination Club letterhead, as if that were an entity independent of Marriott and bore her signature as general manager of Defendant Cobalt, the supposedly independent company vested with discretion under the governing documents over the exchange program through which RCDC owners could access other RCDC properties. In fact, Babich was not a "general manager" and Cobalt had no existence independent of Marriott Vacations Worldwide; all of Cobalt's officers were Marriott Vacations Worldwide executives, and it had no employees or offices of its own. In

Complaint

*Helman, et al. v. Marriott International, et al.*                                    Page 25 of 62

short, Cobalt is and was the alter ego and tool of Marriott Vacations Worldwide. The same is true

on information and belief of the other Marriott Vacations Worldwide subsidiaries except MORI.

83.     Moreover, the letter did not disclose that the 400,000-plus Marriott Vacation Club

members would be able to access to the exclusive RCDC private residence clubs. Babich assured

owners nothing about their private residence club would change even though she and other senior

Marriott executives knew that would not be the case. Further, the letter did not disclose that the

Marriott Defendants would transfer unsold and foreclosed RCDC inventory to the MVC Trust for

use by MVC members.

84.     Babich's July 17, 2012, letter is typical of the many related communications that

followed. For example, just a month later in another mass mailing intended to slow down a

groundswell of opposition, Marriott Vacations Worldwide COO Cunningham repeated the false

assurance that "nothing has changed or will change as a result of the announcement." Discovery

in the related cases proves the Marriott Defendants knew that statement was false. Indeed, the Ritz-

Carlton Destination Club has been fundamentally transformed as a result of the merger. Among

other things, it is no longer an exclusive private residence club akin to a second home. An influx

of MVC members enjoy a right of transient occupancy. Resale values for RCDC fractionals have

collapsed as a result of the merger and the Marriott Defendants' related misconduct.

85.     The July 17, 2012 letter also informed the RCDC owners that they were losing two

clubs — the Ritz-Carlton Abaco and the Ritz-Carlton Kapalua — but concealed from the owners

that the loss resulted from the RCDC re-engineering plans approved by the Marriott Defendants

in May 2012. The loss of options within the RCDC network had a two-fold benefit for the Marriott

Defendants. First, the Marriott Defendants saved costs by shedding expenses associated with

maintaining luxury properties to the standard required by the Marriott International licensing

agreement. Second, as options to trade weeks within the RCDC system dwindled (soon other

RCDC properties would be lost too), there was a greater chance that RCDC owners, when faced

with dwindling options, would trade RCDC weeks for MVC points and thereby increase RCDC

inventory for the Marriott Vacation Club.

Complaint
*Helman, et al. v. Marriott International, et al.*                                                        Page 26 of 62

86.     Within the next month or so, the boards of the associations in Aspen Highlands, Bachelor Gulch, and St. Thomas sent letters expressing their concern about this merger. A letter dated August 3, 2012, from the Association in St. Thomas stated the following to Plaintiffs and the proposed Class:

> Let us take this opportunity to assure you that your Boards of Directors are not taking this "evolution" notice lightly from the RCDC Parties. We are currently evaluating the systemic changes they have communicated in their letter to see how it will affect our club and, together with all of the other remaining RCDC Club Associations, assessing the impact on the entire RCDC system.
>
> We have been in frequent communications with each other and the Presidents of the other RCDC Clubs since this announcement. Our general but preliminary consensus regarding the "evolution" of the RCDC brand as described in Eveleen Babich's letter of July 17th is that we are concerned that this may not be an enhancement to our Membership Interests. We all, as members, invested in the Ritz-Carlton brand!
>
> Please rest assured that your Board will hold the RCDC Parties accountable to preserve, maintain and continually enhance the Ritz-Carlton Destination Club product they developed and sold to all of us.

87.     In August 2012, an internal email to Marriott Vacations Worldwide executives described the negative follow-up to a Marriott webinar about the proposed affiliation. Jacqueline Ader-Grob, Senior Manager of Public Relations for RCDC, was monitoring social media and quoted "several Facebook conversations from the Members' private groups." In this email, which was forwarded to Cunningham, she wrote: "The two most vocal group[s] continue to be St. Thomas and Aspen, which is where the feeds below come from after the call yesterday." The email excerpts, for example, a St. Thomas owner stating that they "know (and owning both MVCI[7] and RCC) that you are not comparing apples to apples with these two types of 'weeks.'" Another wrote: "Such incredib[]le spin! Really, such BS (pardon my French)," and another, "It also looks like we are going to have a much harder time using week for week exchanges due to partial week point users. Our units are also going to have a lot more wear & tear."

[7] MVCI is an acronym for Marriott Vacation Club International, which is one of the many names by which MORI does business.

Complaint
*Helman, et al. v. Marriott International, et al.*                                              Page 27 of 62

88.     On August 28, 2012, CEO and President of Marriott Vacations Worldwide Steve
Weisz and Lee Cunningham (identified in his Ritz-Carlton Club role) held a conference call for
Ritz-Carlton Members. Weisz touted his ongoing commitment to the Ritz-Carlton luxury brand
post-spin off from Marriott International. Cunningham admitted that Babich had been wrong to
say nothing had changed but says that other than the removal of two clubs from the system, nothing
else about the original membership benefits had in fact changed. He also misleadingly answered
the question of how the merger would address the value of the RCDC fractional interests by
calculating the number of MVC points that would be required to reserve several weeks at Aspen
and St. Thomas—glossing over the fact that most MVC points users would not be staying for such
long periods, requiring lower costs of entry. On August 30, 2012, the same entities issued a set of
frequently asked questions addressing the proposed affiliation that essentially cribs from
Cunningham's August 28, 2012, remarks.

89.     On December 3, 2012, an attorney retained by the Association, James M. Derr,
Esq., delivered to the MVW Defendants a "cease and desist" letter, stating, among other points:

> It has come to the [Association]'s attention that Marriott Vacations Worldwide
> Corporation ("MVW"), through its Marriott Vacations Worldwide program [i.e., MVC],
> has begun, or is in the process of beginning to promote the use of the Residence Interests
> at the Ritz-Carlton Club, St. Thomas to Marriott Vacation Club members who are non-
> deeded members of Marriott Vacation Club's timeshare/points/exchange system and are
> not also members of the Ritz-Carlton Destination Club. It has also come to the
> [Association]'s attention that The Ritz-Carlton Management Company, LLC, an affiliate
> of MVW and the manager of the COA (the "COA Manager"), RC Hotels (Virgin Islands),
> Inc., RC St. Thomas, LLC and The Ritz-Carlton Development Company, which presently
> own unsold and returned Residence Interests at the [Association], are active and willing
> participants in and beneficiaries of such promotion and resulting use. Further, we believe
> that part of the plan of each of these entities involves the conveyance of these Residence
> Interests to an entity we believe is known as The Marriott Trust ("Trust"), which will
> ultimately hold title to the Residence Interests and will exert ultimate control and direction
> over their use in the Marriott Vacation Club program. . . .
>
> The [Association] demands that MVW, the HOA Manager, the Program manager
> and their respective affiliates and each of the entities you represent immediately cease and
> desist from promoting the use of the Residence Interests at the [Association] to the MVC
> Members and permanently refrain from implementing any such program at the Ritz-
> Carlton Club, St. Thomas.

In addition to violating the Declaration, any practice of allowing the use of the Residence Interests by MVC Members may constitute, among other things, one or more breaches of the fiduciary duties of the COA Manager to the Association under the COA Management Agreement as a result of self-dealing among the COA Manager, and the various Ritz-Carlton and Marriott entities and their respective affiliates to the detriment of the [Association] and its members.

90.     The Cease and Desist letter cited the Club Declaration, Article XI, section 11.1 (quoted *supra*) prohibiting commercial use of the fractionals, including "a pattern of rental activity or other occupancy by a Member that the Members Association, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice," as well as Article V, section 5.5, which provided that: "In no event . . . shall a member convey or encumber less than a Residence Interest . . . , attempt to subdivide a Residence Interest into lesser interests, or merge together more than one Residence Interest." Derr ended the letter by stating:

I look forward to receiving your collective written confirmation by December 5, 2012 that each of MVW, the COA Manager, the Project Manager, the Marriott licensor entity and their respective affiliates will immediately cease and desist from promoting the use of the Residence Interests to MVC Members and permanently refrain from implementing any such program at the Ritz-Carlton Destination Club, St. Thomas. In the absence of such written confirmation by such date, the COA will have no choice but to pursue claims regarding the circumstances described in this letter.

91.     The Marriott Defendants averted the threatened new lawsuit by, in early 2013, promising to put the issue of the RCDC-MVC merger to a vote of owners at each RCDC property. Lee Cunningham memorialized this promise in a mass email to all RCDC owners on May 14, 2013.

## I.     The Marriott Defendants Resort to Trickery to Overcome the Member Opposition and Explicit Prohibitions in the Governing Documents

92.     On December 11, 2012, owners at Bachelor Gulch and Aspen Highland properties filed a lawsuit in federal court in Minnesota (Case No. 12-CV-03093-DSD-JJK) against Marriott Vacations Worldwide, MORI, RC Hotel Co., RC Management, RC Development and others, based in part on Marriott's "intention to 'affiliate' the formerly exclusive RCDCs with the Marriott Vacation Clubs. . . ." As a result of that lawsuit and cease and desist letters sent by counsel for the

St. Thomas, Aspen Highlands, and Bachelor Gulch associations, the Marriott Defendants were fully aware of the vehement opposition to their plans to leverage the Ritz-Carlton "halo effect" to sell MVC points and that this opposition threatened their merger plans.

93.     Top executives of the Marriott Defendants, including Cunningham and Weisz, decided at a Strategic Council meeting in January 2013 that they needed an aggressive, club-by-club strategy to win the votes needed for their merger. They agreed that Marriott Vacations Worldwide would undertake an aggressive campaign, using an outside communication firm, aimed at each RCDC property to give them the best chance. Marriott Vacations Worldwide hired marketing and other public relations and survey experts to help them "sell" the merger.

94.     For example, the company commissioned APCO, a national firm based in Washington, D.C., to conduct a professionally designed and executed system-wide survey in the summer of 2013 (the "APCO Survey"). But this backfired. Almost 800 RCDC owners responded, and the results were not equivocal: Owners nearly unanimously opposed the MVC merger and vehemently so.

95.     Plaintiffs and the proposed Class were no exception. Out of the 797 survey respondents, 323 were St. Thomas owners. They were expressly vocal about opposing any such affiliation, with their frustration building on each of the Marriott Defendant's prior bad acts.

96.     Meanwhile, Bachelor Gulch exited the RCDC system (and lost the Ritz-Carlton "flag") after its owners voted to reject the RCDC-MVC merger and not renew its management contracts. Opposition to the merger there was so vehement that owners preferred the costly loss of the Ritz-Carlton name rather than suffer the consequences of the merger. Internal Marriott correspondence obtained in the related litigation reveals that senior Marriott Defendants executives became concerned they would lose other votes as well. Faced with this harsh reality, the Marriott Defendants surreptitiously breached the promise made by Cunningham that each RCDC club would be allowed to vote on the proposed merger.

97.     In Aspen Highlands, San Francisco, and Tahoe, the Marriott Defendants quietly delayed and substituted a highly misleading survey for the promised vote, then hoodwinked the

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 30 of 62

association boards at those clubs and, on information and belief, at St. Thomas into consenting to the merger, as more fully alleged below. Indeed, the St. Thomas board signed a joinder to and acknowledgment of the affiliation immediately after the vote.

**J.      The Marriott Defendants Hide a Key Agreement from the Various Boards**

98.      When Plaintiffs, members of the proposed Class, and others purchased their RCDC fractionals, they were given a confusing raft of disclosure documents and agreements. But the contractual picture was even more confusing than that, for there were additional agreements that the Marriott Defendants hid.

99.      As alleged above, there were various management agreements that delegated powers to RC Hotels VI, RC Hotel Co, and RC Management. One of these agreements, the "Sub-Management Agreement" between RC Hotels VI and RC Management, gave RC Management the power to engage a "program manager" to manage and administer the exchange program whereby owners at one RCDC location can access other RCDC locations. An "Affiliation Agreement" designated Defendant Cobalt as the program manager. Confusing provisions in this agreement allowed the Marriott Defendants to falsely claim to the various boards (and repeatedly assert in the related litigation) that the governing documents gave Cobalt "sole discretion" to merge the RCDC with the MVC.

100.      Indeed, the Marriott Defendants rebuffed opposition to the merger by association boards by claiming that this grant of "sole discretion" to Cobalt meant the merger would go through with or without their approval. To the courts presiding over the related cases, the Marriott Defendants argued this grant of "sole discretion" to Cobalt defeated damages claims based on the merger. As it turned out, these were patent and deliberate falsehoods contrived to mislead anyone perceived to have power over the merger.

101.      In fact, there were two other affiliation agreements that the Marriott Defendants did not disclose to purchasers. In a 2010 affiliation agreement, Cobalt delegated its authority to Lion & Crown, another Marriott Vacations Worldwide subsidiary. Then, Lion & Crown signed the 2013 Affiliation Agreement with MRTC, yet another Marriott Vacations Worldwide subsidiary. This

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 31 of 62

latter affiliation agreement was the one that provided for a the RCDC-MVC merger, *but with a critical qualification that the Marriott Defendants concealed for years. Before the merger could extend to a particular RCDC property, the association board at that club had to sign an "Acknowledgment and Joinder" to the 2013 Affiliation Agreement*.

102.    In other words, the board of each RCDC association could thwart the merger at their club with a simple majority vote to refuse to sign the Acknowledgment and Joinder. This gave each board veto power over the merger at their club; they could refuse to sign the Acknowledgment and Joinder with a simple majority vote of the directors.

103.    Intent on pushing the merger through at all costs and knowing that a complete disclosure of the power each association board had would doom the merger, the Marriott Defendants withheld the 2013 Affiliation Agreement from all of the association boards when asking them to sign the Acknowledgment and Joinder.

104.    The Marriott Defendants were able to perpetrate this fraud because they had pervasive control over each RCDC association board, and also because they had crafted the Acknowledgment and Joinder in a highly misleading way that obscured what would happen if a board refused to sign it.

105.    On information and belief, not knowing it had this power to stop the merger, the Association at St. Thomas signed the Acknowledgment and Joinder, and the "affiliation" was given an effective date of December 5, 2014.

106.    Not coincidentally, they failed to produce the 2013 Affiliation Agreement in the related litigation until Plaintiffs discovered its existence in March 2018, years after those cases were first filed and after discovery was well underway, with document production and depositions essentially completed. This resulted in the federal court presiding over the litigation in Aspen Highlands to sanction the Marriott Defendants. *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 6839800 (D. Colo. Dec. 31, 2018). But concealing the 2013 Affiliation Agreement was worth that cost. Indeed, concealment of the 2013 Affiliation Agreement

Complaint

*Helman, et al. v. Marriott International, et al.*                                        Page 32 of 62

was an integral part of the fraudulent scheme that the Marriott Defendants perpetrated between 2012 and 2018 across the entire RCDC network and in three related cases.

107.    Further, providing the 2013 Affiliation Agreement to each of the association boards and their respective members would have revealed its numerous one-sided and unfair terms that transferred significant control from the associations to the Marriott Defendants. For instance, Section X created a ten-year term for the RCDC-MVC merger and that term automatically renews for additional five-year terms. Critically, once an association signed the Acknowledgment and Joinder, it had no further power to withdraw from the merger as termination rights rest solely with the MVW Defendants.

108.    Further, the 2013 Affiliation Agreement gave the Marriott Defendants significant use rights in the RCDC properties, above and beyond the use rights given to owners themselves under the Club Declaration. The Marriott Defendants secured the right during certain periods to use the Ritz-Carlton Great Bay for "marketing and sales of Interests, vacation ownership interests at other resort condominiums or club resorts, or such other vacation ownership or multisite vacation ownership or membership plans developed or marketed by [MVC] or its affiliates."

109.    The Marriott Defendants further secured the right to use exchange time at Ritz-Carlton Great Bay "*for any purpose*, including, without limitation, in [MVC]'s sole and absolute discretion, any purpose related to marketing, selling, or promoting the [MVC] Program or other timeshare or fractional projects developed, marketed or offered by [MVC]'s affiliates." (Emphasis added).

110.    Furthermore, it is customary for such exchange agreements to specify a formula for allocating exchange time between various programs. But section 7.8 of the 2013 Affiliation Agreement gave MVC the sole and absolute discretion to calculate the value of exchange time, meaning that the Marriott Defendants could and likely would use 100% of the exchange time committed by Ritz-Carlton Great Bay owners. Likewise, while it is customary for exchange agreements to fairly allocate costs between affiliating exchanges, the 2013 Affiliation Agreement has no such provision. Indeed, the cost allocation was grossly one-sided and likely to lead to

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 33 of 62

increased costs for Ritz-Carlton Great Bay owners. Section 7.1 of the Agreement reserved for the Marriott Defendants the right to charge Ritz-Carlton Destination Club owners for use of the exchange program, but explicitly prohibited Lion & Crown — which had the power to affiliate the RCDCs with external programs — from charging Marriott Vacation Club members fees for exchanging into the Ritz-Carlton Destination Club.

## K.      The Marriott Defendants Manufacture a Financial Crisis to Overcome Opposition to the RCDC Merger

111.    On October 27, 2008, the Association wrote to all owners at the Ritz-Carlton Great Bay informing them of a Special Assessment due to a problem with delinquent maintenance dues. The Association emphasized the impact of the mortgage crisis, calling the delinquencies, foreclosures and units for sale as "at an all-time high," causing values to decline. The letter cited almost $1 million in unpaid dues, about half of which was delinquent 2008 owner dues, with the remainder from prior years.

112.    The October 27, 2008 letter failed to inform Plaintiffs and the proposed Class that the overwhelming percentage of delinquent owners had also defaulted on their mortgages — mortgages in which RC Development or another Marriott Defendant subsidiary was the mortgagee. Moreover, the letter did not reveal that RC Hotels VI and RC Development were delaying foreclosure proceedings. This slow-walking of foreclosures was a substantial cause of the $1,000,000 (and growing) delinquency in maintenance dues owed to the Association.

113.    RC Development's delay in foreclosing violated its own policies regarding judicial foreclosures which, on information and belief, requires a judicial foreclosure action to be filed within 80 days of default. But the Marriott Defendants had reasons to delay them. First, by delaying foreclosures, the Marriott Defendants avoided having to pay the maintenance dues owed on foreclosed units. Second, the delays created a financial crisis that the Marriott Defendants used as leverage, including to obtain approval for their merger from Plaintiffs and the proposed Class.

114.    On information and belief, by the end of the year 2010, the Association had accrued over $3,000,000 in unpaid maintenance fees. The Marriott Defendants' decision not to foreclose

Complaint

*Helman, et al. v. Marriott International, et al.*                    Page 34 of 62

on delinquent owners caused the great majority of this bad debt expense. On November 14, 2011, at the behest of the Association, Plaintiffs and the proposed Class voted to amend the Club Declaration to allow the Association to rent the fractionals owned by delinquent owners with the proceeds to be used by the Association to cover delinquent maintenance dues. This helped but did not entirely solve the problem. A perception remained that delinquent dues threatened serious harm to the Ritz-Carlton Great Bay.

### L.      *RC Hotels (Virgin Islands), Inc v. B&T Cook Family Partners, Ltd and Great Bay Condominium Owners Association*

115.     It was not lost on the Association that the Marriott Defendants were slow-walking foreclosures. On or about July 25, 2011, the Association had attorney James M. Derr, Esq. file a counterclaim in a foreclosure suit filed on behalf of the RC Hotels VI. The Association alleged that the Marriott Defendants had violated their fiduciary duties by delaying the filing of that particular foreclosure action for seven months from default, resulting in injury to the Association in the form of accruing unpaid maintenance fees.

116.     On July 20, 2012, the court rejected a motion to dismiss filed by the Marriott Defendants. By that time, delinquent maintenance dues were in excess of $4,000,000, of which the great majority resulted from the Marriott Defendants' failure to timely foreclose. In a published opinion, the court agreed that pursuant to the management agreement prepared by the Marriott Defendants, RC Hotels VI assumed all of the duties of the Board of Directors, and that as a consequence, RC Hotels VI assumed a fiduciary relationship with the Association. The court stated:

> that a reasonable person can infer that RC Hotels did not exercise the proper standard of care required as Great Bay's managing agent, *since the sooner a foreclosure action is filed, the sooner the parties can obtain the monies owed on the Note and for assessment of fees. The longer it takes for the commencement of the foreclosure action, the more assessments accrue, Thus, . . . the Court finds that Great Bay's claim for breach of fiduciary duty is plausible on its face.*"

*RC Hotels (Virgin Islands), Inc v. B&T Cook Family Partners, Ltd and Great Bay Condominium Owners Association*, 57 V.I. 3, * 11 (V.I. Super. July 20, 2012) (emphasis added).

117.    Neither the Association nor the Marriott Defendants ever disclosed this significant win to Plaintiffs and the proposed Class. Had they known the Marriott Defendants owed a fiduciary duty to promptly foreclose, they may not have voted in the manner described below. The obvious alternative was to sue the Marriott Defendants for breach of fiduciary duty and recover a judgment for unpaid maintenance dues. As far as Plaintiffs and the proposed Class knew, there was still a brewing financial crises resulting from delinquent maintenance dues.

118.    By the end of 2013, approximately 138 owners at Ritz-Carlton Great Bay were delinquent on their Marriott-held mortgages and had also defaulted on maintenance dues owed to the Association, with nearly 100 of them delinquent for multiple years. The total amount of uncollected maintenance dues approached $7 million, even though, as noted, the Association had begun mitigating losses through rentals.

**M.      The Marriott Defendants Game a Vote at the Ritz-Carlton Great Bay**

119.    In January 2013, the Marriott Defendants approached the St. Thomas Association board with a proposal to solve the perceived financial crisis for which the Marriott Defendants were liable under the *B&T Cook Family Partners* ruling. The Marriott Defendants proposed that, in exchange for an owner vote in favor of the merger, they would begin foreclosure proceedings on each fractional interest in which the member had defaulted on a Marriott Vacations Worldwide-affiliated mortgage and begin paying the delinquent maintenance dues. Among other things, the vote would allow the Marriott Defendants to transfer the foreclosed and unsold inventory to the MVC Trust for use by MVC members.

120.    On February 22, 2013, Association President John Doyle and Treasurer Thomas Doyle travelled to Marriott Vacations Worldwide's headquarters in Orlando, Florida to discuss this proposal. The Marriott Defendants conceded that the Club Declaration potentially blocked them from including the Ritz-Carlton Great Bay in the RCDC-MVC merger, even if they ignored Derr's warning that they were breaching their fiduciary duties and attempting unjust enrichment. The Marriott Defendants therefore sought the vote of owners described herein.

121.   On December 13, 2013, the Association board sent a letter to Plaintiffs and members of the proposed Class recommending that they vote in favor of amending the Club Declaration as requested by the Marriott Defendants. The letter, which was drafted and/or edited by the Marriott Defendants, failed to disclose that the consideration Marriott Vacations Worldwide was proposing for the favorable vote was illusory. Not only did the MVW Defendants have a fiduciary duty to promptly foreclose and concomitantly start paying maintenance fees, but also the Association and its members had a viable claim against the MVW Defendants for the approximately $7 million in unpaid maintenance dues that had accrued by then.

122.   In addition, on December 18 and 19, 2013, the Marriott Vacations Worldwide held a webinar for the owners at the Ritz-Carlton Great Bay in which they attempted to convince Plaintiffs and the proposed Class to vote for the RCDC-MVC merger.

123.   Further, on or about said dates, the Marriott Defendants provided owners with a set of Frequently Asked Questions. Question 6 asked: "If this program is approved, is there an end period to The Ritz-Carlton Destination Club taking over delinquent members or, once approved, is this program ongoing?" And Marriott answered: "The Ritz-Carlton Destination Club will seek liens and foreclosures on new delinquent Members and pay the annual assessments on new delinquent interests once the foreclosure is achieved or a deed in lieu of foreclosure (DIL) is obtained. . . ." Similarly, Question 9 asked: "How many total fractions are currently involved with this transaction (i.e., how many total delinquencies and foreclosures are there)?" Marriott answered: "There are approximately 130 delinquent fractions included in the Agreement. If the proposal is approved, over the next two years, The Ritz-Carlton Destination Club would cover Club dues for all of the approximately 130 delinquent fractional interests for which The Ritz-Carlton Destination Club receives title. This would relieve the Association of approximately one million dollars of ongoing annual bad debt expense beginning with the 2015 Club budget."

124.   Both the webinars and FAQs were materially misleading, and omitted material information that the MVW Defendants were under a fiduciary obligation to provide, including the fact that the consideration Marriott Vacations Worldwide was proposing for the favorable vote

Complaint

*Helman, et al. v. Marriott International, et al.*                              Page 37 of 62

was illusory. The Marriott Defendants also failed to disclosure the numerous one-sided and unfair terms contained in the undisclosed 2013 Affiliation Agreement that transferred permanent and significant control from the Association to the Marriott Defendants.

125.    Further, although the Marriott Defendants owed Plaintiffs and the proposed Class fiduciary duties, the Marriott Defendants concealed from Plaintiffs and the proposed Class that a national appraisal firm hired by the Marriott Defendants had concluded that the merger would negatively impact the owners' fractional interest values.

126.    The vote took place on January 26, 2014.  Faced with misrepresentations and incomplete information, Plaintiffs and the proposed Class voted to approve the merger.

127.    The Marriott Defendants emailed Plaintiffs and the proposed Class two days later, stating in part:

> We are pleased to advise that the proposal extended by your Board and The Ritz-Carlton Destination Club has been accepted and as a result of the vote, the Association will receive funds in relation to the current delinquent Member inventory that will greatly assist in the Association's financial position and in return The Ritz-Carlton Destination Club will have the ability to convey fractional interests in the Club to the MVC Trust. St. Thomas Members will also have the opportunity later this year to exchange with the Marriott Vacation Club Destinations Exchange Program if they choose to do so.

128.    The effective date of the RCDC-MVC affiliation at St. Thomas was in December 2014, with access provided soon thereafter.

129.    In summary, the Marriott Defendants obtained approval for the merger at the Ritz-Carlton Great Bay by means of a fraudulently obtained vote of owners. More specifically, the Marriott Defendants engaged in proxy-fraud by including false and misleading statements in communications with the owners while omitting other material facts.  Among other things, this violated the Marriott Defendants' fiduciary duty of utmost good faith and candor to Plaintiffs and the proposed Class.

Complaint
*Helman, et al. v. Marriott International, et al.*                                           Page 38 of 62

**N.      Marriott International and MVC Profit Greatly at the Expense of RCDC Owners**

130.     The results of the above-described conduct, culminating in the 2014 merger, were disastrous for Plaintiffs and the proposed Class. Among other harms, their fractional interest values declined such that they can barely give them away.[8]

131.     The coerced, fraudulently obtained merger of the Ritz-Carlton Great Bay with the MVC, along with the other misconduct alleged herein, including the slow-walking of foreclosures by the Marriott Defendants and the resulting increase in maintenance dues to Plaintiffs and the proposed Class, caused the values of Plaintiffs' and Class members' fractionals to be far lower than the otherwise would be. These values already were fragile given the Marriott Defendants' decision to abandon the luxury RCDC product line in service of building up the MVC points program. In contrast, the association of the highly regarded luxury Ritz-Carlton Great Bay with the lower-ranked Marriott Vacation Club program had a halo effect for that program, increasing its prestige and allowing it to sell more MVC points at higher prices and earn hundreds of millions in ill-gotten revenues, which this lawsuit seeks to disgorge.

132.     The loss in value post-affiliation was also caused in part by potential fractional purchasers' understanding that an influx of MVC members who had no long-term investment at the St. Thomas resort would lead to increased wear and tear from increased turnover and a diminishment in the resort's renowned peace and calm.

133.     Since this vote, the value of Great Bay fractionals has continued to decline, while the Marriott Defendants have reaped huge profits by using the allure of the RCDC to sell MVC

[8] As an MVC member posting on the popular timeshare blog tuggbbs.com noted in November 2015, "The timeshare sales team still pitch [St. Thomas] as the Ritz Carlton Destination Club, but admit that it is really just MVC. . . . It is great for us that this property is now in the Trust, as the points chart is now fixed, and we benefit from the contractual access to the hotel. It is unfortunate for the original Ritz owners as they fund the MFs [maintenance fees] on the property that is now accessible to us." https://tuggbbs.com/forums/index.php?threads/ritz-carlton-st-thomas.235224/

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 39 of 62

points to the masses at a much lower price point. Marriott Vacations Worldwide's share price rose

since the beginning of the re-engineering to above $150.

## CLASS ALLEGATIONS

134.    Plaintiffs bring this action on behalf of themselves and, under Virgin Islands Rules

of Civil Procedure 23(b), as representatives of the following Class:

> *All entities and individuals (including their assignees) who, at any time from May 22, 2002*
> *to January 26, 2014, purchased a 1/12 fractional interest at the Ritz-Carlton Great Bay,*
> *except that the following individuals and entities are excluded from the class: (a) those*
> *who financed their purchases through any Defendant and whose fractional interest was*
> *foreclosed upon, (b) any defendants named in this Complaint and any affiliate, parent, or*
> *subsidiary of any defendant; any successor or assignee of any defendant; any entity in*
> *which any defendant has a controlling interest; and any officer, director, or employee of*
> *any defendant.*

135.    Plaintiffs reserve the right to amend this "Class Definition" if discovery and further

investigation reveal that the proposed Class should be expanded or otherwise modified.

136.    The Class is sufficiently numerous in that it numbers at least in the hundreds,

rendering joinder of all members of the Class impracticable.

137.    Plaintiffs' claims are typical of the claims of the other members of the Class which

they seek to represent under Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member

of the proposed Class have been subjected to the same wrongful conduct and have been damaged

in the same manner.

138.    Plaintiffs will fairly and adequately protect the interests of the proposed Class.

Plaintiffs are represented by competent counsel experienced in the prosecution of complex class

actions. Plaintiffs' interests coincide with, and are not antagonistic to, those of the proposed Class.

139.    Questions of law and fact common to all class members predominate over any

questions affecting only individual class members. Predominating common questions include,

without limitation:

   a.      Whether any of the Marriott Defendants violated any provision of the Criminally
           Influenced and Corrupt Organizations Act, 14 V.I.C. § 600, *et. seq.*

Complaint

*Helman, et al. v. Marriott International, et al.*                                        Page 40 of 62

b.      Whether any of the Marriott Defendants owed fiduciary duties to Class members and breached those duties.

c.      Whether any of the Marriott Defendants committed constructive fraud or fraudulent concealment.

d.      Whether any of the Marriott Defendants aided and abetted or conspired with other defendant to commit the wrongful conduct alleged herein.

e.      Whether any of the Marriott Defendants are liable for breach of the implied covenant of good faith and fair dealing and/or breached any implied provisions of the purchase contract.

f.      Whether any of the Marriott Defendants violated any provision of the Consumer Protection Law of 1973 and the Consumer Fraud and Deceptive Business Practices Act.

g.      Whether Plaintiffs and members of the proposed Class suffered a diminution in value of their fractional interests, and if so, by how much.

h.      Whether any of the Marriott Defendants were unjustly enriched by the conduct described herein, and if so, by how much.

i.      Whether Class members are entitled to disgorgement of the Marriott Defendants' ill-gotten profits, and if so, the amount of disgorgement.

j.      Whether Class members are entitled to other forms of equitable relief, including imposition of a constructive trust.

k.      Whether Class members are entitled to punitive damages, reasonable attorneys' fees, pre-judgment interest, post-judgment interest, and/or costs of suit.

140.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously and efficiently. There are no difficulties likely to be encountered in the management of this lawsuit that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

## COUNT I

### *Violations of 14 V.I.C. § 605(a) of CICO Against All Defendants*

141.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

142.    The MII and MVW Defendants formed an associated-in-fact enterprise to infiltrate and control the Association and perpetrate a scheme to defraud that began just before the spin-off

Complaint

*Helman, et al. v. Marriott International, et al.*                    Page 41 of 62

of the MVW Defendants from Marriott International in November 2011 and that continued through the January 26, 2014 vote and thereafter as well.  As more fully alleged elsewhere in this Complaint, the MII and MVW Defendants accomplished this unlawful scheme to defraud by using their control over the Association, its board, and its communications with Plaintiffs and the proposed Class to manipulate them into voting for the RCDC-MVC merger based on a real or perceived financial crisis that the Marriott Defendants manufactured by slow-walking foreclosures in violation of their fiduciary duties. In addition, the MVW Defendants, acting at the behest and direction of the MII Defendants, drafted and sent other highly misleading communications to Plaintiffs and the proposed Class that concealed material facts.

143.    The MII and MVW Defendants, and each of them, are and at all relevant times were "persons" within the meaning of 14 V.I.C. § 604(l) that conducted and/or participated in, directly or indirectly, the affairs of the CICO enterprises (i.e., the associated-in-fact enterprise and the wrongfully infiltrated and controlled Association) alleged herein through a pattern of racketeering activity.

144.    At all relevant times, the Association was an "enterprise" within the meaning of 14 V.I.C. § 604(h) that the other Defendants infiltrated, operated, and controlled to perpetrate the scheme to defraud and other wrongful conduct alleged herein. In addition, and alternatively, the MII and MVW Defendants, and each of them, associated together for the common purpose of engaging in the ongoing course of racketeering/criminal activity alleged in this Complaint. They formed and operated an associated-in-fact enterprise to perpetrate the scheme to defraud and other wrongful conduct alleged in this Complaint (the "associated-in-fact enterprise"). Each member of the associated-in-fact enterprise participated in the conduct of this enterprise in furtherance of a common purpose that they all agreed upon (i.e., the scheme to defraud alleged in this Complaint).

145.    Defendants agreed to function and did function as a unit and according to specified roles, and each played specific roles to achieve that agreed upon purpose. Among other things, beginning in 2011 and continuing to the present:

    a.    Using the governing documents that Marriott International and its subsidiaries fashioned to ensure continuing control over nominally independent fractional

Complaint
*Helman, et al. v. Marriott International, et al.*                    Page 42 of 62

        owners associations, such as the Association in St. Thomas, the MII Defendants (through RC Hotels VI, RC Hotel Co., and otherwise) and the MVW Defendants (using MORI personnel acting in the name of RC Management and other MVW subsidiaries that had no actual employees of their own) manipulated the fractional owners associations in St. Thomas, San Francisco, Tahoe, and Aspen into supporting, approving, consenting to, and/or acquiescing to the RCDC-MVC affiliation.

b.    The MII Defendants (through RC Hotels VI, RC Hotel Co., and otherwise) and the MVW Defendants (using MORI personnel acting in the name of RC Management and other MVW subsidiaries that had no actual employees of their own) controlled the flow of information to the owners associations, including the Association in St. Thomas, the agendas for board meetings, and most other aspects of association governance.

c.    The MII Defendants (through RC Hotels VI, RC Hotel Co., and otherwise) and the MVW Defendants (using MORI personnel acting in the name of RC Management and other MVW subsidiaries that had no actual employees of their own) edited communications from the boards of the various owners associations to RCDC owners, including communications from the Association board in St. Thomas to Plaintiffs and the proposed Class.

d.    In consultation with and at the direction of Marriott International, the MVW Defendants sent communications to RCDC owners, including Plaintiffs and the proposed Class, that misstated material facts and concealed others.

e.    Marriott International directed RC Hotels VI (and other MII subsidiaries) to slow-walk foreclosures of the many fractional owners in St. Thomas that financed their purchase through Marriott and fell behind on their mortgages and their maintenance dues. The MII Defendants were joined in this effort by Marriott Vacations Worldwide, which directed RC Development (and other MVW subsidiaries) to slow-walk these foreclosures. This was actually done by MORI personnel because RC Development and other MVW subsidiaries had no actual employees of its own.

f.    Marriott Vacation Worldwide and MORI, acting in the name of Cobalt, Lion & Crown, and MRTC, three MVW subsidiaries with no employees or existence of their own, executed a confusing web of affiliation agreements, including the 2013 Affiliation Agreement and the Acknowledgment and Joinder, to effect the merger.

g.    Once Plaintiffs and the proposed Class were deceived into voting for the RCDC merger, Marriott International had RC Hotels VI (and other MII subsidiaries), and Marriott Vacations Worldwide had RC Development (and other MVW subsidiaries) transfer foreclosed and unsold inventory to the MVC Trust for use by Marriott Vacation Club members.

146.    The MII and MVW Defendants acted in concert and conspired to deprive Plaintiffs and the proposed Class of the value of their fractional interests at the Ritz-Carlton Great Bay. In

Complaint

*Helman, et al. v. Marriott International, et al.*                              Page 43 of 62

addition, the Marriott Defendants deprived Plaintiffs and the proposed Class of maintenance dues that the Marriott Defendants would have had to pay to the Association had they timely foreclosed on delinquent owners, as their fiduciary duties required them to do. Plaintiffs and the proposed Class were required to pay increased maintenance dues to make up for the shortfall in Association funds created by the Marriott Defendants' breach of their obligations, and Plaintiffs and the proposed Class lost the benefit of maintenance dues that the Marriott Defendants would have had to pay had they timely foreclosed.

147.   In furtherance of this scheme to defraud and other wrongful conduct, the MII Defendants and the MVW Defendants participated in, directly or indirectly, the affairs of the CICO enterprises alleged herein (i.e., the Association and the associated-in-fact enterprise) through a pattern of criminal activity within the meaning of 14 V.I.C. § 604(j). This pattern consisted of predicate acts of mail and wire fraud. 18 U.S.C. §§ 1341 and 1343. In addition, the Marriott Defendants engaged in predicate violations of the Travel Act, 18 U.S.C. § 1952, with interstate and foreign travel to and from the U.S. Virgin Islands, Bethesda, Maryland, and Orlando, Florida, among other places, all in furtherance of this scheme to defraud. Specific predicate acts include but are not limited to the following:

a.   During the weeks surrounding May 24, 2012, Lee Cunningham and agents of MORI, RC Hotel Co., and other members of the CGC committee met in person, emailed, and communicated by phone about various re-engineering steps, such as transferring the remaining unsold developer inventory to the MVC Trust and obtaining Marriott International's approval for selling points. They predicted that the process could take a year to a year and a half to complete, extending beyond the subsequent vote at St. Thomas to affiliate with MVC in exchange for the Marriott Defendants taking action on the foreclosures. They also noted the concern about whether the transfer could violate St. Thomas's governing documents' anti-commercialization provisions, and discussed other communications.

b.   On September 12, 2012, David Mann participated in the annual Marriott International/Marriott Vacations Worldwide senior executives meeting in Bethesda, Maryland, which other members joined by phone, and discussed next steps in the re-engineering, including the delinquencies at the St. Thomas and how they harmed the other owners. Additional Marriott International agents participating on information and belief included Tim Grisius, Kevin Kimball, Ken Rehman, and Carl Berquist.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 44 of 62

c.   Marriott International received the attorney's letter alleging breach of contract and breach of fiduciary duty, among other violations, at the Aspen Highlands resort, and on November 28, 2012, discussed it via conference call and an in-person meeting in Orlando, Florida, with Marriott Vacations Worldwide executives, along with other RCDC re-engineering updates.

d.   Marriott International's David Mann and Kevin Kimball participated the October 2, 2013, Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting in Bethesda, Maryland, which some participants joined by phone, discussing, among other topics, the Re-engineering Plan update, furthering the scheme.

e.   Marriott International participated in the June 25, 2014, Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting in Bethesda, Maryland, at which Cunningham once again gave an RCDC Reengineering Plan update. They discussed that the unsold developer inventory at St. Thomas was in the process of going into the Trust, effectuating the scheme. Members joined by phone.

f.   RC Hotel Co. exercised Marriott International's authority over the Associations' governance by emailing, on October 17, 2013, the Aspen board various documents for a pre-read before its vote on the affiliation with the MVC—without sending the 2013 Affiliation agreement. As a distinct predicate act, on August 8, 2013, John Hearns, the vice president of the RC Hotel Co, emailed the letter and survey responses for the APCO member survey to all the RCC General Managers, noting that Sobeck would discuss the results on an upcoming brand conference call. APCO's detailed reports about its member study and focus groups show that the possibility of the MVC affiliation was a serious concern among Ritz-Aspen members. Despite learning about these grave member concerns, Marriott decided to advance its own interests at the expense of Plaintiffs' interests by imposing the MVC affiliation. The Marriott Defendants never gave the reports to any RCDC Association boards, including the St. Thomas board, who were being asked for input on whether their clubs should affiliate. Recognizing that the owners likely would reject affiliation if they knew they had the power to do so, the Marriott Defendants concocted the foreclosure-related settlement plan at St. Thomas.

g.   On information and belief, shortly after the January 26, 2014 vote, RC Hotels VI transferred or participated in the transfer of RCDC fractional inventory to the MVC Trust, which transfers were accomplished using the mails and/or interstate wires.

h.   On January 3, 2012, Cunningham emailed the Action Item/Status Summary circulated at a recent Strategic Council meeting to other Marriott executives. This summary was linked to the Defendants' movement of RCDC inventory into the MVC Trust.

i.   At the Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly meeting on May 30, 2012, attended in person in Orlando, Florida, and by phone, the Defendants, including Cunningham, confirmed the plan to stop selling

Complaint
*Helman, et al. v. Marriott International, et al.*

Ritz-Carlton products, along with confirming other steps in the re-engineering process.

j.   On or about August 17, 2012, Cunningham sent the follow-up email to owners about Babich's July 2012 letter announcing the merger.

k.   On August 28 and 30, 2012, Steve Weisz and Cunningham held the conference call for Ritz-Carlton Members and then issued the FAQs.

l.   Marriott International received the attorney's letter alleging breach of contract and breach of fiduciary duty, among other violations, at the Aspen Highlands resort, and on November 28, 2012, discussed it via conference call and an in-person meeting in Orlando, Florida, with Marriott Vacations Worldwide executives, along with other RCDC re-engineering updates.

m.   Cunningham emailed all RCDC owners on May 14, 2013, promising a vote on the affiliation question.

n.   Lion & Crown, in concert with other Defendants, helped make the MVW-RCDC affiliation permanent by adding unexpected language in the Lion & Crown enrollment agreement in May 2013 after at least one board had reviewed the original provisions. For example, Cunningham engaged in both email and phone conversations with the board of the Association at the Aspen Highlands on June 4, 2013, in furtherance of the scheme, as did Sobeck.

o.   On July 23, 2013, Cunningham emailed RCDC owners reminding them to complete the APCO survey.

p.   Although the Marriott Defendants owed Plaintiffs and the proposed Class fiduciary duties, the Marriott Defendants concealed from Plaintiffs and the proposed Class that they had learned on November 20, 2013, from a national appraisal firm they had hired that the merger would negatively impact the owners' fractional interest values. RCDC/RC Management's Kim Frates-Mazzilli and MVW's Ben Pierce circulated this report by email on that date.

q.   On December 11, 2013, Sobeck responded to an email from St. Thomas's John Doyle that expressed concerns about the Defendants' actions at the other resorts by stating, as turned out to be false, that inventory would not be moved into the MVC trust unless the Aspen owners voted on the decision. A vote never took place, just a misleading survey. Sobeck had also emailed the Aspen board members in April 16, April 29, and May 11, 2013 about a "vote" at the Aspen resort.

r.   Pursuant to the scheme perpetrated by the MII and MVW Defendants, the Association used the mails and interstate wires to file an amendment to a declaration on January 28, 2014, stating that the Club Declaration did not prohibit fractional interests from being moved into the MVC Trust for MVC's use.

s.   On information and belief, shortly after the January 26, 2014 vote, RC Development transferred or participated in the transfer of RCDC fractional inventory to the MVC Trust, which transfers were accomplished using the mails and/or interstate wires.

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 46 of 62

t.   On July 17, 2012, Babich sent the letter on behalf of Cobalt announcing the intention to merge the MVC and RCDC.

u.   Lion & Crown: On November 26, 2014, Babich on behalf of Lion & Crown, wrote MRTC setting the effective date of the St. Thomas Association's at December 5, 2014.

v.   On information and belief, the MVC Trust participated in the transfer of RCDC fractional inventory to that trust, which transfers were accomplished using the mails and/or interstate wires.

w.   Additionally, on January 14, 2015, the MVC Trust, convened a conference call to discuss voting as owners on the Association. This communication constituted two predicate acts, involving both email and phone calls. Participants included Julie Kennedy-Rick, Julie; Jeff Comfort; Keith Kocarek; Laura Cobb; Lori Colaiuta; and Steven Novack.

x.   At the Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly meeting on May 30, 2012, attended in person in Orlando, Florida, and by phone, Marriott Defendants executives and personnel, including David Mann, confirmed the plan to stop selling Ritz-Carlton products, along with confirming other steps in the re-engineering process.

y.   On September 12, 2012, Lee Cunningham traveled to the annual Marriott International/Marriott Vacations Worldwide senior executives meeting in Bethesda, Maryland, and discussed next steps in the re-engineering, including the delinquencies at the St. Thomas and how they harmed the other owners. Additional representatives of Marriott Vacations Worldwide included on information and belief John Geller, Jim Hunter, Lani Kane-Hanan, and Steve Weisz.

z.   Cunningham traveled to the October 2, 2013, Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting in Bethesda, Maryland, and gave a Re-engineering Plan update, furthering the scheme. MVW's John Geller, Jim Hunter, and Lani Kane-Hana also participated.

aa.  Cunningham traveled to the June 25, 2014, Marriott International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting in Bethesda, Maryland, and once again gave an RCDC Reengineering Plan update. They discussed that the unsold developer inventory at St. Thomas was in the process of going into the Trust, effectuating the scheme.

bb.  On January 28, 2014, Randy Mercer sent Ritz-Carlton Great Bay owners an email summarizing the results of the vote.

cc.  Sobeck travelled to the Virgin Islands on multiple occasions to addend meetings of the Association board, including on January 26, 2014. Other MII and MVW personnel travelled to the Virgin Islands to attend other board meetings as well, including one on April 29, 2013.

dd.  In the runup to the January 26, 2014 vote, the Marriott Defendants sent a series of communications to members, as discussed in the January 17, 2014 Business Review Report.

Complaint

*Helman, et al. v. Marriott International, et al.*                                    Page 47 of 62

ee.     On December 18 and 19, 2013, the MVW Defendants held a webinar for the owners at the Ritz-Carlton Great Bay in which they attempted to convince Plaintiffs and the proposed Class to vote for the RCDC-MVC merger. A few days later, they sent a mass communication to Ritz-Carlton Great Bay owners regarding these webinars.

ff.     The MVW Defendants held a meeting with John Doyle and Tom Doyle, including on or about February 23, 2013 and May 20, 2013, to discuss the vote, requiring interstate travel for all or some of the participants.

148.    Because Cunningham not only served MVW but also led and acted in the name of and on behalf of alter egos Lion & Crown, Cobalt, RC Development, RC Management, MRTC, and perhaps other MVW Defendants as well, each predicate act alleged here against Cunningham is also incorporated against those other MVW Defendants. Similarly, because Sobeck acted in the name and on behalf of Marriott Vacations Worldwide, MORI, RC Management, RC Development, Cobalt, and perhaps other MVW Defendants as well, each predicate act alleged against Sobeck is incorporated against these other MVW Defendants too. Similarly, Kim Frates-Mazzilli served both in an RC Development role and as an agent of RC Management, so allegations involving her apply to both of those defendants. More generally, all or most of the predicate acts alleged herein were committed by the MII and MVW Defendants by implication and chain of authority.

149.    The Marriott Defendants, and each of them, agreed to commit these predicate acts, agreed to aid and abet their commission by other members of the associated-in-fact enterprise, and/or agreed that some members of that enterprise would commit the predicate acts for the benefit of all members of the associated-in-fact enterprise.

150.    Plaintiffs and members of the proposed Class suffered harm and/or injury to their business or property as a direct and proximate result of the Marriott Defendants' wrongful conduct. Specifically, the Marriott Defendants' unlawful conduct has destroyed the value of Plaintiffs' separately-deeded property interests, and the private residence club that formed the heart of those property interests. In addition, Plaintiffs and members of the proposed Class have been forced to pay increased maintenance dues as a direct and proximate result of the Marriott Defendants' wrongful conduct.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 48 of 62

151.    Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011).

## COUNT II

### *Violations of 14 V.I.C. § 605(b) of CICO Against All Defendants*

152.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

153.    In violation of 14 V.I.C. § 605(b), the MII and MVW Defendants acquired and maintained control over the Association and the separately-deeded property interests owned by Plaintiffs and other members of the proposed Class through the conduct alleged elsewhere in this Complaint.

154.    Also in violation of 14 V.I.C. § 605(b), the MVC Trust (and through it the MVW Defendants) wrongfully acquired the RCDC fractional inventory that the other Marriott Defendants (including RC Hotels VI and RC Development) transferred to it following the January 26, 2014 vote, each of which transfers were also predicate acts of mail and wire fraud, as they were, on information and belief, accomplished using the mails and/or interstate wires.

155.    Plaintiffs and the proposed Class suffered the harm and/or injury to their business or property alleged above as a direct and proximate result of the Marriott Defendants' wrongful conduct. Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud

alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

## COUNT III

### *Violations of 14 V.I.C. § 605(c) of CICO Against All Defendants*

156.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

157.    Fractional inventory obtained through foreclosure was one of the proceeds that the MII and MVW Defendants derived, directly or indirectly, from their pattern of criminal activity alleged herein. The MII and MVW Defendants invested these RCDC fractionals in their operation of the Marriott Vacation Club, which qualifies as an enterprise within the meaning of 14 V.I.C. § 607(a)(1) by transferring them into the MVC Trust in violation of 14 V.I.C. §§ 605(c).

158.    Plaintiffs and the proposed Class suffered the harm and/or injury to their business or property alleged above as a direct and proximate result of the Marriott Defendants' wrongful conduct. Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

159.    Further, to prevent the Marriott Defendants from continuing to benefit from their wrongdoing, the Court should order pursuant to 14 V.I.C. § 607(a)(1) that all fractionals transferred to the MVC Trust be transferred out of that trust so they are no longer available for use by Marriott Vacation Club members.

Complaint
*Helman, et al. v. Marriott International, et al.*                                          Page 50 of 62

### COUNT IV

### *Conspiracy to Violate CICO, 14 V.I.C. § 605(d), Against All Defendants*

160.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

161.     The Marriott Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to participate in, directly or indirectly, the scheme to defraud, predicate acts, and violations of 14 V.I.C. §§ 605(a)-(c) alleged above and thereby conspired with one another in violation of 14 V.I.C. § 605(d).

162.     Each of the Marriott Defendants agreed to perform these wrongful acts and each acted the material ways alleged herein to accomplish their wrongful purpose, including concerted action. The predicate acts and other conduct alleged elsewhere herein constitute overt acts in furtherance of this conspiracy.

163.     Plaintiffs and the proposed Class suffered the harm and/or injury to their business or property alleged above as a direct and proximate result of the Marriott Defendants' wrongful conduct. Plaintiffs specifically seek treble damages, costs of suit, and attorneys' fees, as authorized by CICO. In addition, pursuant to the Court's authority under 14 V.I.C. § 607(a) to issue "any appropriate order or judgment," a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their violations of CICO and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 51 of 62

## COUNT V

### *Breach of Fiduciary Duty Against All Defendants*

164.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

165.     The Marriott Defendants, and each of them, assumed fiduciary duties to Plaintiffs and the proposed Class based on their control of the Association and its board, and on the high degree of control they otherwise exercised over Plaintiffs' and the proposed Class' separately-deeded fractional property interests, as more fully alleged above.[9]

166.     As fiduciaries, the Marriott Defendants were required to act with utmost good faith and in the best interests of Plaintiffs and the proposed Class and refrain from any actions that would cause harm to Plaintiffs and the proposed Class, or that allow the Marriott Defendants to profit at their expense.

167.     The Marriott Defendants, and each of them, breached their fiduciary duties by advancing their own interests at Plaintiffs' and the proposed Class' expense, as more fully alleged elsewhere herein.

168.     As a direct and proximate result of their breaches of their fiduciary duties, the Marriott Defendants, and each of them, proximately caused damage to Plaintiffs and the proposed Class, including by destroying the value in their fractionals, in an amount to be proven at trial. In addition, a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their breaches of their fiduciary duties and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

---

[9] *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 1535509, at *6 (D. Colo. Mar. 29, 2018) ("The Court finds that the plaintiffs have sufficiently alleged that the Management Agreement entrusted RC Management with control over plaintiffs' property sufficient to create fiduciary duties"); *Reiser v. Marriott Vacations Worldwide Corp.*, 2017 WL 569677, at *4–5 (E.D. Cal. Feb. 13, 2017) (similar ruling).

Complaint

*Helman, et al. v. Marriott International, et al.*                                        Page 52 of 62

169.     For purposes of this cause of action, each of the Marriott Defendants either qualifies as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so qualify.

## COUNT VI

### *Constructive Fraud Against All Defendants*

170.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

171.     The Marriott Defendants, and each of them, had a duty as fiduciaries to act honestly, with full disclosure and loyalty to the Plaintiffs as their principals.

172.     The Marriott Defendants, and each of them, knew that their uniform communications to Plaintiffs and the proposed Class regarding the RCDC-MVC merger and the vote thereon failed to disclose material facts that they had a duty to disclose as fiduciaries and otherwise, including but not limited to:

   a. The fact that the Marriott Defendants knew they would reap massive profits while severely damaging plaintiffs once the merger went through;
   b. The fact they had slow-walked foreclosures to manufacture a financial crisis for the Association;
   c. The fact that their fiduciary duties required them to promptly foreclose even without the deal that owners, including Plaintiffs and the proposed Class, voted on in January 2014; and
   d. The fact that the affiliation would be governed by an undisclosed 2013 Affiliation Agreement that provided the Marriott Defendants with a series of one-sided provisions that were highly damaging to Plaintiffs and the proposed Class and the Ritz-Carlton Great Bay, including a permanent affiliation between RCDC and MVC. These onerous provisions were designed to give unfair advantages to the Marriott Defendants and MVC members over RCDC members.

173.     Based on the materiality of the concealed facts, there is a presumption of reliance on the part of Plaintiffs and the proposed Class, negating the need for individualized testimony from members of the proposed Class.

Complaint
*Helman, et al. v. Marriott International, et al.*                                        Page 53 of 62

174.    By virtue of their non-disclosure of material facts described above and herein, the Marriott Defendants were able to take undue advantage of Plaintiffs and the proposed Class. The Marriott Defendants' misrepresentations and non-disclosure of the material facts described above and elsewhere herein were material in that they were likely to have a substantial effect on how Plaintiffs and members of the Class voted on January 26, 2014.

175.    As a direct and proximate result of their constructive fraud, the Marriott Defendants, and each of them, proximately caused damage to Plaintiffs and the proposed Class, including by destroying the value in their fractionals, in an amount to be proven at trial. In addition, a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their breaches of their fiduciary duties and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

176.    For purposes of this cause of action, each of the Marriott Defendants either qualifies as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so qualify.

## COUNT VII

### *Fraud by Concealment Against All Defendants*

177.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

178.    Because they were fiduciaries and also because they made uniform, class-wide statements that were misleading without disclosure of the concealed material facts, the Marriott Defendants, and each of them, had a duty to disclose all material facts relating to the RCDC-MVC merger and the January 26, 2014 vote.

179.    The Marriott Defendants, and each of them, knew that their class-wide communications with Plaintiffs and the proposed Class would be likely to mislead if the concealed material facts were not included in those uniform communications, but the Marriott Defendants

Complaint

*Helman, et al. v. Marriott International, et al.*                    Page 54 of 62

intentionally concealed these material facts because they intended to mislead Plaintiffs and the proposed Class into agreeing to the RCDC-MVC merger.

180.    Based on the materiality of the concealed facts, there is a presumption of reliance on the part of Plaintiffs and the proposed Class, negating the need for individualized testimony from members of the proposed Class.

181.    As a direct and proximate result of their fraud by concealment, the Marriott Defendants, and each of them, proximately caused damage to Plaintiffs and the proposed Class, including by destroying the value in their fractionals, in an amount to be proven at trial.

182.    In addition, a constructive trust should be imposed on the Marriott Defendants' ill-gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things of value they obtained as a result of their breaches of their fiduciary duties and the scheme to defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust Enrichment § 43.

183.    For purposes of this cause of action, each of the Marriott Defendants either qualifies as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so qualify.

## COUNT VIII

### *Aiding and Abetting Breach Tort Against All Defendants*

184.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

185.    The Marriott Defendants, and each of them, knowingly aided and abetted in the breaches of fiduciary duty, constructive fraud, and fraud by concealments committed by the other defendants by providing assistance to, counseling, commanding, inducing, or providing the means to achieve the wrongful conduct alleged elsewhere in this Complaint, and or otherwise caused those wrongful acts to be done.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 55 of 62

186.     As a direct and proximate result of their aiding and abetting in the other defendants'

breach of fiduciary duty, constructive fraud, and fraud by concealment, the Marriott Defendants,

and each of them, damaged Plaintiffs in an amount to be proven at trial.

187.     In addition, a constructive trust should be imposed on the Marriott Defendants' ill-

gotten gains to prevent their unjust enrichment, and they should be required to disgorge all things

of value they obtained as a result of their breaches of their fiduciary duties and the scheme to

defraud alleged herein in accordance with the Restatement (Third) of Restitution and Unjust

Enrichment § 43.

188.     For purposes of this cause of action, each of the Marriott Defendants either qualifies

as a "conscious wrongdoer" within the meaning of Restatement (Third) of Restitution and Unjust

Enrichment §§ 43, 51-53 or knowingly aided and abetting one or more other defendants who so

qualify.

## COUNT IX

### *Breach of Contract/Implied Covenant Against*
### *RC Hotels VI and RC Club St. Thomas*

189.     Plaintiffs incorporate by reference the allegations contained in the preceding and

subsequent paragraphs of this Complaint as if fully set forth herein.

190.     The standardized purchase agreement and related documents such as the Offering

Plan (collectively the "purchase agreement") constitute an enforceable contract between Plaintiffs

and the proposed Class and the seller, RC Hotels VI, and the organizer RC Club St. Thomas, which

provided financing to certain purchasers.

191.     Plaintiffs and members of the proposed Class performed all, or substantially all, of

the significant things that the purchase agreement required them to do, and/or they were excused

from doing those things.

192.     The purchase agreement includes an implied promise that RC Hotels VI and RC

Club St. Thomas would not take any action that would radically alter the nature of the RCDC, the

Ritz-Carlton Great Bay, or the separately-deeded property interests purchased at premium prices

Complaint

*Helman, et al. v. Marriott International, et al.*                                    Page 56 of 62

by Plaintiffs and the proposed Class, nor any action that would violate the reasonable expectations of Plaintiffs and the proposed Class under the purchase agreement. Plaintiffs reasonably expected that these defendants might make certain changes, but would maintain the fundamental character of the RCDC, the Ritz-Carlton Great Bay, and the fractionals at that club.

193.    The wrongful conduct of RC Hotels VI and RC Club St. Thomas alleged elsewhere in this Complaint — in particular their merger of the RCDC with the MVC — constitutes a material breach of implied promises in the purchase agreement, and a violation of the implied covenant of good faith and fair dealing that the law incorporates into that contract.

194.    RC Hotels VI and RC Club St. Thomas have frustrated Plaintiffs' and the proposed Class's reasonable expectations under the purchase agreement, deprived them of the value of their fractionals and the fruits of the purchase agreement, and/or defeated the purpose of that contract.

195.    As a result of this breach of the purchase agreement, Plaintiffs and the proposed Class are entitled to damages in an amount to be proved at trial.

## COUNT X

### *Violation of the Consumer Protection Law of 1973, 12A V.I.C. §§ 101, et seq.*

196.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

197.    The Virgin Islands Consumer Protection Law protects the consuming public and legitimate business enterprises from those who engage in misleading, deceptive, or unfair acts or practices in the course of trade or commerce.

198.    The Marriott Defendants, and each of them, and any co-conspirators engaged, and continue to engage, in a misleading, deceptive, and unfair trade or commerce practice regarding the management of the fractionals at the Ritz-Carlton Great Bay.

199.    The Marriott Defendants and any co-conspirators' trade and commerce practices misrepresented to, deceived, or unfairly influenced objective and reasonable consumers owning property in the Virgin Islands as more fully alleged elsewhere herein, include by slow-walking foreclosures, manufacturing a real or perceived financial crisis for the Association, and then

Complaint
*Helman, et al. v. Marriott International, et al.*                                      Page 57 of 62

proposing that Plaintiffs and the proposed Class members vote for the RCDC-MVC merger — a merger that Defendants knew would devalue Plaintiffs' and proposed class members' property interests — in exchange for a "solution" to that crisis, i.e., an agreement by the Marriott Defendants to  foreclose on delinquent properties and then start paying maintenance fees as they were already required to do.

200.    The consumer protection laws of the Virgin Islands are to be liberally construed to protect the people and businesses of the Virgin Islands.

201.    Individual reliance is not an element of proof under the consumer protection statutes of the Virgin Islands because the laws are intended to be enforced by class action. Rather, the standard is that of an objective and reasonable consumer in the Virgin Islands.

202.    The Marriott Defendants' and any co-conspirators' wrongful actions additionally constitute a misleading, deceptive and unfair trade or commerce practice in that they unfairly took advance of the consumers' lack of knowledge, ability, experience, or capacity when marketing, selling, developing, and managing fractional and timeshare products in the Virgin Islands.

## COUNT XI

### *Violation of the Consumer Fraud and Deceptive Business Practices Act,*

### *12A V.I.C. §§ 301, et seq.*

203.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

204.    The purpose of the Consumer Fraud and Deceptive Business Practices Act is to protect the consuming public from those who engage in fraudulent and deceptive acts in the course of trade or commerce.

205.    The Marriott Defendants engaged in, and continue to engage in, fraudulent and deceptive trade practice in the marketing, sale, developing, and managing of fractional and timeshare programs.

206.    The Marriott Defendants' trade practices misrepresented, deceived, or unfairly influenced objective and reasonable consumers in the Virgin Islands by marketing, selling,

Complaint

*Helman, et al. v. Marriott International, et al.*                                    Page 58 of 62

developing, and managing fractional and timeshare products in the Virgin Islands in a manner that harmed Plaintiffs and the proposed Class.

207.    The consumer protection laws of the Virgin Islands are to be liberally construed to protect the people and businesses of the Virgin Islands.

208.    Individual reliance is not an element of proof under the consumer protection statutes of the Virgin Islands because the laws are intended to be enforced by class action. Rather, the standard is that of an objective and reasonable consumer in the Virgin Islands.

209.    The Marriott Defendants' and any co-conspirators' wrongful actions additionally constitute a misleading, deceptive and unfair trade or commerce practice in that they unfairly took advance of the consumers' lack of knowledge, ability, experience, or capacity of consumers when marketing, selling, developing, and managing fractional and timeshare products in the Virgin Islands.

## COUNT X

### *Violation of the Consumer Protection Law of 1973, 12A V.I.C. §§ 101, et seq.*

210.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

211.    As a result of their own wrongful conduct or the wrongful conduct of other defendants, the Marriott Defendants, and each of them, received, innocently or knowingly, things of value that are traceable to Plaintiffs and the proposed Class and that rightfully belong to Plaintiffs and the proposed Class.

212.    Plaintiffs and the proposed Class thus conferred benefits on the Marriott Defendants, and each of them, that should be restored to Plaintiffs and the proposed Class. It would be inequitable and unjust for the Marriott Defendants to be permitted to retain these things of value.

213.    The Marriott Defendants should be compelled to disgorge to Plaintiffs and the proposed Class all improperly obtained things of value obtained by them as a result of the wrongful

Complaint

*Helman, et al. v. Marriott International, et al.*                                              Page 59 of 62

conduct alleged herein.  A constructive trust should be imposed upon all such things of value in order to prevent the unjust enrichment of the Marriott Defendants, and each of them.

## FRAUDULENT CONCEALMENT

214.   Throughout the Class Period, the Marriott Defendants and their co-conspirators intended to and did affirmatively and fraudulently conceal their wrongful conduct and the existence of their unlawful actions from Plaintiffs and the proposed Class, and intended that their communications with each other and their resulting actions be kept secret from Plaintiffs and the proposed Class.

215.   Plaintiffs and the proposed Class had no knowledge of the wrongful conduct alleged herein or of any of the facts that might have led to discovery thereof, until in or about 2018, when the Plaintiffs contacted lawyers and learned of the 2013 Affiliation Agreement and the *B&T Cook Family Partners* decision described above.

216.   Plaintiffs and the proposed Class could not have discovered the wrongful conduct alleged herein at any earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the Marriott Defendants to avoid detection and affirmatively conceal their actions.

217.   Based on the foregoing, Plaintiffs and the proposed Class were unaware that the Marriott Defendants had a duty to foreclose on the delinquent properties and also that they had an independent right to reject the RCDC-MVC merger and were injured by such concealment.

## DAMAGES TO PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS

218.   Plaintiffs cannot state at this time the precise amount of damages sustained by them and other members of the proposed Class. A precise determination of damages will require discovery from the Marriott Defendants and any co-conspirators. Further damages will include damages by statute, and punitive damages for intentional wrongful conduct. Plaintiffs allege that the damages are substantial.

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 60 of 62

## NOTICE OF PUNITIVE DAMAGES

219.    The Marriott Defendants' breaches of fiduciary duties, constructive fraud, fraudulent concealment, conspiracies, and unfair and deceptive trade practices, among other alleged wrongful misconduct alleged herein, were outrageous, done with wrongful motive, and recklessly indifferent to the rights of Plaintiffs and the proposed Class.

220.    These bad acts create a profound and pervasive negative effect on all consumers by higher prices.

221.    Further, the Defendants' business practices rob profits from businesses that operate lawfully in the Territory, making the opening and growth of new business, operating lawfully, much more difficult and burdensome.

222.    Such wrongful conduct undermines consumer confidence in the Virgin Islands, impairs the free market, discourages lawfully operating businesses and entrepreneurs, and reduces future sustainable investment in the Virgin Islands.

223.    Punitive damages are appropriate to deter and punish this willful and intentional misconduct, which affects all residents and businesses in the Territory negatively. The deterrence of punitive damages will discourage future wrongful business practices by others.

## JURY TRIAL DEMAND

224.    On behalf themselves and all others similarly situated, Plaintiffs demand a trial by jury, pursuant to 5 V.I.C. § 358 and Rule 38(b) of the Virgin Islands Rules Civil Procedure, of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and behalf of all others similarly situated, pray for judgment against the Marriott Defendants, and each of them, and request as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(b)(2) and (b)(3) of the U.S. Virgin Islands Rules of Civil Procedure; that the Court determine that Plaintiffs are adequate and appropriate representatives of the proposed Class; that the Court designate Plaintiffs' attorneys as lead counsel for the proposed Class; and that the Court direct that the best notice practicable under the circumstances be given to members of the proposed Class pursuant to Rule 23(c)(2).

Complaint
*Helman, et al. v. Marriott International, et al.*                                                                     Page 61 of 62

B.      That the Court adjudge and decree that the Marriott Defendants violated CICO, owed and breached fiduciary duties, committed constructive fraud and fraud by concealment, aided and abetted the other defendants' wrongdoing, and violated the Consumer Protection Law of 1973 and the Consumer Fraud and Deceptive Business Practices Act.

C.      That the Court enter judgment for Plaintiffs and members of the proposed Class against the Marriott Defendants and any co-conspirators, and each of them, jointly and severally, for damages according to proof and trebling of those damages as allowed by law, along with statutory damages, costs, and reasonable attorneys' fees.

D.      That the Marriott Defendants and any co-conspirators, their respective affiliates, successors, transferees, assignees, as well as the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be restrained from, in any manner, continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and adopting or following any practice, plan, program, or device having a similar purpose or effect.

E.      That the Marriott Defendants and any co-conspirators be subject to an award of punitive damages.

F.      That an accounting be performed to account for the Marriott Defendants' ill-gotten gains and that all such ill-gotten gains be disgorged to Plaintiffs and the proposed Class.

G.      That a constructive trust be imposed on the assets, property, contracts, revenues, income and profits of the Marriott Defendants and disgorgement of all benefits received by Defendants.

H.      Pre-judgment and post-judgment interest to the extent allowed by law.

I.      That the Court grant such additional equitable or legal relief as may be deemed just and proper.


Dated: November 08, 2019                                        Respectfully submitted,

By: */s/ J. Russell B. Pate*                                   By: */s/ Tyler Meade*
J. Russell B. Pate, Esq. (V.I. Bar No. 1124)                   Tyler Meade, Esq. (admitted pro hac vice)
THE PATE LAW FIRM                                              THE MEADE FIRM p.c.
P.O. Box 890                                                   12 Funston Ave., Suite A
St. Thomas, VI 00804                                           San Francisco, CA 94129
Tel: (340) 777-7283                                            Tel: (415) 724-9600
Pate@SunLawVI.com                                              tyler@meadefirm.com
SunLawVI@gmail.com

Complaint
*Helman, et al. v. Marriott International, et al.*                                    Page 62 of 62

Michael J. Reiser, Esq. (admitted *pro hac vice*)
REISER LAW, P.C.
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Tel: (925) 256-0400
michael@reiserlaw.com

Michael Schrag, Esq. (admitted *pro hac vice*)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 530-9700
mls@classlawgroup.com

Clay Townsend, Esq. (admitted *pro hac vice*)
MORGAN & MORGAN, P.A.
20 North Orange Ave., Suite 1500
Orlando, FL 32801
Tel: (407) 418-6041
ctownsend@forthepeople.com

*Attorneys for Plaintiffs and the Proposed Class*