IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

ALAN HELMAN, *et al.*,                    )
                                          )
    Plaintiffs,                        )
                                          )
                v.              )          Civil No. 2019-36
                                          )
MARRIOTT INTL., INC., *et al.*,           )
                                          )
    Defendants.                        )
_____ )

**MEMORANDUM OPINION AND ORDER**

Before the Court is "The Marriott Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint."[1] [ECFs 14-18].

## I.      BACKGROUND[2]

Plaintiffs purport to represent a class of approximately 1,000 purchasers of fractional condominium interests ("fractionals") at the Ritz-Carlton Destination Club ("RCDC") on St. Thomas, U.S. Virgin Islands ("Ritz-Carlton Great Bay"). Plaintiffs' fractionals, a type of time-sharing property ownership, were purchased between 2002 and 2009, and entitled them to three weeks of exclusive access to the Ritz-Carlton Great Bay and other RCDC locations worldwide. Defendants are entities and their affiliates and subsidiaries that were engaged in various aspects of timeshare property development, marketing and management, some under the RCDC umbrella, and others associated with other, less expensive Marriott products, such as the Marriott Vacation

---

[1] Although defendants' motion refers to "Plaintiffs' First Amended Complaint," on November 8, 2019, the plaintiffs filed the Second Amended Class Action Complaint [ECF 86] ("SAC" or "the Complaint"). The parties stipulated [ECF 84] that the motion to dismiss filed June 28, 2019, would apply to the SAC and could be resolved on the existing briefing.

[2] These background facts are derived from the allegations in the SAC.

Club ("MVC").[3]  This matter arises from a merger of the two product lines, which plaintiffs claim caused damage to the value of their holdings.

The seeds of the current dispute were planted over forty years ago.  Beginning in the 1980s, Marriott International, Inc. ("MII") established MORI to run the MVC timeshares.  In 1999, MORI introduced the RCDC as a luxury alternative to the MVC timeshares.  Unlike traditional timeshares, the RCDC fractionals were separately deeded property interests marketed as second homes available for extended periods at premium prices.

In 2002, RC Hotels VI, a wholly owned subsidiary of MII, established the Ritz-Carlton Great Bay, which consisted of 105 condominiums.[4]  RC Hotels VI simultaneously recorded a condominium declaration that provided for the formation of the Great Bay Condominium Owners Association, Inc. ("the Association").  The Association then entered into a "Management Agreement" with RC Hotels VI.  That agreement gave RC Hotels VI the authority to exercise all the powers and duties of the Association's Board of Directors (the "Board").  RC Hotels VI, in turn, entered into a Sub-Management Agreement with RC Management,[5]  which gave RC Management the authority to manage the daily affairs of the Ritz-Carlton Great Bay, as well as the authority to exercise all the powers and duties of the Association's Board.

---

[3]  Plaintiffs sort the defendants into two groups.  The "MII Defendants" are Marriott International, Inc. ("MII"); RC Hotels (Virgin Islands), Inc. ("RC Hotels VI"); and The Ritz-Carlton Hotel Co., LLC., ("RC Hotel Co.").  The "MVW Defendants", who are alleged to be alter egos of one another due to interlocking or overlapping directors and officers,  are Marriott Vacations Worldwide Corp. ("MVW"); Marriott Ownership Resorts, Inc. ("MORI"); The Ritz-Carlton Development Co., Inc. ("RC Development"); The Ritz-Carlton Club, St. Thomas, Inc. ("RC Club STT"); The Ritz-Carlton Management Co., LLC ("RC Management"); The Cobalt Travel Co., LLC ("Cobalt"); The Lion & Crown Travel Co., LLC ("Lion & Crown"); Marriott Resorts, Travel Co., Inc. dba MVC Exchange Co. ("MRTC"); RC St. Thomas, LLC; and First American Trust, FSB (solely as Trustee of Land Trust) ("First American").

[4]  Between 2002 and 2011, defendants sold 1181 of the 1260 available Ritz-Carlton Great Bay fractionals, for an average price of over $150,000 each.

[5]  Years later, RC Management entered into a "Sub-Agency Agreement" with RC Hotel Co.

In October 2008, the Association notified all Ritz-Carlton Great Bay fractional owners that a special assessment was being imposed in order to cover maintenance dues owed by delinquent owners.  Citing the financial crisis, the Association told owners that there was a shortage of $1 million in unpaid dues, partly from owners who had not paid their dues in 2008, and partly from previous years.[6]  The majority of the delinquent owners had also defaulted on their mortgages, which they had obtained through RC Development or another defendant.

By 2010, sales of RCDC fractionals had substantially slowed.  At around the same time, MII and its subsidiaries began converting ownership of MVC timeshares to a points-based system whereby participants bought interests in the MVC Trust.  Under the new system, participants could stay at various resorts for a short period of time instead of staying at a specific resort for one week.  Access to the MVC timeshares under the new system was much less expensive than access to the RCDC.[7]

In this same time period, as more owners became delinquent on their dues and defaulted on their mortgages, RC Development and the other lending entities failed to expeditiously pursue foreclosure of those owners' interests.  As a result, in mid-2011, in connection with one mortgage foreclosure action in the Superior Court of the Virgin Islands,[8] the Association claimed that defendants violated their fiduciary duties by delaying the filing of the foreclosure action for seven months after the default, which caused the Association to accrue unpaid maintenance fees.  By this time, the Association was owed increasingly large amounts in delinquent fees.

---

[6]  By the end of 2010, the Association had accrued over $3 million in unpaid maintenance fees.

[7]  Initial access to the MVC required a purchase of just 1,500 points.  At the inception of the program in 2010, the cost of entry was approximately $13,800 ($9.20 per point) whereas on average, the 3,200 owners of RCDC fractionals paid more than $200,000 for each.

[8]  *RC Hotels (Virgin Islands), Inc. v. B&T Cook Family Partners, Ltd. and Great Bay Condominium Owners Association*, ST-10-CV-543 ("*B&T Cook*").

Later in the year, a group of senior MII executives began planning a re-engineering of the RCDC. Ultimately, the group decided to transfer unsold RCDC fractionals (about 20% of RCDC inventory) to the MVC Trust and then merge the RCDC with the MVC. The purpose of the re-engineering campaign was to give more than 400,000 MVC members access to RCDC properties. At approximately the same time, MII spun off certain MVW-related entities as a separately traded public company. MII agreed to permit MVW and its subsidiaries to use the "Marriott" and "Ritz-Carlton" brand tradenames, trademarks, and service marks, in exchange for the payment to MII of $50 million annually plus 2% of annual sales.

In the middle of 2012, Cobalt, an MVW subsidiary and RCDC program manager, sent all RCDC fractional owners a letter describing RCDC's new affiliation with MVC. Several months later, the Board of the Association of Ritz-Carlton Great Bay fractional owners notified plaintiffs that it was evaluating the Cobalt letter and the impact of the proposed merger on the value of their fractionals. In the meantime, MVW senior executives assured RCDC owners in a conference call of MVW's ongoing commitment to the Ritz-Carlton brand. In addition, owners were told that apart from the fact that two specific properties were no longer affiliated with RCDC, all other original membership benefits remained the same.[9]

In December 2012, the Association threatened to sue if MVW and its various affiliates did not stop promoting use of the Ritz-Carlton Great Bay fractionals to MVC members. The Association also requested that MVW not establish a program at Ritz-Carlton Great Bay to facilitate such use by MVC members.

In January 2013, as a means of resolving the perceived financial crisis for which they were potentially liable under the *B&T Cook* ruling, defendants offered to begin foreclosure

---

[9] Also that summer, the *B&T Cook* Court denied defendants' motion to dismiss, finding that the Association stated a claim against RC Hotels VI for breach of fiduciary duty under the Management Agreement.

proceedings on delinquent Ritz-Carlton Great Bay fractionals financed through MVW-affiliated mortgages if the Board convinced owners to vote in favor of the merger,[10] which would allow defendants to transfer any foreclosed or unsold inventory to the MVC Trust.  In the spring of 2013, MVW informed RCDC fractional owners that they would have an opportunity to vote on the proposed RCDC-MVC merger.  Later that year, Lion & Crown (a successor program manager to Cobalt) entered into an Affiliation Agreement with another MVW-subsidiary, MRTC ("the 2013 Affiliation Agreement").  Unbeknownst to plaintiffs at the time, however, under this agreement, the RCDC-MVC merger could only extend to individual RCDC properties if the association board of directors at each of those properties signed an "Acknowledgement and Joinder" to the 2013 Affiliation Agreement.[11]

On December 2, 2013, the parties to the *B&T Cook* litigation entered into a "Settlement Agreement" to resolve that litigation.  Under that Agreement, RC Hotels VI and its affiliates and subsidiaries agreed to pay the outstanding maintenance fees delinquent fractional owners owed to the Association and agreed to repurchase certain delinquent fractional interests from the Association over a limited time period.  In return, the Association agreed, *inter alia*, to encourage its members to vote in favor of a Declaration Amendment, which confirmed RC Hotels VI's ability to convey Ritz-Carlton Great Bay fractionals to the MVC Trust.

In December 2013, the Board recommended that plaintiffs vote to amend the Club Declaration.  MVW held webinars that month for Ritz-Carlton Great Bay owners regarding the proposed merger.  Defendants also provided all owners with a set of Frequently Asked Questions

---

[10]  As of the close of 2013, approximately 138 Ritz-Carlton Great Bay fractional owners were delinquent on their Marriot-held mortgages and on their maintenance dues.  Outstanding maintenance dues totaled approximately $7 million.

[11]  Copies of the 2013 Affiliation Agreement were withheld from the RCDC boards.

("FAQs") related to the proposed merger.  On January 26, 2014, plaintiffs accepted defendants'

proposal and voted in favor of the merger.

The essence of plaintiffs' complaint is that defendants surreptitiously merged two vacation

ownership product lines—the luxury RCDC and the less-exclusive MVC, and that defendants did

not disclose their intent to merge the two property lines until July 2012.  Further, plaintiffs claim

that defendants went ahead with the merger despite concern from RCDC owners that the merger

would dilute the exclusivity and value of their fractionals.  Moreover, plaintiffs allege that although

defendants promised that the merger would not occur without the affirmative vote of a majority of

owners at each RCDC, when defendants realized they did not have the necessary votes, they

resorted to lying to plaintiffs and hiding critical documents from the various RCDC boards.  For

example, plaintiffs claim that defendants hid the contract that ultimately led to the merger—the

2013 Affiliation Agreement—from each RCDC owners' association and its board of directors,

because it gave each association the right to vote against the merger.

Finally, with respect to the Ritz-Carlton Great Bay, plaintiffs claim that defendants

manufactured a financial crisis in order to overcome opposition to the merger.  Under the Ritz-

Carlton Great Bay's governing documents, defendants were responsible for foreclosing on

fractionals with delinquent maintenance dues and were required to pay any outstanding dues on

the foreclosed units.  Thus, according to plaintiffs, when numerous Ritz-Carlton Great Bay owners

fell behind on their mortgages and their condominium dues, defendants used the resulting financial

situation as leverage for the merger.  Plaintiffs contend they did not discover the existence of the

2012 *B&T Cook* decision regarding the fiduciary duties owed to them, or the 2013 Affiliation

Agreement, until 2018.   Plaintiffs filed the Second Amended Class Action Complaint on

November 8, 2019.[12]

Plaintiffs assert the following counts in their complaint:  (1) Violations of Virgin Islands Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. § 605(a); (2) Violations of § 605(b); (3) Violations of § 605(c); (4) Conspiracy to Violate § 605(d); (5) Breach of Fiduciary Duty; (6) Constructive Fraud; (7) Fraud by Concealment; (8) Aiding and Abetting Breach Tort; (9) Breach of Contract/Implied Covenant Against RC Hotels VI and RC Club St. Thomas; (10) Violation of Consumer Protection Law of 1973, 12A V.I.C. §§ 101 *et seq.*; (11) Violation of Consumer Fraud and Deceptive Business Practices Act , 12A V.I.C. §§ 301 *et seq.*; and (12) unjust enrichment/constructive trust.[13]  [ECF 86] ¶¶ 141-213.  Defendants filed the instant motion to dismiss on June 28, 2019,[14] arguing that (1) the claims were barred by a release executed in connection with the Settlement Agreement, (2) some of the claims are time barred and (3) plaintiffs have failed to state a claim with respect to any cause of action asserted.  [ECFs 14-18].  Plaintiffs filed an opposition and defendants replied.[15]  [ECFs 67, 82].[16]

---

[12]  Plaintiffs filed their complaint in the Virgin Islands Superior Court on January 24, 2019.  Defendants removed the case to this Court on May 22, 2019 on the grounds that this Court has original jurisdiction under the Class Action Fairness Act.

[13]  Plaintiffs mislabeled this count as number X, for violation of the Consumer Protection Law.  The allegations in paragraphs 210 to 213 instead describe a claim for unjust enrichment and seek the imposition of a constructive                                                                                                          trust.

[14]  On July 24, 2019, RC Hotels VI, which had been served later than most of the other defendants, filed its own motion to dismiss, adopting the other defendants' arguments.  [ECF 35].

[15]  On June 19, 2020, defendants MRTC and First American, which were newly added in the SAC, joined in their co-defendants' dismissal arguments.  [ECF 97].  They further argued that dismissal was warranted on the basis that plaintiffs delayed over six months in serving them despite the Court's order to "promptly cause summonses for the newly-named defendants to be issued and served."  *Id*. at 3.  *See* [ECF 85].

In addition, on July 2, 2020, plaintiffs filed two documents:  a "Notice of Supplemental Authority" in opposition to the motion to dismiss, and a "Request for Judicial Notice."  [ECFs 98, 99].  On July 16, 2020, defendants filed a "Response to Plaintiffs' Notice of Supplemental Authority and to Plaintiffs' Response to Dkt. No. 97."  [ECF 100].  The Court deems these three additional filings unauthorized as they are sur-replies, and none of the parties sought leave to file them.  Accordingly, they will not be considered.  *See* LRCi 7.1(a).

## II.      LEGAL STANDARDS

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).

The "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  In other words, the complaint "must state enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").   "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Twombly*, 550 U.S. at 555 (citations and quotation marks omitted).  Moreover, a court need not "accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993).  "In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff."  *Dicesare v. Office of Children, Youth & Families*, 2012 WL 2872811, at *2 (W.D. Pa. July 12, 2012) (citing *U.S. Express Lines, LTD. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)); *accord Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

---

[16]  The parties consented to Magistrate Judge jurisdiction over this matter and on February 13, 2020, the District Court referred the case to the undersigned.

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

## III.   DISCUSSION

### A.   Plaintiffs' Common Law Claims

Defendants removed this case from the Superior Court to this Court under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332, 1446, and 1453. *See* [ECF 1]. Because there is diversity jurisdiction, plaintiffs' common law claims are reviewed under the law of the Virgin Islands. *See Sheridan v. iHeartMedia, Inc.*, 255 F. Supp. 3d 767, 769-70 (N.D. Ill. 2017) (applying Illinois law on the grounds that CAFA claims brought in Illinois are "governed by state law like any other claim brought under diversity jurisdiction").

### 1.   Breach of Fiduciary Duty

In *Ebner v. Petrohan*, the Superior Court of the Virgin Islands concluded, following a *Banks* analysis,[17] that to state a claim for breach of fiduciary duty, plaintiff must allege "1) that a fiduciary relationship exists, 2) that the fiduciary breached the duty imposed by said relationship, 3) that the plaintiff must have been harmed, and 4) that the fiduciary's breach was a proximate cause of said harm." 2018 WL 3996888, at *7 (V.I. Super. Aug. 14, 2018). The undersigned adopts this standard.

With respect to the first element, that a fiduciary relationship exists, plaintiffs allege that the Marriott defendants "were the agents for and assumed fiduciary duties to the Association, Plaintiffs, and the proposed Class based on principles of agency law, the terms of the management

---

[17] When the Supreme Court of the Virgin Islands has not yet announced a common law rule that addresses an issue, courts in the Virgin Islands must conduct a so-called *Banks* analysis. *See Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 977-78 (V.I. 2011). Such an analysis requires consideration of "(1) whether any Virgin Islands courts have previously adopted a particular rule; (2) the position taken by a majority of courts from other jurisdictions; and (3) most importantly, which approach represents the soundest rule for the Virgin Islands." *Nicholas v. Damian-Rojas*, 62 V.I. 123, 129 (V.I. Super. 2015) (citations omitted).

agreements described above, their almost complete control over the Association and its board, and

the separately-deeded property interests purchased by Plaintiffs."   SAC ¶ 64.   Specifically,

plaintiffs allege that on May 22, 2002, the Association entered into a Management Agreement with

RC Hotels VI, which gave it "*all of the power and authority* of the Association to the extent

necessary to perform the Management Company's duties and obligations under this Agreement"

and further provided that "on behalf of and at the expense of, the Association, to the exclusion of

all other persons including the Association and its Members, [RC Hotels VI] shall have *all the*

*powers and duties* of the Board of Directors as set forth in the Declaration and the Bylaws of the

Association."  *Id.* ¶ 60 (quotation marks omitted) (emphasis added).  Next, plaintiffs allege that on

that same day, RC Hotels VI entered into a "Sub-Management Agreement" with RC Management,

which gave it "*all of the power and authority* of RC Hotels VI under the Management Agreement

to the extent necessary to perform RC Hotels VI's duties and obligations under the Management

Agreement" and further provided that  "on behalf of and at the expense of, the Association, to the

exclusion of all other persons including the Association and its Members, [RC Hotels VI] shall

have *all the powers and duties* of the Board of Directors as set forth in the Declaration and the

Bylaws of the Association."  *Id.* ¶ 61 (quotation marks omitted) (emphasis added).  Plaintiffs

further allege that on November 21, 2011, RC Management entered into a sub-agency agreement

with RC Hotel Co., which had the effect of giving MII the authority to manage on-site operations

at Ritz-Carlton Great Bay and as well the authority to govern the Association.  *Id.* ¶ 62.  According

to plaintiffs, the governing documents gave defendants additional control over the fractionals in

that (1) plaintiffs were not given keys to their units, (2) defendants controlled who had access to

the fractionals, (3) plaintiffs were unable to choose to stay in a particular unit, and (4) defendants

controlled how the fractionals were decorated.  *Id.* ¶¶ 64-65.  Lastly, plaintiffs maintain that

"whether a fiduciary duty exists is typically a question of fact that cannot be resolved on a motion to dismiss."  [ECF 67] at 27.  They argue that they adequately allege a fiduciary duty arising from two independent sources.  *Id.* at 27-31.

Regarding the second element, plaintiffs also contend the Complaint adequately describes the ways in which the defendants breached their fiduciary duties to plaintiffs.  *Id.* at 31-33.  According to plaintiffs, defendants had a duty to promptly foreclose on delinquent fractionals and failed to do so; used the financial crisis created by the lack of foreclosures as leverage to obtain votes in favor of the merger; and failed to disclose important information to plaintiffs, such as the 2013 Affiliation Agreement and the Virgin Islands Superior Court's decision in *B&T Cook*.  *Id.* at 32.

Defendants dispute that the Management Agreement created any fiduciary duties flowing from RC Hotels VI as manager to plaintiffs because the Agreement provides that "nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement."  [ECF 15] at 33 (quotation marks omitted); *see also* [ECF 82] at 24.  Defendants argue further that no agency relationship arose because the Management Agreement states that the Association has no "right of control over the method, manner or means by which [RC Hotels VI] performs its duties and responsibilities under th[e] Agreement."  [ECF 15] at 34 (quotation marks omitted).  Moreover, defendants contend that even plaintiffs' ability to terminate the Management Agreement does not give them the right to control RC Hotels VI's conduct.  [ECF 82] at 26.  They thus conclude that no agency or fiduciary relationship exists between the Association and RC Hotels VI based on a contract.  [ECF 15] at 34; [ECF 82] at 26.

Next, defendants deny that they owe plaintiffs a fiduciary duty under a control theory.  [ECF 15] at 34-35.  While defendants acknowledge that the Management Agreement gives RC

Hotels VI the authority to enter plaintiffs' properties to provide housekeeping and other related services necessary for the upkeep of the units, defendants suggest that this is not the type of "control over Plaintiffs' interests necessary to establish a fiduciary obligation." *Id.* at 35; [ECF 82] at 25.  Defendants also suggest that even if RC Hotels VI owes the Association a fiduciary duty, that obligation does not extend to individual association members.  [ECF 15] at 35; [ECF 82] at 27.

Defendants further deny that RC Hotels VI owes plaintiffs a fiduciary duty in its capacity as developer and holder of the mortgages.  [ECF 15] at 37-38; [ECF 82] at 28-29.  Defendants liken the duty of RC Hotels VI to foreclose on a delinquent mortgage to that of any mortagee-bank, which ordinarily assumes no fiduciary obligations to its borrower.  *Id.*

In the alternative, defendants contend that even if RC Hotels VI, acting as a management company, owed plaintiffs a fiduciary duty, plaintiffs have not adequately pled that it breached that duty.  [ECF 15] at 36-37; [ECF 82] at 27-28.  According to defendants, because the Management Agreement gives RC Hotels VI "sole discretion" to decide whether to initiate foreclosure proceedings against an Association member, RC Hotels VI's "alleged failure to timely foreclose upon the Association's maintenance-fee lien on delinquent fractional interests would not constitute a breach of that purported duty."  [ECF 15] at 36-37.

The parties have identified no Virgin Islands caselaw that stands for the proposition that a management company and its agents owe property owners a fiduciary duty.  However, even in cases where a fiduciary relationship between two parties is not traditionally assumed, this Court has found the existence of a fiduciary relationship based on one party's control over the affairs of another party.  For example, in *Financial Trust Company, Inc. v. Citibank N.A.*, the District Court concluded that the lender owed a fiduciary duty to the borrower.  268 F. Supp. 2d 561, 573 (D.V.I.

2003).   Applying Virgin Islands law, the court stated that although "there is a presumption that the[se] parties operate at arms-length and in their own interest," a fiduciary relationship may exist "when a lender has substantial control over the borrower's business affairs."   *Id.*; *accord LPP Mortg. Ltd. v. Caledonia Springs, Inc.*, 2007 WL 6035933, at *10 (D.V.I. Nov. 6, 2007) ("The presumption [that a lender and borrower operate at arms-length] is not insurmountable and a fiduciary duty may arise if, for example, the lender acquires substantial control over the borrower's business.").   A fiduciary relationship has also been found to exist between an insured and an insurer based on the element of control.   *See Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 573 (D.V.I. 2004) (citing with approval the standard articulated in *Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101, 1112 (S.D. Iowa 1998), wherein "the court stated that the indicia of a fiduciary relationship between an insured and insurer include 'the exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another.'").[18]

Outside of this jurisdiction, two district courts have concluded—in cases similar to the case at bar—that a fiduciary relationship may exist where one party exercises a sufficient degree of control over the affairs of another.   First, in *RCHFU, LLC v. Marriott Vacations Worldwide Corporation*, plaintiffs are the owners of fractionals at the Ritz-Carlton Club, Aspen Highlands, in

---

[18]   Within the Third Circuit, several Pennsylvania courts, applying state law, have similarly found that the degree of control or influence one party exercises over the affairs or property of another party triggers a fiduciary duty.   *See, e.g., Perloff v. Transamerica Life Ins. Co.*, 393 F. Supp. 3d 404, 411 (E.D. Pa. 2019) ("Where fiduciary duties do not exist as a matter of law, they may only arise under circumstances which create *confidential* (or fiduciary) relationships, such as when one party can exert undue influence over the other, or where one party 'cedes decision-making control to the other party.'") (emphasis in original); *Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 582 (W.D. Pa. 2004) (noting that a fiduciary relationship can exist between a landlord and his tenant "only if one party surrenders substantial control over some portion of his affairs to the other") (quotation marks omitted); *Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 823 (2017) ("[T]he critical question is whether the relationship goes **beyond** mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side, which results in the effective ceding of control over decision-making by the party whose property is being taken.") (quotation marks omitted) (emphasis in original).

Aspen, Colorado.   2018 WL 1535509, at *1 (D. Colo. Mar. 29, 2018).   They sued their condominium association (the Aspen Highlands Condominium Association), their management company (RC Management), and their membership program manager (Cobalt) for breach of fiduciary duty.[19] *Id.* at *4.  Plaintiffs claimed that defendants owed them fiduciary duties because of their "high degree of control over plaintiffs' property" and because of the "agency and subagency relationships" between the parties.  *Id.* at *5.  The district court in Colorado concluded "that plaintiffs have sufficiently alleged that the Management Agreement entrusted RC Management with control over plaintiffs' property sufficient to create fiduciary duties."  *Id.* at *6. Significantly, the court noted that the Management Agreement authorized RC Management "to *act on behalf of the Association and its members* as the exclusive managing entity of the Condominium and to manage the daily affairs of the Condominium and the Plan" and granted RC Management "*such additional authority and power as may be necessary to carry out the spirit and intent*" of the agreement.  *Id.* at *5 (emphasis in original).  In the court's view, the fact that RC Management was given discretionary power to manage plaintiffs' properties demonstrated the high degree of trust defendants placed in RC Management and was the source of defendants' fiduciary duties toward plaintiffs.  *Id.* at *6.  Having found that plaintiffs' control theory was sufficiently plausible to state a claim for breach of fiduciary duty, the court did not address plaintiffs' alternative theory that the Association, RC Management, and Cobalt owed them fiduciary duties based on agency theory.  *Id.*

Further, the court rejected the Marriott defendants' argument that a disclaimer within the management agreement between RC Management and the Association precludes plaintiffs from claiming that RC Management owes them a fiduciary duty.  *Id.* at *6.  According to the court, the

---

[19] The *RCHFU* plaintiffs also asserted claims for constructive fraud, aiding and abetting a breach of fiduciary duty and constructive fraud, conspiracy, and unjust enrichment.  *RCHFU*, 2018 WL 1535509, at *4.

statement that "nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement," was not "inconsistent with RC Management owing fiduciary duties to plaintiffs." *Id.*

Second, in *Reiser v. Marriott Vacations Worldwide Corporation*, the District Court for the Eastern District of California denied defendants' motion to dismiss plaintiffs' breach of fiduciary duty claim. 2017 WL 569677, at *4-5 (E.D. Cal. Feb. 13, 2017). The *Reiser* plaintiffs are 22 owners of fractionals in the Ritz-Carlton Club, Lake Tahoe, located in Truckee, California. *Id.* at *1. They alleged two theories in support of their claim that defendants owed them a fiduciary duty. *Id.* at *4-5. First, they argued that a fiduciary duty existed as a result of the agency relationship between the property owners' association and RC Management and the subagency relationship between RC Management and Cobalt. *Id.* at *4. Next, they argued that a fiduciary duty existed as a result of the agreement between the association and RC Management, which gave the latter control over the fractionals as well as the common areas. *Id.* at *5.

Ultimately, the court held that under California law, the key to establishing the existence of a fiduciary duty is determining whether one party has control over the property of another. *Id.* at *5. The court then concluded that because plaintiffs alleged that RC Management had control over the fractionals, they "pleaded sufficient facts to survive a motion to dismiss under either of their agency theories." *Id.* Finally, the *Reiser* court dismissed defendants' argument regarding the significance of the disclaimer in the management agreement, noting that it only bound the signatories to the agreement. *Id.*

Here, plaintiffs have stated a claim for breach of fiduciary duty. First, as in both *RCHFU* and *Reiser*, because plaintiffs allege that both the MII and MVW defendants owed plaintiffs a fiduciary duty as a result of the high degree of control defendants exercised over plaintiffs'

properties, the Court finds that they have adequately alleged the existence of a fiduciary duty.

Second, by alleging that defendants failed to promptly initiate foreclosure proceedings, manufactured a financial crisis to manipulate plaintiffs' vote on the merger, and failed to disclose relevant documents prior to the vote on the merger, plaintiffs have identified various ways in which defendants breached that duty.  Finally, plaintiffs claim that the value of their fractionals has been destroyed by defendants' actions, thereby satisfying the remaining elements of their breach of fiduciary duty claim.

2.    Constructive Fraud

The Court will grant defendants' motion to dismiss plaintiffs' constructive fraud claim, as it is not recognized as a viable cause of action in the Virgin Islands.  *See Nicholas v. Wyndham Int'l, Inc.*, 2007 WL 4201032, at *5 (D.V.I. Nov. 13, 2007) ("No Virgin Islands court has recognized a claim for constructive fraud.  Likewise, the Third Circuit has not recognized a claim for constructive fraud."); *accord Walsh v. Daly*, 2014 WL 2922302, at *8 (V.I. Super. June 18, 2014) ("[I]t looks as if no Court in the Virgin Islands has previously adopted the common law action of constructive fraud.").

3.    Fraudulent Concealment

To state a claim for fraudulent concealment in the Virgin Islands, plaintiffs must allege the following:

> (1) the defendant concealed or suppressed a material fact; (2) the
> defendant had a duty to disclose the fact to the plaintiff; (3) the
> defendant knew or had reason to know that the material fact had
> been concealed or suppressed: (4) the defendant concealed or
> suppressed the material fact for the purpose of inducing plaintiff to
> act or refrain from acting; and (5) the plaintiff suffered pecuniary
> loss caused by his or her justifiable reliance on the concealed or
> suppressed material fact.

*Virgin Islands v. Takata Corp.*, 67 V.I. 316, 417 (V.I. Super. 2017).[20]  Regarding the duty to disclose, the court identified the following factors for consideration:  "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact: (5) the customs of the trade; and (6) other relevant circumstances." *Id.* at 418.

Defendants contend "that Virgin Islands law is currently unsettled as to whether a claim for fraudulent concealment, rather than affirmative misrepresentation, is actionable." [ECF 15] at 39.  Citing *Takata*, defendants aver that such a claim is actionable only if plaintiffs, in addition to proving common law fraud, can also prove defendants had a "duty to disclose the omitted or concealed information." *Id.*  Defendants conclude that because plaintiffs cannot allege that defendants had a duty to foreclose on the delinquent fractionals, plaintiffs cannot claim defendants were required to disclose that obligation. *Id.*  Defendants further argue that they had no duty to disclose either the *B&T Cook* decision or the 2013 Affiliation Agreement and that, therefore, plaintiffs cannot satisfy the duty element of fraudulent concealment. *Id.*

Plaintiffs argue that they have adequately pled fraudulent concealment under the *Takata* standard.  [ECF 67] at 34.  According to plaintiffs, the basis of defendants' duty or obligation to disclose this information derives from defendants' status as fiduciaries. *Id.*  Plaintiffs further contend that because "a court may presume reliance on fraudulent concealment, and the complaint alleges that the concealment proximately caused damages," plaintiffs have satisfied their pleading burden. *Id.* at 35.

In *Takata*, the Virgin Islands government (the "GVI") sued Takata Corporation, TIC Holdings, Inc., and three Honda corporate entities for installing defective airbags in at least 7,000

---

[20]   In the absence of guidance from the Supreme Court of the Virgin Islands, the undersigned adopts the standard articulated by the Virgin Islands Superior Court, following a *Banks* analysis, in *Takata*.

cars in the Virgin Islands.  67 V.I. at 334.  The court granted Takata and TIC Holdings' motion to

dismiss the GVI's fraudulent concealment claim because the GVI failed to allege facts that

demonstrate that it relied on "intentionally concealed or suppressed material facts regarding the

extent of the airbags' defects" or "suffered pecuniary loss as a result thereof."  *Id.* at 418.

Specifically, the Court found that the GVI's allegations that "7,000 Virgin Islands residents own

vehicles that were 'economically devalued' as a result of the allegedly defective airbags" failed to

demonstrate the GVI's reliance or damages.  *Id.*  In addition, the court noted that "[p]ecuniary loss

in the form of diminished value or loss of resale value can only result" if plaintiff owns at least

one car with a defective airbag.  *Id.* at 419.  Because the complaint in *Takata* failed to allege facts

suggesting ownership, the court found the GVI had not properly pled fraudulent concealment.  *Id.*

Here, plaintiffs begin by providing examples of material facts they contend defendants

concealed or suppressed:

> a.   The fact that the Marriott Defendants knew they would reap massive profits while severely damaging plaintiffs once the merger went through;
>
> b.   The fact they had slow-walked foreclosures to manufacture a financial crisis for the Association;
>
> c.   The fact that their fiduciary duties required them to promptly foreclose even without the deal that owners, including Plaintiffs and the proposed Class, voted on in January 2014; and
>
> d.   The fact that the affiliation would be governed by an undisclosed 2013 Affiliation Agreement that provided the Marriott Defendants with a series of one-sided provisions that were highly damaging to Plaintiffs and the proposed Class and the Ritz-Carlton Great Bay, including a permanent affiliation between RCDC and MVC.   These onerous provisions were designed to give unfair advantages to the Marriott Defendants and MVC members over RCDC members.

SAC [ECF 86] ¶ 172(a)-(d).  Next, plaintiffs describe the parties' relationship and the duties

plaintiffs contend derived therefrom:

> 165.  The Marriott Defendants, and each of them, assumed fiduciary duties to Plaintiffs and the proposed Class based on their control of the Association and its board, and on the high degree of control they otherwise exercised over Plaintiffs' and the proposed Class' separately deeded fractional property interests . . . .
>
> * * *
>
> 178.  Because they were fiduciaries and also because they made uniform, class-wide statements that were misleading without disclosure of the concealed material facts, the Marriott Defendants, and each of them, had a duty to disclose all material facts relating to the RCDC-MVC merger and the January 26, 2014 vote.

SAC [ECF 86] ¶¶ 165, 178.

Plaintiffs also allege that defendants knew the material facts were concealed or suppressed

and that defendants did so in order to induce plaintiffs to vote in favor of the merger:

> 121.  On December 13, 2013, the Association board sent a letter to Plaintiffs and members of the proposed Class recommending that they vote in favor of amending the Club Declaration as requested by the Marriott Defendants.  The letter, which was drafted and/or edited by the Marriott Defendants, failed to disclose that the consideration Marriott Vacations Worldwide was proposing for the favorable vote was illusory.   Not only did the MVW Defendants have a fiduciary duty to promptly foreclose and concomitantly start paying maintenance fees, but also the Association and its members had a viable claim against the MVW Defendants for the approximately $7 million in unpaid maintenance dues that had accrued by then.

SAC [ECF 86] ¶ 121.  Finally, plaintiffs allege pecuniary loss caused by their justifiable reliance

on the concealed or suppressed material facts:

> 10.  Over a period of years, losses caused by the unusually high number of delinquent owners and the "slow walking" of

foreclosures by the Marriott Defendants began to accrue. In 2013, the Marriott Defendants proposed their "solution": If owners, including Plaintiffs and the proposed Class, voted to permit the RCDC-MVC merger, the Marriott Defendants would accelerate foreclosures and begin paying maintenance dues on the foreclosed fractionals—both things that they were required to do even without a vote.

11. Misled by their fiduciaries and put into financial extremis, owners, including Plaintiffs and the proposed Class, voted on January 26, 2014, to accept the Marriot Defendants' proposal.

\* \* \*

13. As a result of the merger, thousands of MVC members have flooded the Ritz-Carlton Great Bay and other Ritz-Carlton Destination Clubs, fundamentally altering the offering. Resale prices have plummeted and are forever diminished because nobody is willing to pay premium prices for supposedly exclusive access to a supposed private residence club when access can be obtained at a much lower price-point and with much greater flexibility through the Marriott Vacation Club. Plaintiffs and other members of the proposed Class have suffered losses to their property values, rights and expectations while the Marriott Defendants, as they predicted, reaped hundreds of millions of dollars by selling more MVC points at higher prices.

SAC [ECF 86] ¶¶ 10, 11, 13. Given these allegations, the Count concludes that plaintiffs have plausibly stated a claim for fraudulent concealment under the *Takata* standard.

4. <u>Aiding and Abetting</u>

In *Guardian Insurance Company v. Estate of Knight-David*, the Superior Court of the Virgin Islands recognized a cause of action for aiding and abetting a tort in the civil context. 2018 WL 4352114, at \*4 (V.I. Super. May 29, 2018). Following a *Banks* analysis, the court adopted the standard articulated in the Restatement (Second) of Torts as the soundest rule for the Virgin Islands:

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 21

> For harm resulting to a third person from the tortious conduct of
> another, one is subject to liability if he: (b) knows that the other's
> conduct constitutes a breach of duty and gives substantial assistance
> or encouragement to the other so to conduct himself, or (c) gives
> substantial assistance to the other in accomplishing a tortious result
> and his own conduct, separately considered, constitutes a breach of
> duty to the third person.

*Id.* at *5 (quoting Restatement (Second) of Torts § 876(b) and (c)).  Describing the important

public policy objectives satisfied by its adoption of this standard, the court stated:

> Recognizing aiding and abetting liability as a means of spreading
> damages among several persons who have given substantial
> assistance to the primary wrongdoer in committing a tort advances
> the public interest by helping to avoid that circumstance in which a
> primary wrongdoer either does not have assets sufficient to
> compensate an injured party for a tort or transfers assets, in order to
> avoid the collection of a judgment for money damages, to others
> who knowingly rendered assistance in the commission of the tort.

*Id.* at *4.

Defendants argue that, like constructive fraud, aiding and abetting is not recognized in the

Virgin Islands as a cause of action.  [ECF 15] at 39.  Alternatively, defendants contend that if it is

an actionable claim, it is a derivative tort that requires an actionable underlying wrong.  *Id.* at 40.

Defendants reason that because plaintiffs' aiding and abetting claim is derivative of their breach

of fiduciary duty and fraud claims, which are themselves insufficiently pled, it must be dismissed.

*Id.*

Plaintiffs contend that aiding and abetting is a recognized cause of action under Virgin

Islands law based on *Guardian Insurance.*  [ECF 67] at 35.   Plaintiffs state that the Complaint

sufficiently alleges a claim of aiding and abetting, averring that defendants (1) used their control

over Ritz-Carlton Great Bay to implement the merger even though they knew that doing so

constituted a breach of their fiduciary duties to plaintiffs and (2) worked with the Association to

breach its fiduciary duties to plaintiffs by failing to disclose the *B&T Cook* decision and convincing Association members to vote for the merger. *Id.* at 35-36.

Here, under the *Guardian Insurance* standard, plaintiffs state plausible claims for aiding and abetting breach of fiduciary duty and aiding and abetting fraudulent concealment.[21] First, plaintiffs allege in conclusory fashion that defendants "knowingly aided and abetted in the breaches of fiduciary duty . . . and fraud by concealments committed by the other defendants by providing assistance to, counseling, commanding, inducing, or providing the means to achieve the wrongful conduct alleged elsewhere in the Complaint, and or otherwise caused those wrongful acts to be done." SAC [ECF 86] ¶ 185. More specifically, however, regarding breach of fiduciary duty plaintiffs allege that MVW and MII developed a business strategy to increase sale of MVC properties by featuring access to RCDC properties in MVC sales presentations and promotional material, *id.* ¶¶ 80, 89; and that top Marriott executives decided to engage in an aggressive campaign, using outside marketing and public relations firms, to convince RCDC property owners to vote in favor of the merger, *id.* ¶¶ 92-95. Regarding fraudulent concealment, plaintiffs allege, *inter alia*, that neither defendants nor the Association informed them of the *B&T Cook* decision, wherein the court found that Ritz-Carlton Great Bay stated a plausible claim for breach of fiduciary duty, *id.* ¶¶ 116-117; and that on December 13, 2013, the Association Board sent plaintiffs a letter that was drafted and/or edited by defendants, which failed to inform plaintiffs that the MVW defendants had an existing fiduciary duty to promptly foreclose on delinquent properties and pay outstanding maintenance dues, *id.* ¶ 121. With these allegations, plaintiffs have stated plausible claims for aiding and abetting breach of fiduciary duty and aiding and abetting fraudulent concealment.

---

[21] Having determined that the Virgin Islands does not recognize a claim for constructive fraud, the Court necessarily finds that plaintiffs cannot state a plausible claim for aiding and abetting constructive fraud.

4.      Breach of Implied Covenants

"In the Virgin Islands, every contract imposes upon each party a duty of good faith and fair

dealing in its performance and enforcement." *Arvidson v. Bucher*, 2019 WL 4307580, at *23 (V.I.

Super. Sept. 10, 2019) (quotation marks omitted).  Breach of the implied covenant occurs when

one party acts in a way that deprives another party of the benefits for which it bargained.  *Id.*  To

state a claim for breach of the implied covenant of good faith and fair dealing, "a plaintiff must

[allege] acts by the defendant that amount to fraud, deceit, or misrepresentation."  *Stapleton v.*

*WenVI, Inc.*, 2014 WL 3765855, at *3 (D.V.I. July 30, 2014) (quotation marks omitted).  "To

successfully allege an act of fraud or misrepresentation, a complainant must demonstrate: (1) a

knowing misrepresentation of a material fact, (2) intent by the defendant that the plaintiff would

rely on the false statement, (3) actual reliance, and (4) detriment as a result of that reliance."  *Id.;*

*but see Remak v. Virgin Islands Water & Power Auth.*, 2017 WL 3122642, at *2, 4 (V.I. Super.

July 21, 2017) (concluding that the standard for proving a claim for breach of the implied covenant

of good faith and fair dealing in the Virgin Islands remains unclear because the Virgin Islands

Supreme Court has not clarified whether a *Banks* analysis must always be performed in order to

establish binding precedent).

Defendants argue that although Virgin Islands law recognizes a claim for breach of the

implied covenant of good faith and fair dealing, plaintiffs fail to state such a claim.  [ECF 15] at

44.  According to defendants, plaintiffs' allegation that the MVC affiliation violated implied

promises in their purchase contracts as well as the implied covenant of good faith and fair dealing

fails because plaintiffs do not identify "any specific duty in any express provision of the Purchase

Contracts that was allegedly breached."  *Id.* at 45.  Defendants further contend that plaintiffs' claim

that the affiliation frustrated their reasonable expectations under the purchase contracts is

contradicted by the express language of those agreements and other documents, which state that

the Program Manager has the right to affiliate Ritz-Carlton Great Bay with other resorts. *Id.* at 45.

Plaintiffs maintain that the Complaint sufficiently alleges breach of implied promises in

their purchase agreements as well as breach of the covenant of good faith and fair dealing. [ECF

67] at 43. According to plaintiffs, as a result of the merger, plaintiffs lost their expectations of

exclusivity. *Id.* Plaintiffs further contend that defendants' reasoning is flawed in that an implied

term cannot be express. *Id.* Finally, plaintiffs argue that the mere fact that defendants had the

authority or discretion to affiliate Ritz-Carlton Great Bay with other programs does not absolve

them from "liability for failing to act in good faith." *Id.* at 44.

Plaintiffs allege a plausible claim for breach of the implied covenant of good faith and fair

dealing against RC Hotels VI and RC Club St. Thomas/Ritz-Carlton Great Bay.[22] SAC [ECF 86]

¶¶ 189-195. According to plaintiffs, the standardized purchase agreement and other related

documents constitute an enforceable contract between plaintiffs, RC Hotels VI, and RC Club St.

Thomas. *Id.* ¶ 190. Plaintiffs further contend that by virtue of these agreements, RC Hotels VI

and RC Club St. Thomas implicitly promised that they would not take any action that would

"radically alter the nature of the RCDC, the Ritz-Carlton Great Bay, or the separately-deeded

property interests purchased at premium prices by Plaintiffs," or that would violate plaintiffs'

"reasonable expectations" under the agreements. *Id.* ¶ 192. Next, plaintiffs state that while they

"reasonably expected that these defendants might make certain changes," they also expected that

they "would maintain the fundamental character of the RCDC, the Ritz-Carlton Great Bay, and

the fractionals at that club." *Id.* Plaintiffs further aver that defendants' "wrongful conduct" with

respect to the merger "constitutes a material breach of implied promises in the purchase agreement,

---

[22] Plaintiffs alternatively refer to the Ritz-Carlton Great Bay as the RC Club St. Thomas.

and a violation of the implied covenant of good faith and fair dealing." *Id.* ¶ 193.  Finally, plaintiffs claim that because they reasonably relied on RC Hotels VI and RC Club St. Thomas acting in plaintiffs' best interests and because these defendants failed to do so, plaintiffs were deprived of the "the value of their fractionals and the fruits of the purchase agreement." *Id.* ¶ 194.

Plaintiffs have articulated facts in support of each element of a claim for breach of the implied covenant of good faith and fair dealing.  Plaintiffs need not identify "any specific duty in any express provision of the Purchase Contracts that was allegedly breached" because, as plaintiffs note, the duty—if it exists—is implied.  *See Basic Servs., Inc. v. Gov't of the V.I.*, 71 V.I. 652, 663-64 (V.I. 2019) ("[T]he implied duty of good faith and fair dealing is limited by the original bargain; it prevents a party's acts or omissions that, *though not proscribed by the contract expressly*, are inconsistent with the contract's purpose and deprive the other party of the contemplated value . . . [and it] operates as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.") (quotation marks omitted) (emphasis added).  Finally, that the express language of the governing documents may "state that the Program Manager has the right to affiliate Ritz-Carlton Great Bay with other resorts," is not, in and of itself, inconsistent with plaintiffs' claim that their reasonable expectations were frustrated.  If, for example, RC Hotels VI had chosen to affiliate with another vacation club, resulting in an increase in the value of the fractionals, plaintiffs would not contend that the affiliation frustrated their reasonable expectations.

     5.    The Timeliness of Plaintiffs' Breach of Fiduciary Duty, Fraud, and Aiding and Abetting Claims

In the Virgin Islands, tort claims are generally governed by a two-year statute of limitations.  5 V.I.C. § 31(5)(A) (applying a two-year statute of limitations to "[a]n action for libel,

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 26

slander, assault, battery, seduction, false imprisonment, or for any injury to the person or rights of

another not arising on contract and not herein especially enumerated . . . .")  However, the Virgin

Islands employs a discovery rule; the limitations period does not begin to run until the plaintiff has

discovered its claim.  A limitations period may thus be tolled by fraudulent concealment.  To utilize

the doctrine of fraudulent concealment for equitable tolling purposes,[23] a plaintiff must allege and

prove the following:

> (1) that the defendant affirmatively concealed, or failed to disclose
> despite a duty to do so, material facts critical to plaintiff's cause of
> action; (2) that the defendant knew or had reason to know that the
> material fact had been concealed or suppressed; (3) that the
> defendant's conduct prevented plaintiff from discovering [] the
> nature of the claim within the limitations period; and (4) that the
> plaintiff could not have discovered sufficient facts to identify the
> particular cause of action despite reasonable care and diligence.

*Gerald*, 67 V.I. at 466.  In the Third Circuit, "[a]t the motion to dismiss stage, a plaintiff who seeks

to invoke equitable tolling need only 'plead the applicability of the doctrine.'"  *Perelman v.*

*Perelman*, 545 F. App'x 142, 151 (3d Cir. 2013) (*quoting Oshiver v. Levin, Fishbein, Sedran &*

*Berman*, 38 F.3d 1380, 1391 (3d Cir. 1994)).  *But see Bethlehem Steel Corp. v. Fischbach &*

*Moore, Inc.*, 641 F. Supp. 271, 275 (E.D. Pa. 1986) ("Whether a party has exercised due diligence

[in discovering a potential claim] is a factual issue which cannot be decided on a motion to dismiss

unless it appears beyond doubt that plaintiff can prove no facts to support the claim.").  There

must, however, be "allegations in [the] complaint that would support application of the fraudulent

concealment doctrine . . . ."  *Perelman*, 545 F. App'x at 151.  Further, "the fraudulent concealment

doctrine does not toll the statute of limitations where the plaintiff knew or should have known of

---

[23]  In the absence of authority from the Virgin Islands Supreme Court, the undersigned adopts the standard articulated by the Superior Court of the Virgin Islands, following a *Banks* analysis, in *Gerald v. R.J. Reynolds Tobacco Co.*, 67 V.I. 441, 463-67 (V.I. Super. 2017).

his claim despite the defendant's misrepresentation or omission." *Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006).

Finally, a statute of limitations defense may be raised in a motion to dismiss "if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)) (quotation marks omitted)). "'If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).'" *Robinson*, 313 F.3d at 135 (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir.1978)).

Defendants assert that plaintiffs' tort claims are time-barred.[24] [ECF 15] at 25.  Citing the two-year statute of limitations period in 5 V.I.C. § 31(5)(A), defendants argue that because plaintiffs describe certain actions defendants took in 2014 and 2015, and because the instant case was not filed until January 2019, these claims are untimely.  *Id.*  For example, defendants argue that the key terms of the Settlement Agreement were disclosed in advance of the January 2014 vote.  [ECF 82] at 19.  Thus, defendants contend plaintiffs knew that as a result of the Settlement Agreement, plaintiffs "would only receive the financial benefits Defendants agreed to provide under the Settlement Agreement if they voted in favor of the Declaration Amendment, that MVC Owners would be able to access RCC, St. Thomas if the Members approved the Declaration Amendment, and that the Settlement Agreement resolved underlying claims in the Foreclosure Cases."  *Id.* at 19-20.  Further, regarding the *B&T Cook* decision and the 2013 Affiliation

---

[24]  Defendants also argue that plaintiffs' CPL and CFDBPA claims are untimely.  These arguments are dealt with below, in the Court's discussion of whether plaintiffs' claims under these two statutes survive defendant's motion to dismiss.

Agreement, defendants argue these documents are not material to plaintiffs' claims, and so cannot support the application of fraudulent concealment. *Id.* at 20.

Plaintiffs counter that the doctrine of fraudulent concealment tolls the onset of the limitations period on these claims. [ECF 67] at 23-26. In plaintiffs' view, the period did not begin to run until 2018, when they learned from their attorneys that defendants had been hiding information from them. *Id.* at 23. Plaintiffs allege the following: (1) In January 2013, after the *B&T Cook* decision was issued, the defendants approached the Association Board with a proposal for solving the financial crisis at the Ritz-Carlton Great Bay; (2) the defendants offered to begin foreclosure proceedings on delinquent fractionals obtained with MVW-affiliated mortgages; (3) the defendants offered to begin paying outstanding maintenance dues associated with these properties; (4) in exchange, the defendants asked the Association to secure its members' approval of the merger; (5) on December 13, 2013, the Association Board sent its members a letter recommending the amendment of the Club Declaration to permit the merger; (6) the letter, drafted by the defendants, did not inform the members that the MVW defendants had an existing fiduciary duty to promptly foreclose on delinquent fractionals and remit outstanding maintenance dues; (7) the Association and its members were unaware that they had a viable claim against the MVW defendants for approximately $7 million in unpaid maintenance dues; (8) at a webinar held on December 18 and 19, 2013, MVW mislead plaintiffs about MVW's existing fiduciary duty to promptly initiate foreclosure proceedings on delinquent fractionals; (9) the defendants provided plaintiffs with similarly misleading information in the form of answers to FAQs; (10) the defendants failed to disclose the 2013 Affiliation Agreement, which transferred control from the Association to the defendants but would have allowed plaintiffs to reject the merger; (11) the defendants did not inform plaintiffs that a national appraisal firm they hired concluded that the

merger would harm the value of the fractionals; (12) plaintiffs first became aware of defendants'

wrongful conduct in 2018, when they contacted lawyers and learned of the 2013 Affiliation

Agreement and the *B&T Cook* decision; and (13) plaintiffs could not, through due diligence, have

discovered defendants' wrongful conduct at an earlier date.  SAC [ECF 86] ¶¶ 119-125, 215, 216.

The Court finds that plaintiffs have alleged enough facts to plausibly invoke equitable

tolling.  They describe concealment or nondisclosure of information defendants were obliged to

provide that would have allowed plaintiffs to discover their tort claims within the two-year

limitations period; and that despite exercising reasonable care and diligence, plaintiffs could not

have discovered these facts earlier.

Arguably, because the *B&T Cook* decision was publicly available, plaintiffs could have

discovered it through the exercise of due diligence.  *See Weiss v. Bank of Am. Corp.*, 2016 WL

6879566, at *3 (W.D. Pa. Nov. 22, 2016) (stating that "a plaintiff who is not reasonably diligent

may not assert fraudulent concealment because the fraudulent concealment inquiry, and equitable

tolling, require diligence") (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997)

(quotation marks omitted)).  This fact standing alone, however, is not dispositive of the timeliness

issue.  In any event, many of the parties' arguments rely on underlying disputed facts, and the

Court cannot at this stage conclusively resolve the timeliness issue in defendants' favor.  Whether

defendants may ultimately prevail on the statute of limitations defense must await a later stage of

this case.

6.    Effect of the Gist of the Action Doctrine

The gist of the action doctrine "precludes tort suits for the mere breach of contractual duties

unless the plaintiff can point to separate or independent events giving rise to the tort." *Pollara v.*

*Chateau St. Croix, LLC*, 2016 WL 2865874, at *4 (V.I. Super. May 3, 2015) (quotation marks

omitted).  It is applied

> when the claims are (1) arising solely from a contract between the
> parties; (2) where the duties allegedly breached were created and
> grounded in the contract itself; (3) where liability stems from a
> contract; or (4) where the tort claim essentially duplicates a breach
> of contract claim or the success of which is wholly dependent on the
> terms of a contract.

*Id.* at *6 (quotation marks omitted);[25] *accord Joseph v. Divine Funeral Servs., LLC*, 71 V.I. 121,

128-29 (V.I. Super. 2019); *Woodson v. Akal*, 2017 WL 3587370, at *3-4 (V.I. Super. Aug. 17,

2017); *Daroff Design, Inc. v. Neighborhood Ass'n, Inc.*, 2016 WL 3212484, at *3 (D.V.I. May 13,

2016).  Further, the doctrine "is designed to maintain the conceptual distinction between breach of

contract claims and tort claims" by allowing tort actions "for breaches of duties imposed by law

as a matter of social policy" and contract actions "for breaches of duties imposed by mutual

consensus agreements between particular individuals." *Pollara*, 2016 WL 2865874, at *8 (quoting

*Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 386 (3d Cir. 2004)) (quotation marks omitted).

Defendants argue that the "gist of the action" doctrine bars plaintiffs' breach of fiduciary

duty, fraud, and aiding and abetting claims.  [ECF 15] at 29-31.  According to defendants, the

doctrine bars plaintiffs' tort claims because they "plainly derived" from the various contracts

between the parties, such as the Management Agreement and related sub-management agreements.

*Id.* at 31.

Plaintiffs counter that the doctrine does not apply because the Management Agreement is

a contract between the Association and Marriott subsidiaries, not between plaintiffs and the

defendants.  [ECF 67] at 33.  In plaintiffs' view, the Management Agreement gave the defendants

---

[25]  In *Pollara*, the Superior Court reached this conclusion following a *Banks* analysis.

a high level of control over plaintiffs' property, and it is their high level of control that is the source

of the defendants' fiduciary duties. *Id.* at 33-34.

Here, the Court cannot find that the gist of the action doctrine bars plaintiffs' tort claims

because the duties breached are alleged to have arisen by virtue of contracts between the

defendants and others who are not plaintiffs here.[26]  *See Pollara*, 2016 WL 2865874, at *10

(finding that because one of the defendants was not a party to the contract at issue, the gist of the

action doctrine did not apply); *cf. Addie v. Kjaer*, 737 F.3d 854, 868 (3d Cir. 2013) (applying the

gist of the action doctrine to bar "tort claims against an individual officer-defendant where the

duties allegedly breached were created by a contract between the plaintiff and the defendant's

company").  Thus, defendant's motion to dismiss based on the gist of the action doctrine will be

denied.

B.       Plaintiffs' Statutory Claims

1.       The Virgin Islands Criminally Influenced and Corrupt Organizations Act ("CICO")

Under CICO, "[i]t is unlawful for any person employed by, or associated with, any

enterprise . . . to conduct or participate in, directly or indirectly, the affairs of the enterprise through

a pattern of criminal activity."  14 V.I.C. § 605(a).  A pattern of criminal activity is defined as

"two or more occasions of conduct."  *Id.* § 604(j).  "[T]o establish a CICO pattern, the 'two

occasions of conduct' must not be lone instances of criminal activity;" they must relate to each

other, but not in a temporal sense.  *People of the V.I. v. McKenzie*, 66 V.I. 3, 19-20 (V.I. Super.

2017).

Subsection (c) of section 605 further provides as follows:

> It is unlawful for any person who has received any proceeds derived,
> directly or indirectly, from a pattern of criminal activity in which he

---

[26]  Defendants appear to concede this fact by omitting any mention of the doctrine in their reply.

> participated as a principal, to use or invest, directly or indirectly, any part of the proceeds thereof, or any proceeds derived from the investment or use of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property, or in the establishment or operation of any enterprise.

14 V.I.C. § 605(c).  "Any person, directly or indirectly, injured by conduct constituting a violation" of CICO shall have a cause of action for treble damages.  14 V.I.C. § 607(c).  *See Cameron v. Rohn*, 2012 WL 511443, at *13 (D.V.I. Feb. 14, 2012) (holding that minority members of an LLC had standing to bring suit under CICO for injuries directly affecting the LLC but only indirectly affecting plaintiffs).

Lastly, subsection (d) provides that "[i]t is unlawful for any person to conspire or attempt to violate, either directly or through another or others, the provisions of section 605, subsections (a), (b), and (c)."  14 V.I.C. § 605(d).

Defendants argue that plaintiffs fail to state a claim under CICO because they do not allege the requisite pattern of criminal activity.  [ECF 15] at 40-42.  According to defendants, the predicate acts plaintiffs identify—mail fraud, wire fraud, and violations of the Travel Act—are insufficient because plaintiffs fail to allege that these acts relate to any underlying fraud scheme.  *Id.* at 41-42.  Further, defendants contend that plaintiffs fail to sufficiently allege a causal connection between the predicate acts and plaintiffs' injuries.  *Id.* at 42-43.  Rather, defendants aver, other factors, such as external market forces, may have impacted the value of plaintiffs' fractionals.  *Id.*  In addition, defendants argue that to the extent the MVC affiliation negatively impacted plaintiffs, it was the Association members' January 2014 vote rather than defendants' conduct that directly caused these negative consequences.  *Id.* at 43.  Finally, defendants state that plaintiffs fail to allege violations of § 605(c) and (d).  *Id.* at 43-44.  With respect to subsection (c), defendants argue that although plaintiffs claim that the fractionals defendants obtained as a result

of the foreclosures constitute proceeds derived from criminal activity, plaintiffs neglected to list foreclosures as one of the predicate criminal acts. *Id.* at 43. With respect to subsection (d), defendants contend that because plaintiffs fail to allege violations of subsections (a) through (c), they necessarily fail to allege a conspiracy or attempted conspiracy to violate any of those subsections. *Id.* at 44.

Plaintiffs point out that paragraph 147 of the Complaint identifies over 30 predicate acts of mail fraud, wire fraud, and violations of the Travel Act, and thus sufficiently alleges a pattern of criminal activity under CICO. [ECF 67] at 37. Plaintiffs also defend their allegations of causation, arguing that, unlike RICO claims, CICO claims may be premised on indirect injury. *Id.* at 38. Alternatively, plaintiffs contend that even under "RICO's more restrictive 'directness' standard," the Complaint is sufficient because "[a] RICO complaint alleging a scheme to defraud *aimed at the plaintiffs* sufficiently alleges the causal link." *Id.* at 38-39 (emphasis in original). In response to defendants' assertion that other factors unrelated to defendants' actions may have affected the value of the fractionals, plaintiffs aver that this raises factual issues unsuitable for resolution at this stage. *Id.* at 41. Next, plaintiffs argue that their allegations that "the Marriott International and MVW Defendants received fractional inventory from their pattern of criminal activity (defrauding Plaintiffs into favoring the MVC merger in exchange for Marriott foreclosing and taking ownership of inventory), and then invested those fractionals in the Marriott Vacation Club" satisfy the requirements of subsection (c). *Id.* at 42. Finally, plaintiffs contend that they have sufficiently pled a claim under subsection (d) because the Complaint details various examples of Marriott International and MVC defendants conspiring to defraud plaintiffs. *Id.*

Here, the Court finds that plaintiffs raise plausible claims for violations of CICO. First, plaintiffs introduce their CICO claims with a summary of the enterprise:

142.   The MII and MVW Defendants formed an associated-in-fact enterprise to infiltrate and control the Association and perpetrate a scheme to defraud that began just before the spin-off of the MVW Defendants from Marriott International in November 2011 and that continued through the January 26, 2014 vote and thereafter as well.  As more fully alleged elsewhere in this Complaint, the MII and MVW Defendants accomplished this unlawful scheme to defraud by using their control over the Association, its board, and its communications with Plaintiffs and the proposed Class to manipulate them into voting for the RCDC-MVC merger based on a real or perceived financial crisis that the Marriott Defendants manufactured by slow-walking foreclosures in violation of their fiduciary duties.  In addition, the MVW Defendants, acting at the behest and direction of the MII Defendants, drafted and sent other highly misleading communications to Plaintiffs and the proposed Class that concealed material facts.

SAC [ECF 86] ¶ 142.  Next, plaintiffs describe multiple acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343,[27] as well as violations of the Travel Act, 18 U.S.C. § 1952.  *Id.* ¶¶ 145-47.  In one example, plaintiffs identify the steps various defendants took to facilitate the transfer of the fractionals:

a.   During the weeks surrounding May 24, 2012, Lee Cunningham and agents of MORI, RC Hotel Co., and other members of the CGC committee met in person, emailed, and communicated by phone about various re-engineering steps, such as transferring the remaining unsold developer inventory to the MVC Trust and obtaining Marriott International's approval for selling points. They predicted that the process could take a year to a year and a half to complete, extending beyond the subsequent vote at St. Thomas to affiliate with MVC in exchange for the Marriott Defendants taking action on the foreclosures.  They also noted the concern about whether the transfer could violate St. Thomas's governing documents' anti-commercialization provisions, and discussed other communications.

---

[27] "Sections 1341 and 1343 reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises."  *Carpenter v. United States*, 484 U.S. 19, 27 (1987).

SAC [ECF 86] ¶ 147(a).

Thereafter, plaintiffs aver that these acts were all part of defendants' underlying scheme and harmed plaintiffs:

> 149.    The Marriott Defendants, and each of them, agreed to commit these predicate acts, agreed to aid and abet their commission by other members of the associated-in-fact enterprise, and/or agreed that some members of that enterprise would commit the predicate acts for the benefit of all members of the associated-in-fact enterprise.
>
> 150.    Plaintiffs and members of the proposed Class suffered harm and/or injury to their business or property as a direct and proximate result of the Marriott Defendants' wrongful conduct. Specifically, the Marriott Defendants' unlawful conduct has destroyed the value of Plaintiffs' separately-deeded property interests, and the private residence club that formed the heart of those property interests. In addition, Plaintiffs and members of the proposed Class have been forced to pay increased maintenance dues as a direct and proximate result of the Marriott Defendants' wrongful conduct.

SAC [ECF 86] ¶¶ 149, 150.

Thus, plaintiffs identify the actors, describe the actions taken, indicate when the actions were taken, and list the statutes allegedly violated. From these facts, as pled, the Court can reasonably infer that the predicate acts described in the Complaint constitute a pattern of criminal activity. *See Gardiner v. St. Croix Dist. Governing Bd. of Dirs.*, 2019 WL 3814427, at *7 (V.I. Super. July 30, 2019) (holding that plaintiff failed to state a CICO claim because the allegations in the complaint only consisted of conclusory statements).

The Court can also reasonably infer the requisite degree of causation. Plaintiffs allege:

> 157.    Fractional inventory obtained through foreclosure was one of the proceeds that the MII and MVW Defendants derived, directly or indirectly, from their pattern of criminal activity alleged herein. The MII and MVW Defendants invested these RCDC fractionals in their operation of the Marriott

> Vacation Club, which qualifies as an enterprise within the meaning of 14 V.I.C. § 607(a)(1) by transferring them into the MVC Trust in violation of 14 V.I.C. §§ 605(c).

SAC [ECF 86] ¶ 157.

Next, plaintiffs identify the predicate acts allegedly related to defendants' receipt of plaintiffs' real property:

> g.      On information and belief, shortly after the January 26, 2014 vote, RC Hotels VI transferred or participated in the transfer of RCDC fractional inventory to the MVC Trust, which transfers were accomplished using the mails and/or interstate wires.
>
> h.      On January 3, 2012, Cunningham emailed the Action Item/Status Summary circulated at a recent Strategic Council meeting to other Marriott executives.    This summary was linked to the Defendants' movement of RCDC inventory  into  the MVC Trust.
>
> * * *
>
> r.      Pursuant to the scheme perpetrated by the MII and MVW Defendants, the Association used the mails and interstate wires to file an amendment to a declaration on January 28, 2014, stating that the Club Declaration did not prohibit fractional interests from being moved into the MVC Trust for MVC's use.
>
> s.      On information and belief, shortly after the January 26, 2014 vote, RC Development transferred or participated in the transfer of RCDC fractional inventory to the MVC Trust, which transfers were accomplished using the mails and/or interstate wires.
>
> * * *
>
> v.      On information and belief, the MVC Trust participated in the transfer of RCDC fractional inventory to that trust, which transfers were accomplished using the mails and/or interstate wires.

SAC [ECF 86] ¶ 147(g), (h), (r), (s), and (v).

Although plaintiffs do not characterize the foreclosures as predicate acts, the acts described above support a plausible claim that defendants unlawfully acquired real property in violation of subsection (c).  *See Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*, 223 F. Supp. 3d 1, 8-9 (D.D.C. 2016) (plaintiff stated a plausible claim under RICO by alleging, *inter alia*, a scheme by defendants "to improperly obtain control over millions of dollars of [church's] assets through a merger [with another church] that lacked approval from its rightful Board members").  Plaintiffs need not identify every predicate act allegedly committed in order to withstand a motion to dismiss.

Lastly, plaintiffs satisfy subsection (d) by alleging the following:

> 161.   The Marriott Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to participate in, directly or indirectly, the scheme to defraud, predicate acts, and violations of 14 V.I.C. §§ 605(a)-(c) alleged above and thereby conspired with one another in violation of 14 V.I.C. § 605(d).

> 162.   Each of the Marriott Defendants agreed to perform these wrongful acts and each acted the material ways alleged herein to accomplish their wrongful purpose, including concerted action.  The predicate acts and other conduct alleged elsewhere herein constitute overt acts in furtherance of this conspiracy.

SAC [ECF 86] ¶¶ 161, 162.  Thus, plaintiffs state a claim for conspiracy under CICO.  *See Gov't of the U.S.V.I. v. The Servicemaster Co.*, 2019 WL 6358094, at *14 (V.I. Super. Nov. 27, 2019) (noting that "civil claims can be plead in the alternative and a civil CICO conspiracy claim is a viable claim and can be alleged on its own").

### 2.    The Virgin Islands Consumer Protection Law ("CPL")

The CPL provides that "[n]o person shall engage in any deceptive or unconscionable trade practice in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any

consumer goods or services, or in the collection of consumer debts."   12A V.I.C. § 101.   "[T]o

state a claim under the CPL, a plaintiff must establish the following elements: (1) defendant is a

'person' under CPL; (2) defendant is engaged in a deceptive or unconscionable trade practice; and

(3) the deceptive or unconscionable trade practice occurred during the sale, lease, rental or loan of

any consumer goods or services."  *Takata*, 67 V.I. at 381.

Defendants argue that plaintiffs fail to state a claim because the CPL only applies to

"consumer goods or services," not real estate or real estate transactions.   [ECF 15] at 45-46.

Alternatively, defendants argue that even if the statute does apply to real estate transactions, it only

applies to pre-sale conduct, which is not referenced in the Complaint.[28]  *Id.* at 46.  Plaintiffs do not

address this argument.

Regarding the CPL, plaintiffs allege the following:

> 198.   The Marriott Defendants, and each of them, and any co-conspirators engaged, and continue to engage, in a misleading, deceptive, and unfair trade or commerce practice regarding the management of the fractionals at the Ritz-Carlton Great Bay.

> 199.   The Marriott Defendants and any co-conspirators' trade and commerce practices misrepresented to, deceived, or unfairly influenced objective and reasonable consumers owning property in the Virgin Islands as more fully alleged elsewhere herein, includ[ing] by slow-walking foreclosures, manufacturing a real or perceived financial crisis for the Association, and then proposing that Plaintiffs and the proposed Class members vote for the RCDC-MVC merger—a merger that Defendants knew would devalue Plaintiffs' and proposed class members' property interests—in exchange for a "solution" to that crisis, i.e., an agreement by the Marriott Defendants to foreclose on delinquent properties and then start paying maintenance fees as they were already required to do.

---

[28] Defendants also contend that a two-year statute of limitations period also applies to plaintiffs' CPL claims. [ECF 15] at 26.  According to defendants, because the CPL only addresses pre-sale conduct, and because plaintiffs purchased their fractionals in 2002, 2006, and 2009, their CPL claims are untimely.  *Id.*  Plaintiffs do not address this argument.

SAC [ECF 86] ¶¶ 198, 199.  Thus, plaintiffs allege that the Marriott defendants engaged in deceptive practices in the management of the fractionals and in their treatment of plaintiffs as property owners.  Even if the Court assumes that fractionals qualify as consumer goods and that the management of the fractionals qualifies as a service, none of the practices described above are alleged to have occurred "during the sale, lease, rental or loan" of either.  Therefore, plaintiffs have failed to state a claim under the CPL.

3. <u>The Virgin Islands Consumer Fraud and Deceptive Business Practices Act ("CFDBPA")</u>

The CFDBPA is a statute that aims to protect consumers from fraud.  "To state a claim under CFDBPA, a plaintiff must establish that: (1) defendant is a 'person' under CFDBPA; (2) defendant is engaged in unfair methods of competition, unfair, or deceptive trade acts or practices; and (3) the unfair method of competition or deceptive trade act or practice occurred in the conduct of any trade or commerce."  *Takata*, 67 V.I. at 396.  "Trade or commerce" is defined as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated."  12A V.I.C. § 303(k).

Defendants argue that the Complaint fails to state a CFDBPA claim because the statute only applies "to the advertisement, sale, and distribution of property or other items, not to their management."  [ECF 15] at 47.  Thus, defendants contend that plaintiffs' claims regarding their management of the fractionals cannot be the basis of an alleged violation under the CFDBPA.  *Id.* Plaintiffs dispute defendants' interpretation, suggesting instead that because the statute applies to the sale or distribution of services, it applies to the management services defendants provided plaintiffs and continue to provide plaintiffs on an annual basis.  [ECF 67] at 44.

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 40

In the Complaint, plaintiffs allege generally:

> 205.  The Marriott Defendants engaged in, and continue to engage in, fraudulent and deceptive trade practices in the marketing, sale, developing, and managing of fractional and timeshare programs.
>
> 206.  The Marriott Defendants' trade practices misrepresented, deceived, or unfairly influenced objective and reasonable consumers in the Virgin Islands by marketing, selling, developing, and managing fractional and timeshare products in the Virgin Islands in a manner that harmed Plaintiffs and the proposed Class.
>
> * * *
>
> 209.  The Marriott Defendants' and any co-conspirators' wrongful actions additionally constitute a misleading, deceptive and unfair trade or commerce practice in that they unfairly took advantage of the consumers' lack of knowledge, ability, experience, or capacity of consumers when marketing, selling, developing, and managing fractional and timeshare products in the Virgin Islands.

SAC [ECF 86] ¶¶ 205, 206, and 209.

In addition, plaintiffs purport to allege the following specific acts of fraud and deceit:

> 2.  In industry parlance, the Ritz-Carlton Great Bay and the other RCDC properties are known as "private residence clubs," a term intended to capture their exclusive and luxurious nature.  Based on the storied Ritz-Carlton brand and the promise of exclusivity, Plaintiffs and the nearly thousand other members of the proposed Class paid premium prices (in the hundreds of thousands of dollars) for three weeks of exclusive access to the Ritz-Carlton Great Bay and what was supposed to be a growing network of RCDC locations around the world.
>
> 3.  Marriott marketed these fractionals as akin to second homes, distinct from mere timeshares in that they required a multi-week purchase and came with a separate deed recorded at the time of purchase.  Marriott claimed that these fractionals would be "operated for the exclusive use, benefit and enjoyment of the Members, their families and their guests." But in or around 2011, the Marriott Defendants quietly

embarked on a multi-year re-engineering campaign to give more than 400,000 members of the Marriott Vacation Club access to the Ritz-Carlton Destination Clubs, including by transferring unsold RCDC fractional inventory (approximately 20% of all RCDC fractionals) to a land trust affiliated with the Marriott Vacation Club.

4.      The Marriott Defendants did not disclose their intention to merge the Ritz-Carlton Destination Club with the Marriott Vacation Club until July 2012. Opposition was massive and immediate across the entire RCDC network.  Many owners and their association boards complained—presciently as it turned out—that the merger would dilute the exclusivity of the Ritz-Carlton Destination Club and erode resale values. This groundswell of opposition did not surprise the Marriott Defendants; internal documents obtained in related litigation confirm that they knew the "affiliation," as they termed it, would gut the value of the 3,200 luxury or so [sic] fractionals they sold at nine RCDC locations, including St. Thomas.

\* \* \*

52.     The Ritz-Carlton Destination Club was conceived and sold as a "luxury" product line that was more exclusive than and superior to a mere timeshare.  . . .

53.     Marriott touted the deeded property interest aspect of the RCDC to differentiate these fractional offerings from mere timeshares and to sell them as a superior form of real property ownership.  Marriott marketed these fractionals as "[l]ike any form of real estate, . . . [that] can be sold, willed or transferred by the Member at any time" and represented in sales materials that they would be "operated for the exclusive use, benefit and enjoyment of the Members, their families and their guests."  The luxurious and private nature of these fractionals, the requirement that they be purchased and used in longer blocks of time measured in weeks not days, and the exclusivity of use distinguished them from the MVC product line.

\* \* \*

57.     Beginning in 2002 and through 2011, the Marriott Defendants sold all but 79 of the 1,260 available fractionals at the Ritz-Carlton Great Bay for an average price of over $150,000 per fractional.   As at the other Ritz-Carlton

> Residence Club locations, the Marriott Defendants marketed these St. Thomas fractionals as being superior to mere timeshares in that they were separately deeded property interests equivalent to a second home, located in an exclusive and private property available only to those who purchased three weeks at premium prices

SAC [ECF 86] ¶¶ 2-4, 52, 53 and 57.

Corporations such as defendants are included in the definition of a "person" under the statute.[29]  Thus, the first element is satisfied.  Further, because plaintiffs allege that the defendants fraudulently promoted the fractionals as exclusive properties, they arguably satisfied the pleading requirements of the second and third elements of the statue regarding defendants' marketing practices.  Plaintiffs have not, however, satisfied these two elements with respect to their claims of fraudulent management, as they fail to identify any practices related to the management of the properties that were deceptive or misleading.  The Court therefore concludes that plaintiffs may have stated a plausible claim under the CFDBPA regarding the marketing but not the management of the fractionals.

The next issue is whether plaintiffs' CFDBPA marketing claim is timely.  The statute of limitations for actions brought under the CFDBPA is governed by 5 V.I.C. § 31(3)(B).  12A V.I.C. § 336.  Section 31(3)(B), in turn, provides that a civil action must be commenced within six years when premised "upon a liability created by statute, other than a penalty or forfeiture."  Plaintiffs concede that their CFDBPA claim is untimely to the extent it is based on the marketing, sale, and development of those fractionals purchased between 2002 and 2009.  *See* [ECF 15] at 26.  Therefore, plaintiffs have not stated a viable CFDBPA claim.

---

[29]  Under 12A V.I.C. § 303(h), a "person" is defined as "any natural person or his legal representative, partnership, corporation, domestic or foreign, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof."

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 43

C.      Plaintiffs' Claims Against Marriott International, Inc.

Defendants contend the Complaint lacks any direct allegations of wrongdoing against MII.

[ECF 15] at 47.  According to defendants, plaintiffs improperly "seek to impose liability on [MII]

through an alter ego theory," and only make conclusory allegations in support of this theory.  *Id.*;

[ECF 82] at 35.  In defendants' view, MII has not exercised the degree of domination and control

over the MVW defendants such that it would be appropriate under Virgin Islands law to pierce

MII's corporate veil.  [ECF 15] at 47.[30]  Moreover, defendants question the relevance of plaintiffs'

claim that MII executives "decided to transfer unsold RCDC fractional inventory to the [MVC

Trust] and thereby make it available to [MVC Owners], and then merge [RCDC] with the [MVC]."

[ECF 82] at 36 (quotation marks omitted).  In defendants' view, this decision has nothing to do

with the alleged slow-walking of foreclosures and manufacturing of a financial crisis.  *Id.*  Finally,

defendants state that shortly after MII executives decided, in 2011, to transfer inventory to the

MVC Trust, MII spun off from MVW and its subsidiaries and thus was "no longer involved in any

decision-making."  *Id.*

Plaintiffs argue that the Complaint contains numerous viable claims directly against MII.

[ECF 67] at 45.  Specifically, plaintiffs point to allegations that (1) MII worked with MVW to

implement the merger; (2) senior MII executives began planning the re-engineering of RCDC in

2011, ultimately deciding to transfer RCDC inventory to the MVC land trust; (3) MII ratified

MVW decisions regarding the merger; and (4) MII used its subsidiaries to control the flow of

information to the RCDC owners' association.  *Id.*

---

[30]  According to defendants, plaintiffs fail to explain how the licensing agreements between MVW and MII
are relevant to plaintiffs' assertion that MII influenced and controlled MVW's conduct.  [ECF 82] at 35-36.

The Court finds that plaintiffs have stated plausible claims directly against MII.[31]   For example, in Count 1, where plaintiffs assert violations of CICO, they allege that "[u]sing the governing documents that Marriott International and its subsidiaries fashioned to ensure continuing control over nominally independent fractional owners associations . . . [defendants] manipulated the fractional owners associations" into supporting the merger, SAC [ECF 86] ¶ 145(a); "at the direction of Marriott International, the MVW Defendants sent communications to RCDC owners, including Plaintiffs and the proposed Class, that misstated material facts and concealed others," SAC [ECF 86] ¶ 145(d); "Marriott International directed RC Hotels VI (and other MII subsidiaries) to slow-walk foreclosures," SAC [ECF 86] ¶ 145(e); and "Marriott International had RC Hotels VI (and other MII subsidiaries) . . . transfer foreclosed and unsold inventory to the MVC Trust," SAC [ECF 86] ¶ 145(g).  Plaintiffs also identify two MII executives they claim were involved in perpetrating these CICO violations:  "Marriott International's David Mann and Kevin Kimball participated in the October 2, 2013, Marriot International/Marriott Vacations Worldwide Senior Executive Quarterly Meeting in Bethesda, Maryland," wherein participants discussed "the Re-engineering Plan update, furthering the scheme."  SAC [ECF 86] ¶ 147(d).  Given these allegations, the Court finds that claims against MII survive the motion to dismiss.

D.     Effect of the Settlement Agreement on Plaintiffs' Claims

Finally, defendants argue that plaintiffs' claims are barred by the 2013 Settlement Agreement between RC Hotels VI and the Association.  [ECF 15] at 22-24.  In *Ruffin v. Allstate Insurance Company*, defendant argued that all of plaintiff's claims were barred by a settlement

---

[31]   The Court need not determine at this point whether plaintiffs are entitled to equitable remedies such as corporate veil piercing; the issue before the Court is whether plaintiffs' claims against Marriott International survive defendants' motion to dismiss.

agreement, which defendant attached to its motion to dismiss.  2015 WL 5567433, at *1 (D.N.J.

Sept. 22, 2015).   The court stated that although it could consider "an undisputedly authentic

document that a defendant attaches as an exhibit to a motion to dismiss," it could do so only "if

the plaintiff's claims are based on the document."  *Id.* (quoting *Pension Benefit Guar. Corp. v.

White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (quotation marks omitted)).   The

court then concluded that because plaintiff's complaint was not based on the settlement agreement,

it could not therefore dismiss plaintiff's claims.   Here, the Court similarly concludes that the relief

defendants seek "is outside the bounds of a Rule 12(b)(6) motion."[32]  Further,  plaintiffs argue this

case is factually distinguishable from the claims released in the Settlement Agreement:   "[b]ecause

this case concerns the Marriott Defendants' scheme to achieve the MVC-RCDC merger at Great

Bay, it is distinct from the Foreclosure Complaints and Dismissed Claims" that were the subject

of the 2013 Settlement Agreement.  [ECF 67] at 21-22.   Thus, whether the Settlement Agreement

ultimately bars some or all the claims here is simply not an issue the Court can resolve in the

current motion at this stage.

## IV.    CONCLUSION

Accordingly, the premises considered, the following is hereby ORDERED:

1.    "The Marriott Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint" and "RC Hotels (Virgin Islands), Inc's Motion to Dismiss Plaintiffs' First Amended Complaint" [ECFs 14, 35] are GRANTED in part and DENIED in part;

2.    Plaintiffs' constructive fraud claim (Count VI) is DISMISSED;

3.    Plaintiffs' aiding and abetting claim, to the extent it is based on constructive fraud (Count VIII) is DISMISSED;

4.    Plaintiffs'' Virgin Islands Consumer Protection Law claim (Count X) is DISMISSED; and

---

[32] *Ruffin*, 2015 WL 5567433, at *1.

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 46

     5.     Plaintiffs' Virgin Islands Consumer Fraud and Deceptive Business Practices Act claim (Count XI) is DISMISSED.

**Dated:** August 5, 2020

S\_____

**RUTH MILLER**
United States Magistrate Judge