IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

ALAN HELMAN, *et al.*,      )
                              )
      Plaintiffs,         )
                              )
             v.         )        Civil No. 2019-36
                              )
MARRIOTT INTL., INC., *et al.*,  )
                              )
      Defendants.     )
_____ )

## MEMORANDUM OPINION AND ORDER

Before the Court is Alan Helman's and the other named plaintiffs' (the "Helman Parties")

motion for class certification under Federal Rule of Civil Procedure ("FRCP") 23.  [ECFs 201,

211].[1]  Defendants filed a response, to which the Helman Parties replied.  [ECFs 205, 208].  The

Court writes for the parties, so only those facts necessary for understanding the context of the

motion will be recited here.[2]

## I.    FACTUAL BACKGROUND

The Helman Parties purchased fractional condominium interests ("fractionals") at the Ritz-

Carlton Destination Club ("RCDC") on St. Thomas, U.S. Virgin Islands ("Ritz-Carlton Great

Bay") between 2002 and 2009.   The fractionals are a type of high-end time-sharing property

ownership, entitling purchasers to exclusive access to the Ritz-Carlton Great Bay and other RCDC

locations worldwide.  Defendants are Marriott-related entities that were engaged in various aspects

---

[1]  The Helman Parties initially filed their memorandum in support of the motion and accompanying exhibits as multiple docket entries, separating sealed from unsealed documents.  Pursuant to Court order, they refiled their memorandum and exhibits under docket entry [ECF 211], which includes both sealed and unsealed documents.

[2]  A more detailed recitation of the allegations appears in this Court's opinion granting in part and denying in part defendants' motions to dismiss.  *Helman v. Marriott Intl., Inc.*, 2020 WL 4506199, at *1-4 (D.V.I. Aug. 5, 2020).  The abbreviations used herein are the same as those used in the Court's August 5, 2020 opinion.

of timeshare property development, marketing, and management, some under the RCDC umbrella, and others associated with other less expensive Marriott products such as the Marriott Vacation Club ("MVC"). The Helman Parties allege that the merger of the RCDC and MVC product lines, first announced in 2012 and consummated following a vote of approval by the owners in 2014, caused damage to the value of their holdings.

In 2002, RC Hotels VI, a Marriott International, Inc. ("MII") subsidiary, established the Ritz-Carlton Great Bay; it consisted of 105 condominiums with a total of 1260 available fractionals. The project included the formation of the Great Bay Condominium Owners Association, Inc. ("the Association"). The Association was empowered to enter into agreements with certain defendants such as the "Management Agreement," which gave those defendants the authority to exercise powers and assume duties of the Association's Board of Directors, and to manage the daily affairs of the Ritz-Carlton Great Bay.

In October 2008, during the so-called "Great Recession," many owners became delinquent on maintenance fees they owed the Association, and defaulted on mortgages they obtained through RC Development or another defendant. The Helman Parties contend that certain defendants— lending entities—failed to expeditiously pursue foreclosure of those owners' interests; the Helman Parties allege they did so because foreclosing on the interests would have made defendants responsible for paying any outstanding dues on those interests. In mid-2011, in connection with one mortgage foreclosure action defendants filed in the Superior Court of the Virgin Islands,[3] the Association claimed that defendants violated their fiduciary duties by delaying the filing of the

---

[3] *RC Hotels (V.I.), Inc. v. B&T Cook Family Partners, Ltd. and Great Bay Condo. Owners Ass'n*, ST-10-CV-543 ("*B&T Cook*").

action, thereby causing the Association to accrue unpaid maintenance fees.[4]  By this point, the Association was owed increasingly large amounts in delinquent fees, and sales of fractionals had slowed significantly.

Also during this time period, MII began planning a re-engineering of the RCDC, deciding to merge the RCDC with the MVC to give more than 400,000 MVC members access to RCDC properties.  In 2012, defendants sent a letter to the owners describing RCDC's new affiliation with MVC.  While the Association's Board was evaluating the impact of the proposed merger on the value of the fractionals, senior executives of defendants were assuring RCDC owners of their ongoing commitment to the Ritz-Carlton brand and promised them that the original membership benefits would remain the same.

According to the Helman Parties, in January 2013, defendants offered to begin foreclosure proceedings on delinquent Ritz-Carlton Great Bay fractionals if the Board convinced owners to vote in favor of the merger.  Later that year, the Helman Parties aver, defendants entered an agreement ("the 2013 Affiliation Agreement") that provided defendants with one-sided benefits.  Defendants did not, the Helman Parties allege, share the 2013 Affiliation Agreement with the Association.

On December 2, 2013, the Association and RC St. Thomas, LLC entered a "Settlement Agreement" to, among other things, resolve certain claims between them in the pending foreclosure litigation.  Under the terms of the agreement, RC Hotels VI, its affiliates, and subsidiaries agreed to pay any outstanding maintenance fees owed to the Association and to

---

[4]  In the summer of 2012, the *B&T Cook* court denied defendants' motion to dismiss, finding that the Association stated a claim against RC Hotels VI for breach of fiduciary duty under the Management Agreement.

repurchase certain delinquent fractional interests from the Association.  In return, the Association agreed to encourage its members to vote in favor of the merger.  Throughout December 2013, the Board recommended that the owners vote to amend the Club Declaration and approve the merger. Further, defendants held webinars and provided information to the Ritz-Carlton Great Bay owners regarding the proposed merger—efforts the Helman Parties allege were misleading and deliberately omitted important information.  On January 26, 2014, a majority of the owners who voted approved the merger.

The essence of the Helman Parties' complaint is that defendants surreptitiously planned to merge two vacation ownership product lines—the luxury RCDC and the less-exclusive MVC, and that defendants did not disclose their intent to merge the two property lines until July 2012. Further, the Helman Parties claim that defendants went ahead with the merger despite concern from RCDC owners that the merger would dilute the exclusivity and value of their fractionals. Moreover, the Helman Parties allege that although defendants promised that the merger would not occur without the affirmative vote of a majority of the owners at each RCDC, when defendants realized they did not have the necessary votes, they resorted to lying and hiding critical documents from the various RCDC boards.  For example, the Helman Parties claim that defendants hid the contract that ultimately led to the merger—the 2013 Affiliation Agreement—from each RCDC owners' association and its board of directors because it expressly gave each association the right to vote against the merger.

Finally, with respect to the Ritz-Carlton Great Bay, the Helman Parties claim that defendants manufactured a financial crisis to overcome opposition to the merger.  According to the Helman Parties, despite defendants' obligation (under the Ritz-Carlton Great Bay's governing

documents) to foreclose on fractionals with delinquent maintenance fees and pay any outstanding dues, when numerous Ritz-Carlton Great Bay owners fell behind on their mortgages and outstanding fees, defendants used the resulting financial situation as leverage for the merger. The Helman Parties contend they did not discover the existence of the 2012 *B&T Cook* decision regarding the fiduciary duties owed to them, or the 2013 Affiliation Agreement, until 2018.

The Helman Parties initiated this litigation in the Spring of 2019. They filed the Second Amended Class Action Complaint ("SAC") on November 8, 2019. SAC [ECF 86]. On August 5, 2020, the Court ruled on defendants' motions to dismiss. On August 26, 2020, defendants filed their answer and counterclaims, alleging claims for contractual indemnification under the Management Agreement, and unjust enrichment based on the payments defendants made under the Settlement Agreement. [ECF 110]. On August 6, 2021, the Court denied the motion to dismiss the counterclaims. [ECF 189]. Meanwhile, class-related discovery proceeded and the instant motion for class certification followed.

## II.   LEGAL STANDARDS

### A.   Class Certification Under Rule 23 Generally

"In deciding whether to certify a class under Fed. R. Civ. P. 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). Thereafter, the court must make findings that each of the rule's requirements has been met. *Id.* Findings must be based on a preponderance of the evidence, and the movant bears the burden of proof. *Wharton v. Danberg*, 854 F.3d 234, 241 (3d Cir. 2017). Further, the court must resolve all relevant factual or legal disputes, even if they implicate the merits of the claims.

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307. If required to review expert opinion testimony offered in support of or against an element of class certification under Rule 23, the Court must conduct a "rigorous analysis." *Id.* at 323. Moreover, upon class certification, the court must include in "the text of the order or an incorporated opinion . . . (1) a readily discernable, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187 (3d Cir. 2006) (quoted in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320-21) (quotation marks omitted). Lastly, the court's decision to certify a class is discretionary. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310 ("The trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23.").

B.     Prerequisites to Class Certification Under FRCP 23(a)

1.     Numerosity

Parties seeking class certification under FRCP 23 must first demonstrate that "the class is so numerous that joinder of all members is impracticable." FRCP 23(a)(1). "Impracticable does not mean impossible and refers rather to the difficulties of achieving joinder." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016) (quotation marks and citation omitted). To assess impracticability, the court must conduct "an inherently fact-based analysis." *In re Modafinil Antitrust Litig.*, 837 F.3d at 249. Further, although the numerosity requirement does not specify a numerical minimum or maximum, classes of 20 or fewer members are generally deemed

insufficiently numerous, while classes of 41 or more members are generally deemed sufficiently numerous because they raise a presumption that joinder is impracticable. *Id.*

2.   Commonality

Next, parties must demonstrate that "there are questions of law or fact common to the class." FRCP 23(a)(2). To establish commonality, "the plaintiff [must] demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Simply alleging that each class member has "suffered a violation of the same provision of law," is not enough. *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Rather, the plaintiff must demonstrate that the claims of the class members depend upon a common contention, one "that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In other words, "[w]hat matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quotation marks omitted). In assessing this factor, courts may consider the dissimilarities between the putative class members to determine if there is "[e]ven a single [common] question." *Id.* at 359 (alteration in original).

3.   Typicality

Third, parties must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FRCP 23(a)(3). The purpose of this requirement is to ensure "that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those

individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (emphasis in original).  To assess typicality, "courts must consider the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class." *Id.*  Thus, courts must "focus[] on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *Id.* at 597-98.

4.    Adequacy of Representation

Finally, parties must demonstrate that "the representative parties will fairly and adequately protect the interests of the class."  FRCP 23(a)(4).  There are two elements to this requirement.  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 602.  "First, the adequacy inquiry tests the qualifications of the counsel to represent the class." *Id.* (quotation marks omitted).  Second, "the adequacy inquiry seeks to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* (quotation marks omitted).

C.    Class Certification Under FRCP 23(b)(3)

If the above four prerequisites are met, courts may permit the class action to go forward where at least one of the three scenarios listed in FRCP 23(b) is present.  *Wal-Mart Stores, Inc.*, 564 U.S. at 345.  Here, the Helman Parties seek class certification under FRCP 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

"Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,' a standard 'far more demanding' than the commonality requirement of Rule 23(a)."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (citation omitted).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001) (quoted in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311) (quotation marks omitted).  Regarding the superiority of a class action, the court must weigh, "in terms of fairness and efficiency, the merits of the class action against those of alternative available methods of adjudication."  *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 225 (M.D. Pa. 2012) (quotation marks omitted).

Prior to certifying the class under this subsection of the rule, the court should also consider the following four non-exclusive factors:

> (A)     the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)     the likely difficulties in managing a class action.

FRCP 23(b)(3)(A)-(D).

Further, in the Third Circuit, a Rule 23(b)(3) class must also be "currently and readily ascertainable."  *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469 (3d Cir. 2020) (quotation marks omitted).  To demonstrate that the class is ascertainable, "[p]laintiffs must show that (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively

feasible mechanism for determining whether putative class members fall within the class

definition." *Id.* at 469-70 (quotation marks omitted).

Lastly, class membership under subsection (b)(3) is not mandatory. *Wal-Mart Stores, Inc.*,

564 U.S. at 362. Rather, "class members are entitled to receive 'the best notice that is practicable

under the circumstances' and to withdraw from the class at their option." *Id.* (citing FRCP

23(c)(2)(B)).

### III.    DISCUSSION

A.    <u>Proposed Classes</u>

The Helman Parties propose the certification of two classes. [ECF 211] at 17-18.[5] The

first proposed class ("the 2012 Class") asserts CICO,[6] breach of fiduciary duty, aiding and abetting,

and breach of implied covenant claims. The Helman Parties define this proposed class as follows:

> All entities and individuals (including their assignees) who owned a
> 1/12 fractional interest at the Ritz-Carlton Great Bay as of July 17,
> 2012, but excluding (a) those who financed their purchases through
> any Defendant and whose fractional interest was foreclosed upon;
> (b) any Defendants named in the complaint and any affiliate, parent,
> or subsidiary of any defendant; any successor or assignee of any
> defendant; any entity in which any defendant has a controlling
> interest; and any officer, director, or employee of any defendant; and
> (c) anyone who was a member of the board of directors of either the
> Great Bay Condominium Owners Association or the Neighborhood
> Association between 2008-2014.

*Id.* at 17. The Helman Parties also propose a second class ("the 2014 Class"), which asserts

fraudulent concealment claims, and comprises "[a]ll members of the Class described above who

---

[5] References to page numbers are to those appearing on the docket, not those appearing on the documents or exhibits themselves.

[6] CICO refers to the Virgin Islands Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. § 600 *et seq.*

also owned their fractional interests as of January 26, 2014." *Id.* at 18.[7]

B.      Whether the Proposed Classes Satisfy Certification Prerequisites Under FRCP 23(a)

     1.      Numerosity

The Helman Parties contend that because the classes they seek to represent are comprised of approximately 1,000 members, they meet the numerosity standard.   [ECF 211] at 18. Defendants do not challenge the Helman Parties' representations regarding numerosity.  However, the Helman Parties do not distinguish between the proposed classes, and do not state or otherwise show how many putative class members would be in each of the two proposed classes.  As a result, the Court has no way of knowing, for example, how many fractional interests were owned and sold between July 2012 and January 2014, and therefore cannot determine the size of the proposed 2012 Class.

However, based on information in one of the Helman Parties' expert's report, there appear to have been 31 units sold in 2013.[8]  If a like number of transactions occurred in 2012, then it is more likely than not that a group of more than 50 members comprise the 2012 Class.  Assuming

---

    [7] In the SAC, the Helman Parties proposed only one class, which they defined as follows:

> *All entities and individuals (including their assignees) who, at any time from May 22, 2002 to January 26, 2014, purchased a 1/12 fractional interest at the Ritz-Carlton Great Bay, except that the following individuals and entities are excluded from the class: (a) those who financed their purchases through any Defendant and whose fractional interest was foreclosed upon, (b) any defendants named in this Complaint and any affiliate, parent, or subsidiary of any defendant; any successor or assignee of any defendant; any entity in which any defendant has a controlling interest; and any officer, director, or employee of any defendant.*

SAC [ECF 86] ¶ 134 (emphasis in original).

    [8] The Helman Parties' expert Dan Salah purports to summarize information contained in several "Schedules," none of which were attached to the copy of his report filed on the docket. *See, e.g.*, [ECF 211-57] at 3 and n.7.

the Court's interpretation of the expert's report is correct, the Helman Parties have satisfied the numerosity requirement. *See In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. at 216 (finding that proposed class of over 2,900 members satisfies numerosity requirement).

2.    Commonality

The Helman Parties contend that defendants engaged in a "common scheme," which consisted of working with the Association to send owners multiple uniform communications that either contained misrepresentations or omitted material information.  It is this common scheme upon which the Helman Parties claim liability is predicated. Proof that defendants took these actions or drafted these communications would therefore support the Helman Parties' claims. Defendants do not challenge the Helman Parties' representations regarding commonality.  The Court finds that the Helman Parties have satisfied the commonality requirement.

3.    Typicality

The Helman Parties argue that the claims of the proposed class representatives "are typical of absent class members' claims because they were all injured by the Common Scheme to Defraud." [ECF 211] at 32.  Despite the fact that not all owners voted in favor of the merger or even voted, the Court finds that the claims of the proposed class representatives are typical because the Helman Parties contend that all the owners were injured either by defendants' conduct with respect to pursuing foreclosures or by defendants' alleged fraudulent acts, such as their failure to inform the owners of local court decisions, their failure to inform the owners of the terms of the 2013 Affiliation Agreement, and their failure to inform the owners that the proposed merger would result in a decrease in the value of their properties.  Defendants do not challenge the Helman

Parties' representations regarding typicality.  The Court finds that the typicality requirement has been satisfied.

      4.    <u>Adequacy of Representation</u>

The Helman Parties argue that they are adequate class representatives "because they each share the same grievances against Marriott as the rest of the Class and seek the same goal of obtaining damages and disgorgement." [ECF 211] at 32.  The Helman Parties also state that none of the proposed class representatives has a conflict with the other class members and that they have each demonstrated their commitment to the case: "Each has followed the progress of the litigation, actively participated in discovery, appeared for a deposition, and understands the essence of the claims: that Marriott unlawfully merged the Ritz-Carlton Club with the Marriott Vacation Club." *Id.* at 33.  Regarding class counsel, the Helman Parties aver that counsel are experienced in class actions and have vigorously prosecuted this case thus far and will continue to do so.  *Id.*

Defendants contest the Helman Parties' adequacy as class representatives, arguing that there are conflicts of interest between them and the other putative class members.  [ECF 205] at 13.  According to defendants, if the Helman Parties prevail on their request to "undo" the merger and settlement, their interests will conflict with those class members who are satisfied with the settlement.  [ECF 205] at 38.  Further, according to defendants, to award the relief the Helman Parties seek, the Court would have to either order a rescission of the Settlement Agreement—which defendants argue is not feasible—or rule in defendants' favor on their counterclaim for unjust enrichment.  *Id.*  In either case, defendants contend, all owners would be liable for reimbursing defendants the millions of dollars they paid under the terms of the Settlement

Agreement, thus placing the interests of the Helman Parties at odds with those of the other owners. *Id.*

The Helman Parties reply that there is no potential conflict because they made it clear in their motion for class certification "that the class only seeks damages and restitution remedies," and that they no longer seek to remove the fractionals from the pool available to the MVC members.  [ECF 208] at 25.

It is far from clear that the statement the Helman Parties rely on constituted an "abandonment" of a claim for relief.  Nevertheless, the Court finds that the Helman Parties are capable of adequately representing the classes, and that no disqualifying conflict is apparent at this stage.

C.      Whether the Proposed Classes Satisfy Certification Requirements Under FRCP 23(b)(3)

1.      Whether Common Questions of Law or Fact Predominate

Defendants challenge the Helman Parties' assertion that proof of reliance and causation—elements of several of the claims—is common, rather than individual.  Accordingly, the Court will discuss each of the claims in turn, with particular focus on these elements.

The Helman Parties assert the following common law and statute-based claims for the 2012 Class: breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, aiding and abetting a tort, and CICO violations.[9]  SAC [ECF 86] ¶¶ 141-163, 164-169, 184-195. With respect to the 2014 Class, the Helman Parties assert an additional claim of fraudulent

---

[9] In its ruling on defendant's motion to dismiss, the Court concluded that plaintiffs stated plausible claims for aiding and abetting two torts—breach of fiduciary duty and fraudulent concealment.  *Helman*, 2020 WL 4506199, at *10-11.

concealment. *Id.* ¶¶ 177-183. As to all of the claims, the Helman Parties must demonstrate that the requisite proof is predominantly class-wide, rather than individual.

### a.   The Common Law Claims

The two most significant elements of the common law claims, for class certification determination purposes, are reliance and causation. The Court will first consider the Helman Parties' proof as to reliance, an element shared by the fraudulent concealment and breach of implied covenant claims. Next, the Court will consider the Helman Parties' proof as to causation, an element of all of the claims.

### i.   Reliance

To prove the reliance element of their claim for fraudulent concealment,[10] the Helman Parties must demonstrate that they suffered a pecuniary loss because of their "justifiable reliance on the concealed or suppressed material fact." *Virgin Islands v. Takata Corp.*, 67 V.I. 316, 417 (V.I. Super. 2017). Similarly, to prove the reliance element of their claim for breach of the implied covenant of good faith and fair dealing, the Helman Parties must demonstrate actual reliance on a knowing misrepresentation of a material fact.[11]

---

[10] This Court has previously observed that to prevail on a claim for fraudulent concealment, a plaintiff must prove the following:

> (1) the defendant concealed or suppressed a material fact; (2) the defendant had a duty to disclose the fact to the plaintiff; (3) the defendant knew or had reason to know that the material fact had been concealed or suppressed: (4) the defendant concealed or suppressed the material fact for the purpose of inducing plaintiff to act or refrain from acting; and (5) the plaintiff suffered pecuniary loss caused by his or her justifiable reliance on the concealed or suppressed material fact.

*Helman*, 2020 WL 4506199, at *8 (quotation marks omitted).

[11] This Court has previously found that "[t]o [prove] a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must [demonstrate that the defendants' acts] amount to fraud, deceit, or misrepresentation." *Helman*, 2020 WL 4506199, at *11 (D.V.I. Aug. 5, 2020) (quotation marks omitted). "To successfully [prove] an act of fraud or misrepresentation, a complainant must demonstrate: (1) a knowing misrepresentation of a material fact,

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 16

According to the Helman Parties, "[a] jury can infer that, had class members known about Marriott's pre-existing duty to promptly foreclose and then pay maintenance fees on foreclosed units, reports concluding that the MVC merger would result in a drop to class members' property values, one-sided terms in the affiliation agreement, and a settlement agreement binding the Association from disclosing any downside to the merger, they would have voted against it." [ECF 211] at 29.  Further, they argue that these material facts are susceptible to common proof.  *Id.* at 27-30.  Alternatively, the Helman Parties argue that even if they must demonstrate through individual evidence—in the form of the submitted declarations of 146 owners—that they would not have voted for the proposed merger had they been aware of these facts, this should not affect the Court's decision to certify the class.  *Id.* at 27.

Defendants counter that while reliance may be presumed in the context of securities fraud claims, the presumption does not extend to the Helman Parties' fraudulent concealment and breach of implied covenant claims.  [ECF 205] at 23.  Further, defendants contend that the non-Third Circuit cases the Helman Parties cite are distinguishable in that class certification only occurred because the entire class received the misleading information.  *Id.* at 24.  According to defendants, in the instant case, "the 'total mix of information' for each Owner in connection with the vote was *not* uniform, and varied greatly."  *Id.* (emphasis in original).  Lastly, defendants argue that even if such a presumption applied, it is rebuttable, and defendants would have the right to examine each owner to determine whether they "relied on the allegedly omitted and misrepresented information, what information they had, and whether they would have changed their vote."  *Id.*

---

(2) intent by the defendant that the plaintiff would rely on the false statement, (3) actual reliance, and (4) detriment as a result of that reliance."  *Id.*

In reply, the Helman Parties maintain that they need not directly prove reliance: "[T]he materiality of an omission creates a rebuttable presumption in fraud-based cases in certain circumstances, such as the one here." [ECF 208] at 12. They contend that this presumption of reliance focuses not on the information each voter had access to but what defendants told the voters; thus, the Helman Parties argue that the relevant proof is common to the entire class. *Id.* at 13-16. According to the Helman Parties, such common evidence "may include, for example, the results of the Marriott-commissioned opinion surveys showing that Ritz-Carlton owners strongly opposed an affiliation with MVC before the fraudulent omissions, the uniformity of the materials Marriott sent to owners that omitted material information, and the fact that many class members then changed course to approve the affiliation after receiving those materials." *Id.* at 15-16. In the Helman Parties' view, that certain owners may have received additional unique information from board meeting minutes or other sources is irrelevant. *Id.* at 13.

In the Virgin Islands, there is no binding common law rule nor is there an applicable local statute that addresses whether the Court may infer reliance in common law fraud class action claims; therefore, the Court must conduct a *Banks* analysis. *See generally Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967 (V.I. 2011). The first consideration is "whether any Virgin Islands courts have previously adopted a particular rule." *Nicholas v. Damian-Rojas*, 62 V.I. 123, 129 (V.I. Super. 2015) (quotation marks omitted). Here, that does not appear to be the case.

Next, the Court must consider "the position taken by a majority of courts from other jurisdictions." *Nicholas*, 62 V.I. at 129. Generally speaking, "[l]egal presumptions of class-wide reliance [in the context of common law fraud cases] are rare." 2 McLaughlin on Class Actions § 8:11 (18th ed.) (citing cases). While courts routinely permit a rebuttable presumption of reliance

in the context of securities fraud cases, they do so because of the unique way in which financial

markets operate. *Id.* As the Supreme Court stated:

> The fraud on the market theory is based on the hypothesis that, in an
> open and developed securities market, the price of a company's
> stock is determined by the available material information regarding
> the company and its business. . . . Misleading statements will
> therefore defraud purchasers of stock even if the purchasers do not
> directly rely on the misstatements.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (quoted in 2 McLaughlin on Class Actions §

8:11). Otherwise, a presumption of reliance has only been recognized in limited situations, such

as when the evidence demonstrates "that there can be no doubt that class members relied on an

alleged misrepresentation because there is no other reasonable explanation for the class members'

decision[s]." 2 McLaughlin on Class Actions § 5:55 (citing cases).

Finally, and "most importantly," the court must determine "which approach represents the

soundest rule for the Virgin Islands." *Nicholas*, 62 V.I. at 129. The Court concludes that the

majority rule is the soundest rule for the Virgin Islands. In other words, the Court sees no reason

to extend the fraud on the market theory beyond its originally intended application. Further, a

Virgin Islands plaintiff moving for class certification would not be significantly prejudiced—if at

all—by the Court's decision not to permit an inference of reliance at this stage because he or she

must ultimately prove reliance to prevail on the fraud claims. Thus, the Court concludes that in

the Virgin Islands, reliance may not be inferred in cases wherein a proposed class asserts claims

of common law fraud.

Having concluded that an inference of reliance is not appropriate, the Court must now

determine whether evidence regarding reliance will be primarily common or individualized. As

to this issue, the Court is persuaded by the analysis and report of defendants' expert, Dr.

Dominique Hanssens.[12]  According to Hanssens,

> (1) Owners' preferences are heterogeneous and their voting decisions depend on their individual evaluation of the various attributes of fractional interest ownership at RCC-St. Thomas; (2) Owners differ in their financial situations and preferences; (3) Owners differ in their preferences regarding non-financial attributes, like exclusivity, and flexibility offered by the Affiliation; (4) Owners apply different decision-making strategies and (5) Owners differ in the extent to which they consider information before making a decision.

[ECF 205] at 28.  In other words, according to Hanssens, even if owners received uniform communications from defendants, the effect of those communications on the individual owners was not uniform.[13]

Defendants demonstrate this principle through the depositions of the named plaintiffs.  For example, Alan Helman testified that when he voted in favor of the merger, he did not (1) know that the proposal "obligated Marriott to assume responsibility for unpaid maintenance fees and would permit the transfer of the fractional interests of delinquent members to the Marriott Vacation Club Trust;" Helman Dep. [ECF 206-5] at 6; (2) know of the *B&T Cook* decision; *id.* at 10;  (3) recall whether he was aware that the affiliation between Ritz-Carlton Great Bay and the MVC would automatically renew; that Ritz-Carlton Great Bay would not have the power to withdraw from the affiliation; that MVC members would have more use rights at Ritz-Carlton Great Bay than Ritz-Carlton Great Bay members; that MVC would have the right to use the property for

---

[12]  *See* [ECF 207-2] (Hanssens Report dated July 22, 2021).  "District courts have considerable latitude in deciding how to perform their *Daubert* gatekeeping function."  *United States v. Phung*, 127 F. App'x 594, 597 (3d Cir. 2005) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).   Here, the Court is persuaded by Dr. Hanssens' views on owner preferences and decision-making strategies that there is not a reliable class-wide method of proving reliance.  Plaintiffs' concern that "Dr. Hanssens is not qualified to opine on when causation presumptions arise under the law, what forms of evidence Plaintiffs may use to prove their case, nor which trial management tools the Court may use," [ECF 208] at 20, is therefore of no moment.

[13]  The Helman Parties do not offer any countervailing evidence or expert opinion on this issue.

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 20

marketing and sales; and that MVC could unilaterally calculate the value of exchange points that would be assigned to weeks at the Ritz-Carlton Great Bay; *id.* at 10-13. Significantly, however, Helman also testified that even if he had known this information, it would not have changed his vote. *Id.* at 13. According to Helman, if the Association said the merger was "a good thing," he would vote for it, *id.* at 6, and that he was most influenced by the Association's "wanting to make the Ritz-Carlton Club as a whole possible, financially as whole as possible," *id.* at 9. The other named plaintiffs similarly testified that they were not aware of this type of information; however, their answers differed when asked whether this lack of information would have influenced their vote.[14] Thus, evidence as to reliance appears to be predominantly individual in this case.

Finally, the Helman Parties argue that if the mere fact that some class members had knowledge of the allegedly suppressed information were enough to preclude class certification, courts would never certify classes alleging fraud. [ECF 208] at 14. However, the issue before the Court as to the predominance factor is, when viewed comprehensively, whether common proofs predominate over those affecting only individual members. Here—as demonstrated above—

---

[14] *See* Maurice Kaspy Dep. [ECF 206-4] at 9-11 (stating that he could not answer whether he would have voted differently if he had known at the time that the *B&T Cook* decision had issued; that the affiliation between Ritz-Carlton Great Bay and the MVC would automatically renew; that Ritz-Carlton Great Bay would not have the power to withdraw from the affiliation; that MVC members would have more use rights at Ritz-Carlton Great Bay than Ritz-Carlton Great Bay members; that MVC would have the right to use Ritz-Carlton Great Bay for marketing and sales; and that MVC could unilaterally calculate the value of exchange points that would be assigned to weeks at the Ritz-Carlton Great Bay); Timothy Aker Dep. [ECF 206-6] at 7-11 (stating that one of the main reasons he voted in favor of the merger was the Association's endorsement and that he was "not aware of the terms and conditions of the affiliation," and does not know if it would have changed his vote); Liborio Piazza Dep. [ECF 206-7] at 8 (stating that he was not aware that that the affiliation between Ritz-Carlton Great Bay and the MVC would automatically renew and that it is possible it would have changed his vote); Michael Gianatasio Dep. [ECF 206-8] at 6-15 (stating that he could not say whether knowing about the *B&T Cook* decision would have changed his vote and that although he did not recall whether he knew that the affiliation between Ritz-Carlton Great Bay and the MVC would automatically renew, that Ritz-Carlton Great Bay would not have the power to withdraw from the affiliation, that MVC would have the right to use the property for marketing and sales, and that MVC could unilaterally calculate the value of exchange points that would be assigned to weeks at RC-St. Thomas, he could not say whether such knowledge would have influenced his vote).

despite the owners receiving multiple uniform communications from defendants in advance of the vote, at the time the owners voted, they were not necessarily motivated by the same concerns. Thus, despite alleging a common scheme to defraud, the Helman Parties must demonstrate reliance on an individual basis.

ii.   <u>Causation</u>

The Helman Parties urge that evidence of defendants' common scheme to defraud, which includes the many steps defendants took to merge Ritz-Carlton Great Bay and MVC, satisfies the causation element of their breach of fiduciary duty and aiding and abetting claims.  [ECF 211] at 30.  Defendants counter that proof of "but for" causation is required as to each of the Helman Parties' claims, and that the Court must examine individualized proof to determine whether defendants' actions injured the putative class members.  [ECF 205] at 26.  Significantly, defendants define the "injury" as "the end result of the alleged scheme and wrongful conduct—the [Diminution in Value] of the Owners' Interests and the additional profits to Defendants"; defendants contend that the cause of that injury was the vote.  *Id.*  For defendants, therefore, the key issue is whether, if the owners had access to certain information prior to the vote, that would have changed the outcome—an analysis defendants contend can only be done on an individual basis.  *Id.* at 26-27.

In assessing proof of causation, the Court must first determine what harm the Helman Parties allege defendants' conduct caused.  From the record, it appears that the ultimate harm is the diminution of value of the various owners' interests, which varies over time, and the alleged enrichment of defendants, which primarily occurred following the vote.

Next, the Court must determine whether the way the harm is measured varies by class. The Helman Parties spend a great deal of effort discussing common evidence of defendants' alleged scheme to defraud, which they claim began many years before the vote, and which they contend harmed the putative 2012 Class, irrespective of the vote. This discussion, however, is flawed in three significant ways. First, the Helman Parties focus solely on the defendants' wrongful conduct and fail to explain the causal link between that conduct and the harm.[15] Admittedly, although the Helman Parties briefly refer to the expert opinions they propose to offer at trial, *see* [ECF 211] at 17, they neglect to discuss this evidence in connection with the causation element of each of the respective causes of action. Second, the Helman Parties fail to address proof of the causation element as it pertains to the 2014 Class. In other words, while proof of the diminution of value of the owners' interests might vary over time and therefore be relevant to both purported classes, proof of the defendants' alleged enrichment, which appears primarily to have occurred after the vote, may be more significant as to the 2014 Class. Lastly, the Helman Parties neglect to address, through their experts, whether these varying proofs are predominantly common to each of the purported classes, predominantly individual to each of the purported classes, or a mix of both.

---

[15]   Regarding the causation element of the breach of fiduciary duty claim, which requires a showing that the fiduciary's breach was a proximate cause of the harm, the Helman Parties focus solely on defendants' conduct, alleging that the value of their fractionals was destroyed by, *inter alia*, (1) defendants' manufacturing a financial crisis to manipulate the owners' vote on the merger; (2) defendants' failure to promptly initiate foreclosure proceedings; and (3) defendants' failure to disclose relevant documents prior to the vote. The Helman Parties similarly focus solely on defendants' conduct with respect to the causation element of their aiding and abetting breach of fiduciary duty and aiding and abetting fraudulent concealment claims. Regarding their aiding and abetting breach of fiduciary duty claim, the Helman Parties allege that defendants developed a business strategy to increase sale of MVC properties by featuring access to RCDC properties in MVC sales presentations and promotional material, SAC [ECF 86] ¶¶ 80, 89; and that top Marriott executives decided to engage in an aggressive campaign, using outside marketing and public relations firms, to convince RCDC property owners to vote in favor of the merger, *id.* ¶¶ 92-95. Regarding the causation element of defendants' aiding and abetting fraudulent concealment claim, the Helman Parties allege that neither defendants nor the Association informed them of the *B&T Cook* decision, *id.* ¶¶ 116-117; and that on December 13, 2013, the Association Board sent owners a letter that was drafted and/or edited by defendants, which failed to inform the owners that certain defendants had an existing fiduciary duty to promptly foreclose on delinquent properties and pay outstanding maintenance dues, *id.* ¶ 121.

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 23

Based on this record, the Court is not persuaded that the Helman parties have met their burden to

establish the predominance of common issues.

                b.      <u>The CICO Claims</u>

                      i.      <u>CICO Violations Generally</u>

Under CICO, the following actions are unlawful:

    (a)      It is unlawful for any person employed by, or associated with, any enterprise, as that term is defined herein, to conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of criminal activity.

    (b)      It is unlawful for any person, through a pattern of criminal activity, to acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.

    (c)      It is unlawful for any person who has received any proceeds derived, directly or indirectly, from a pattern of criminal activity in which he participated as a principal, to use or invest, directly or indirectly, any part of the proceeds thereof, or any proceeds derived from the investment or use of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property, or in the establishment or operation of any enterprise.

14 V.I.C. § 605(a)-(c).  "It is [also] unlawful for any person to conspire or attempt to violate, either

directly or through another or others, the provisions of section 605, subsections (a), (b), and (c)."

*Id.* § 605(d).

        An enterprise "includes any individual, sole proprietorship, partnership, corporation, trust,

or other legal entity, or any union, association or group of persons, associated in fact although not

a legal entity."  14 V.I.C. § 604(h).  A pattern of criminal activity is defined as "two or more

occasions of conduct."  *Id.* § 604(j).  "[T]o establish a CICO pattern, the 'two occasions of conduct'

must not be lone instances of criminal activity;" they must relate to each other, but not in a temporal

sense. *People of the V.I. v. McKenzie*, 66 V.I. 3, 19-20 (V.I. Super. 2017). Further, "[a]ny person, directly or indirectly, injured by conduct constituting a violation" of CICO shall have a cause of action for treble damages. 14 V.I.C. § 607(c).

Finally, because "CICO is cast in the mold of the federal [Racketeer Influenced and Corrupt Organizations Act or] RICO statute,"[16] it is appropriate for Virgin Islands courts to reference RICO cases in their analysis of CICO claims.[17] The only significant difference between the language of the two statutes is the fact that a plaintiff seeking to recover under CICO need not prove that he was directly injured by a defendant's conduct; a showing of indirect injury will suffice. *See Cameron v. Rohn*, 2012 WL 511443, at *8-13 (D.V.I. Feb. 14, 2012).

ii.   Evidence of the Existence of an Enterprise

The Helman Parties argue that common evidence will demonstrate that "the MI and MVW Defendants formed an association-in-fact enterprise to control the Association and push their intentions to merge the St. Thomas Club with the MVC despite massive opposition." [ECF 211] at 19-20. The Helman Parties refer to numerous agendas, contact lists, and minutes for meetings that took place in 2012 and 2013 between MI and MVW representatives regarding the proposed merger—arguing that none of the evidence is individualized. *Id.* at 20.[18]

As to this element, because the evidence consists wholly of materials created by defendants, the Court finds that questions of law or fact common to class members predominate over questions affecting only individual members and that those questions may be susceptible to

---

[16] *Pemberton Sales & Servs., Inc. v. Banco Popular de P.R.*, 877 F. Supp. 961, 970 (D.V.I. 1994) (quoted in *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 577 (D.V.I. 2004)).

[17] *Charleswell*, 308 F. Supp. 2d at 577.

[18] Defendants do not address this element.

common proof.  *See* SAC [ECF 86] ¶ 145 (describing the ways defendants coordinated their

activities as an enterprise).

> iii.   Evidence of a Pattern of Criminal Activity

The Helman Parties argue that the enterprise's criminal activity consists of (1) concealing

"material facts regarding the impact of the proposed merger on the operations of the Club and the

value of the fractional interests," (2) concealing that it violated its fiduciary duty by failing to

"promptly foreclose and pay outstanding maintenance fees on foreclosed units," and (3) concealing

that the 2013 Affiliation Agreement contained terms unfavorable to the Club.  [ECF 211] at 21.

The Helman Parties also argue that common evidence will demonstrate this pattern.  *Id.* at 20-21.

First, the Helman Parties point to multiple internal Marriott memos—documents the Helman

Parties contend demonstrate the "association-in-fact enterprise's intentions, concerns about

opposition to the merger, and strategies for implementing the merger despite the opposition."  *Id.*

at 20.  Next, the Helman Parties reference documents including the Association's annual meeting

minutes, RCDC cross-club board of director meeting minutes, and correspondence the Helman

Parties contend show "that Marriott fabricated a financial crisis (or at least the appearance thereof)

by slow-walking foreclosures, despite their fiduciary duty to promptly foreclose."  *Id.*  Third, the

Helman Parties point to the Association's correspondence and memoranda to members as well as

Association board of director meeting minutes as evidence that Marriott used its control over the

Association and the threat of de-flagging—denying Ritz-Carlton Great Bay the right to use Ritz-

Carlton branding and services—"to coerce the Association into recommending that members

approve the changes to the governing documents required for the RCDC-MVC merger."  *Id.* at 21.

Finally, the Helman Parties point to documents that detail the communication plan created by the

enterprise to mislead members into thinking that the merger was the only way of saving the RCDC from financial ruin. *Id.*[19]

As to this element, the Court finds that because the materials primarily illustrate actions defendants took,[20] questions of law or fact common to class members predominate over questions affecting only individual members and common proof may resolve these questions. *See* SAC [ECF 86] ¶ 147 (describing predicate acts of mail and wire fraud as well as violations of the Travel Act, 18 U.S.C. § 1952).

### iv.   Evidence of Reliance and Causation

The Helman Parties make separate arguments regarding reliance and causation under CICO. Regarding reliance, the Helman Parties argue that they "do not need to prove that the Class *as a whole* would have voted differently had Marriott disclosed all relevant information." [ECF 211] at 22 (emphasis in original). Rather, the Helman Parties contend that proof that "*someone*" would have voted differently is sufficient under CICO. *Id.* Further, according to the Helman Parties, CICO claims predicated on mail or wire fraud—like RICO claims based on the same underlying conduct—do not require proof of first-party reliance. *Id.* (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).

Alternatively, the Helman Parties contend that "[a] showing of materiality gives rise to an inference or presumption of reliance where fraud claims are premised on a defendant's omissions or where fraud may be established with common evidence of a common plan or scheme." [ECF 211] at 22. In support of this contention, the Helman Parties reference the declarations of the 146

---

[19] Defendants do not address this element.

[20] Certain documents reflect actions the Association took; the Association is not a defendant in this action.

owners who voted in favor of the merger, each of whom stated that they would not have done so had Marriott not withheld the information it did. *Id.* at 24; [ECF 208] at 11. The Helman Parties also argue that defendants' common scheme to defraud the owners, which they contend can be established by common evidence, supports a presumption of reliance. *Id.*

Regarding causation, the Helman Parties similarly argue that they need not demonstrate that defendants' misconduct was the proximate cause of the owners' harm and that factual evidence that putative class members were indirectly injured by defendants' conduct is sufficient. [ECF 211] at 25. According to the Helman Parties, defendants' misconduct is not limited solely to their concealment of material facts prior to the members' vote on the proposed merger, but also includes the "broader scheme to defraud." *Id.* at 26; [ECF 208] at 8-9.

Defendants do not speak to the issue of reliance and instead focus solely on causation, arguing that the Helman Parties "need to prove 'but for' causation between the alleged CICO violation and an actual harm suffered by plaintiffs and the class." [ECF 205] at 26. In defendants' view, the issue is whether the Helman Parties can establish—through common evidence—that there is a causal link between defendants' acts and omissions and the putative class members' injuries, which defendants again define as any diminution in value of the owners' interest and any increase in defendants' profits that were caused by the vote. *Id.* Defendants thus contend that the court must consider "whether access to 'corrected or omitted information would have changed how each Owner voted to determine whether the majority vote would have changed from 'yes' to 'no,'" an inquiry that may only be made by asking each owner individually. *Id.* at 26-27. Defendants therefore conclude that whether defendants' alleged misrepresentations and omissions

were the but for causation of each member's decision to vote the way he did is not susceptible to common proof. *Id.* at 27.

Applying *Bridge v. Phoenix Bond and Indemnity Company* to the case at bar,[21] the Court first finds that to establish liability under CICO, the Helman Parties need not demonstrate reliance as a distinct element and need not demonstrate that they were directly injured by defendants' actions. That is not to say, however, that the Helman Parties, as they acknowledge, need not establish that "someone" relied on the defendants' fraudulent acts. Further, the Helman Parties must show that the omissions and misrepresentations underlying defendants' alleged scheme of CICO mail and wire fraud were the "but for" cause of the putative class members' injuries—the diminution in value of their properties as well as the increase in defendants' profits.

Here, the Helman Parties contend that they will show that the 146 members who voted in favor of the merger did so in reliance on defendants' omissions and misrepresentations, and that their reliance was the cause of their injuries. The Helman Parties further contend that proof of this reliance is common to the class. By focusing on the vote, however, the Helman Parties have not persuaded the Court that evidence of causation will be predominantly common, at least with respect to the 2012 Class. As the Court noted in its discussion of fraudulent concealment, evidence on this issue and on the issue of reliance is primarily individual. Further, by defining the 2012 Class as individuals or entities who owned a fractional interest as of July 2012, the Helman Parties appear to contend that the defendants' actions prior to the vote also caused harm. However, in this regard, the Helman Parties undercut their own argument by repeatedly returning to discussions of

---

[21] In *Bridge*, respondents sought a civil remedy under 18 U.S.C. § 1964(c), a section of RICO. In the instant action, plaintiffs seek a civil remedy under 14 V.I.C. § 607(c), the corresponding section of CICO.

the vote.  Lastly, although the Helman Parties claim that a jury will make a determination of causation under CICO using "common evidence," [ECF 211] at 26, they once more fail to articulate what that common evidence will be, reverting to the notion that proving the existence of the scheme itself is sufficient.[22]  In sum, as to the civil CICO claims, the Court finds that the Helman Parties have not met their burden to show that questions of fact or law common to class members predominate over individual questions.

  2. <u>Whether a Class Action is Superior</u>

  In making a determination as to the superiority of a class action over other available methods of adjudication, a court must consider and balance the perceived efficiencies of proceeding as a class with the need for fairness.  To that end, Rule 23 provides a non-exhaustive list of considerations pertinent to this determination.  The Court will discuss each of these in turn.

  a. <u>The Class Members' Interests in Individually Controlling the Prosecution or Defense of Separate Actions</u>

  The Helman Parties argue that this factor weighs in favor of class certification because "the cost of individual litigation would be prohibitively high."  [ECF 211] at 33.  According to the Helman Parties, given the time and resources necessary to prove their case, even if they individually prevailed, the recovery would be less than the cost of litigation.  *Id.* at 34.

  Defendants counter that there is a sufficient economic incentive for owners to bring their own cases.  [ECF 205] at 32.  Citing the Helman Parties' expert's estimate that, as a class, plaintiffs

---

[22] Although the Helman Parties acknowledge they "need only prove that *someone* relied . . ." to prove their CICO claim.  [ECF 211] at 22, they again argue that a showing of materiality of an omitted statement leads to an inference of reliance, pointing to the 146 owners they say would have changed their votes if they had known the facts to demonstrate materiality.  *Id.* at 24.  However, as the Court discussed in connection with the good faith and fraudulent concealment claims, reliance may not be inferred, and proof regarding owners' votes is more individual than common to the class.

could potentially recover $128 million before trebling, defendants calculate that each individual plaintiff could recover approximately $128,000—a sum defendants suggest is monetarily significant. *Id.* at 33. Defendants further posit that the Helman Parties' claims are better suited to a mass action: "[I]n a mass action, Defendants would be able to obtain discovery from, and depositions of, each Owner *as a party* in the case, which would be easier, far more efficient and less costly than serving subpoenas on hundreds of non-party class members in dozens of different states." *Id.* (emphasis in original). Defendants cite, as an example of an efficient mass action, the case of *RCHFU, LLC v. Marriott Vacations Worldwide Corporation*, 445 F. Supp. 3d 1327 (D. Colo. 2020) ("*RCHFU*"), wherein the same attorneys representing the Helman Parties here sued several of the same defendants, alleging similar claims. [ECF 205] at 33. Lastly, defendants dispute the Helman Parties' assertion that the cost of pursuing their claims exceeds their dollar value, noting that in *RCHFU*, "more than 200 owners were able to finance similar claims in a multi-plaintiff mass action over a five-year period." *Id.* at 34.

In their reply, the Helman Parties reiterate their assertion that the putative class members do not have a financial incentive to bring their own claims, as demonstrated by the fact that that none have done so. [ECF 208] at 21. According to the Helman Parties, "[t]here is no incentive for an owner to bring his own case because the anticipated cost of suing individually outweighs even a six-figure recovery." *Id.* Further, the Helman Parties note that their counsel "has spent thousands of hours and nearly $200,000 in expenses, including the costs of three experts just for the class certification stage," and state that these "attorney hours and expenses would be necessary whether this is a class or an individual action, given the complex nature of the facts, legal issues, and remedies theories [sic] at hand." *Id.* at 22.

Assuming—as the Helman Parties represent—that no individual owner has filed suit against defendants, the Court cannot summarily conclude that the reason is a lack of financial incentive.  While that may be the case, there may also be other or additional factors at play. Further, it is unclear whether the cost of litigation will outweigh recovery.   In other words, although "proof that a particular action is a negative value suit may satisfy the requirement of superiority under Rule 23(b)(3),"[23] no such proof is currently before the court.  As defendants note, the only evidence before the Court is the report of the Helman Parties' expert, Dan Salah, who valued each owner's damages at approximately $128,000,[24] prior to any trebling.[25]

Further, "[t]he expense of litigation does not necessarily turn [a] case into a negative value suit" where "the prevailing party may recover attorneys' fees."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).  Here, if the Helman Parties substantially prevail, they may be able to recover attorney's fees under CICO, *see* 14 V.I.C. § 607(c), or under Virgin Islands law for common law claims, *see* 5 V.I.C. § 541.  *See also Boggs v. Alto Trailer Sales*, 511 F.2d 114, 118 (5th Cir. 1975) (noting that a plaintiff's ability to recoup attorney's fees and costs is often used to support a finding of non-superiority) (cited in *Castano*, 84 F.3d at 748).

    b.    <u>The Extent and Nature of Any Litigation Concerning the Controversy Already Begun By or Against Class Members and the Desirability or Undesirability of Concentrating the Litigation of the Claims in the Particular Forum</u>

The Helman Parties argue that both the second and third factors for consideration under

---

[23] *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769-70 (5th Cir. 2020).

[24] [ECF 211-57] at 49.

[25] Plaintiffs seek "damages according to proof and trebling of those damages as allowed by law."  SAC [ECF 86] at 61.

Rule 23(b)(3) weigh in favor of class certification.  [ECF 211] at 34.  In addition to restating that, to their knowledge, no owner has filed an individual suit, they also aver that because this Court has been overseeing the case since 2019 and has issued key rulings, it would be "desirable" to continue the litigation in this forum.  *Id.*  Defendants do not address these factors and thus appear to concede that it would be more desirable to continue the litigation in the District Court of the Virgin Islands.  The Court agrees.  Although there is no forum that is convenient for all litigants, the properties at issue are located on St. Thomas and this Court has already ruled on several motions, including the parties' motions to dismiss.  Further, defendants do not dispute the assertion that no owner has brought the same claims in another jurisdiction.

c.    <u>The Likely Difficulties in Managing a Class Action</u>

The Helman Parties contend that a class action is a more efficient means of resolving their claims than a mass action such as *RCHFU*.  [ECF 208] at 23.  According to the Helman Parties, in *RCHFU*, "[t]he parties were essentially litigating over 200 individual actions under one case number," but if the instant case was certified as a class action, only the class representatives would "be named in the complaint, respond to discovery, and sit for depositions."  *Id.*  In addition, the Helman Parties state that class actions resolve the claims of all class members whereas mass actions only resolve the claims of the named plaintiffs.  *Id.*  The Helman Parties acknowledge that "the same proof is necessary whether this case is tried on a class or individual basis."  *Id.*

Defendants contend that the Helman Parties' claim that they would have voted differently had they been aware of "the allegedly misrepresented and concealed information," [ECF 205] at 35, can only be proven through "highly individualized examinations or 'mini-trials' of each member of the class," *id.* at 34.  Thus, defendants argue that if class certification was granted in

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 33

this case, defendants' due process rights could potentially be compromised.  *Id.*  Defendants conclude that a class action is unmanageable and therefore not "a 'superior' method of adjudication."  *Id.* at 35.

Responding to defendants' due process concerns, the Helman Parties state that defendants are free to cross examine any of the 146 owners they plan to question at trial.  [ECF 208] at 23. The Helman Parties further urge that they need only prove that 129 owners who voted yes would have voted differently.  *Id.* at 24.  According to the Helman Parties, whether they proceed individually or as a class, "how any class member voted (or whether she voted at all) is not the question; it is how the vote would have turned out."  *Id.*

Plaintiff have not persuaded the Court that a class action is superior in these circumstances. "A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues."  *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).  Here, although the Helman Parties suggest that defendants' due process rights are adequately protected because they would have the right to cross-examine any owners called as witnesses at trial, this is not enough. To ensure the protection of defendant's due process rights, defendants should have the option of examining at trial any of the owners who voted "yes" on the merger, not just those the Helman Parties choose.  The Court observes that this option, without more, would not lead to a finding that a class action is superior to other methods of fairly and efficiently adjudicating this dispute.

*Helman, et al. v. Marriott Intl., Inc., et al.*
Civil No. 2019-36
Page 34

      d.     <u>Whether the Proposed Class is Ascertainable</u>

The Helman Parties contend that the proposed class is ascertainable because Marriott has a list of all the owners. [ECF 211] at 18. Defendants do not dispute that the class is ascertainable, and the Court finds that it is.

## IV.    CONCLUSION

Having considered the requirements for proceeding as a class action as set forth in Federal Rule of Civil Procedure 23, along with the parties' arguments, evidence and authorities, the Court finds that this matter is not appropriate for treatment as a class action. Accordingly, the premises considered, it is ORDERED that the motion for class certification is DENIED.

**Dated:**  August 17, 2022                  S\_____

                                             **RUTH MILLER**
                                             United States Magistrate Judge